# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

RANDY BELLMAN, JR.; JACQUELINE
BELLMAN; RANDY BELLMAN; BRETT
BOOTH; BRITTANY BOOTH; VICKI
GOSS and ANTHONY BOOTH,

      Plaintiffs,

vs.                                                                             No. CIV 16-0113 JB/LAM

NXP SEMICONDUCTORS USA, INC.;
PHILIPS ELECTRONICS NORTH
AMERICA CORPORATION; PHILIPS
SEMICONDUCTORS, INC. and
RINCHEM COMPANY, INC.

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Plaintiffs' Motion for Remand and

Memorandum in Support Thereof, filed March 23, 2016 (Doc. 8)("Motion"). The Court held a

hearing on July 11, 2016. The primary issue is whether the Court should remand the case pursuant

to 28 U.S.C. § 1447(c) for lack of subject matter jurisdiction, because the parties are not completely

diverse under 28 U.S.C. § 1332(a)(1). To decide this issue, the Court must determine whether the

Plaintiffs joined Defendant Rinchem Company, Inc., a non-diverse party and citizen of New Mexico,

fraudulently to defeat federal diversity jurisdiction. The Court concludes that the Plaintiffs have

stated possibly viable claims against Rinchem Co., and thus, that Rinchem Co. is not fraudulently

joined. Accordingly, because the Court lacks diversity jurisdiction under 28 U.S.C. § 1332(a)(1), the

Court will grant the Motion and remand the case to the First Judicial District Court, County of Santa

Fe, State of New Mexico.

**FACTUAL BACKGROUND**

This action involves allegations concerning serious injuries to Plaintiffs Randy Bellman, Jr., Brett Booth, and Brittany Booth, stemming from their mothers' exposure to chemical products and substances while working at a semiconductor manufacturing plant in Albuquerque, New Mexico. Defendants NXP Semiconductors USA, Inc., Philips Electronics North America Corp., and Philips Semiconductors, Inc. (the "Signetics Defendants") owned and operated the plant at all times relevant to this action. Rinchem Co. allegedly supplied the chemicals that the Plaintiffs contend caused their injuries. R. Bellman, Jr., Brett Booth, and Brittany Booth bring negligence, products liability, and warranty claims against the Signetics Defendants and Rinchem Co. Their parents -- Plaintiffs Jacqueline Bellman, Randy Bellman, Vicki Goss, and Anthony Booth -- bring derivative claims for damages.

The Court takes its recitation of the facts from the Complaint for Personal Injuries, filed February 2, 2016 (Doc. 1-1)(filed January 8, 2016, in Bellman, Jr. v. NXP Semiconductors USA Inc., D-101-CV-2016-00045)("Complaint"). The Court relies on this factual account for background purposes only, particularly because the Signetics Defendants advance several objections to the Complaint's allegations concerning Rinchem Co. The Court recognizes that the Complaint's factual account is largely the Plaintiffs' version of events.

The Court will provide a brief overview of the parties and then review the Complaint's factual allegations.

1.     **Overview of the Parties.**

R. Bellman, Jr. was born on January 21, 1991. See Complaint ¶ 14, at 3. J. Bellman and R. Bellman are his parents. See Complaint ¶ 14, at 3. Brett Booth and Brittany Booth were born on December 29, 1988. See Complaint ¶¶ 15-16, at 3. Brett Booth and Brittany Booth are siblings, and

V. Goss and A. Booth are their parents.  See Complaint ¶¶ 15-16, at 3.

The Signetics Defendants are foreign corporations organized under the laws of Delaware.  See Complaint ¶¶ 8-10, at 2.  At all times relevant to this action, the Signetics Defendants owned and operated a semiconductor manufacturing facility in Albuquerque.  See Complaint ¶ 18, at 3.  The Signetics Defendants operated the facility as "Signetics" or "Signetics Corporation."  Complaint ¶ 18, at 3.  Rinchem Co. is a domestic corporation that allegedly supplied, transported, formulated, re-formulated, mixed, sold, and/or distributed chemical products and substances to the Signetics Corp. facility and its employees.  See Complaint ¶ 11, at 2; id. ¶¶ 22-23, at 5-6.

### 2.      The Complaint's Factual Allegations.

From April 1987 to 2000, J. Bellman worked at Signetics Corp.'s Albuquerque facility manufacturing semiconductor products or components.  See Complaint ¶ 19, at 3.  V. Goss worked at the facility in a similar capacity from July 1983 to 1989.  See Complaint ¶ 19, at 3-4.  While there, J. Bellman and V. Goss "worked with, in proximity to and/or were exposed to," a wide variety of chemical products and substances[1] that were used in the manufacture of semiconductor products or components.  See Complaint ¶ 20, at 4.  Rinchem Co. supplied, and Signetics Corp. prescribed, specified, and approved, these chemicals.  See Complaint ¶¶ 23, 26, at 6.  Signetics Corp. monitored

---

[1] These chemicals included ethylene glycol ethers; propylene glycol ethers; photoresist systems and their ingredients, namely, xylene, n-butyl acetate, n-methyl pyrrolidone, trihydroxy benzophenone, and diazo napthoquinone resins; chemicals used in each process; fluorine compounds including ammonium fluoride, aluminum fluoride, boron trifluoride, and sulfur hexafluoride; chlorinated compounds including hydrogen chloride, ammonium chloride, aluminum chloride, and boron trichloride; acids such as hydrofluoric acid and sulfuric acid; radio frequency radiation and ionizing radiation; arsenic compounds such as gallium arsenide, inorganic arsenic, and arsine gas; volatile organic degreasing and cleaning solvents such as trichloroethylene, methylene chloride, stabilized trichloroethane, Freon 113, and stabilizers such as epichlorohydrin and epichlorohydrin 1,4-dioxane; organic solvents such as benzene, toluene, acetone, methyl ethyl ketone, and methanol; hexamethyldisilizane; mercury; acetone; phosphorus compounds including phosphine gas; isopropyl alcohol; developers; strippers and/or stripping agents; and epoxy resin-based glues made from epichlorohydrin and bisphenol A.  See Complaint ¶¶ 21.a-s, at 4-5.

some of its employees' exposure to these chemicals; generally monitored its employees' medical, including reproductive, health; tracked the incidence of adverse reproductive outcomes among its employees' offspring; and tracked the potential disease burden to its employees and their families that exposure to these chemicals posed.  See Complaint ¶¶ 28-31, at 6-7.

The chemicals that Signetics Corp. used included known or suspected teratogenic, genotoxic, and/or reproductively toxic chemical products and/or substances.  See Complaint ¶ 33, at 7.  Before and during J. Bellman's and V. Goss' employment at Signetics Corp.'s Albuquerque facility, Signetics Corp. had "developed, approved and/or promulgated industrial hygiene policies and procedures to be followed" at the facility.  Complaint ¶ 37, at 9.  These policies "did not include any warnings to workers about the potential for reproductive harm resulting from exposure to the [] chemical[s]" that the facility used, Complaint ¶ 38, at 9, nor did they include methods, processes, or controls to mitigate excessive exposure to, or standards, regulations, or guidelines to minimize the danger from exposure to, those chemicals, see Complaint ¶¶ 39-41, at 10.  Likewise, although Signetics Corp. had training programs for its employees, those programs did not include warnings about reproductive harm that might result from chemical exposure, such as "miscarriage, stillbirth and/or birth defects[] among their offspring."  Complaint ¶¶ 43-44, at 10.  Finally, although employees in "wafer processing areas" wore protective equipment, that equipment was designed to protect Signetics Corp.'s semiconductor products/components from particulates and not to protect workers from chemical exposure.  Complaint ¶ 51, at 11.

During their periods of gestation, R. Bellman, Jr., Brett Booth, and Brittany Booth all sustained injuries in utero that are linked to their mothers' exposure to chemicals at Signetics Corp. See Complaint ¶¶ 69-70, at 16.  R. Bellman, Jr.'s injuries include pheochromocytoma, Von Hippel-Lindau disease, adrenal gland tumors, other tumors, resection of the adrenal glands, and internal

injuries.  See Complaint ¶ 76, at 17.  Brett Booth's injuries include congenital heart defects, single ventricle, transportation of the great arteries, and cirrhosis of the liver, resulting in numerous heart surgeries and a heart transplant.  See Complaint ¶ 78, at 17.  Brittany Booth experiences seizures as a result of her chemical exposure.  See Complaint ¶ 80, at 18.

## PROCEDURAL BACKGROUND

The Plaintiffs commenced this action on January 8, 2016, in the First Judicial District Court, County of Santa Fe, State of New Mexico.  See Complaint at 1; Bellman, Jr. v. NXP Semiconductors USA Inc., D-101-CV-2016-00045, Register of Actions Activity.  The Complaint asserts three counts against the Signetics Defendants for (i) negligence, see Complaint ¶¶ 32-81, at 7-18; (ii) punitive damages, see Complaint ¶¶ 82-93, at 18-23; and (iii) strict liability, see Complaint ¶¶ 104-17, at 27-29.  The Complaint also asserts two counts against Rinchem Co. for (i) negligence, see Complaint ¶¶ 94-98, at 24-26; and (ii) breach of express and implied warranties, see Complaint ¶¶ 99-103, at 26.  R. Bellman, Jr., Brett Booth, and Brittany Booth seek damages for medical care and treatment, pain and suffering, lost earnings, loss of future earning capacity, loss of future household services, and other damages.  See Complaint ¶¶ 119.a-d, at 29-30.  J. Bellman, R. Bellman, V. Goss, and A. Booth bring derivative claims for damages for interference in their parent-child relationships, mental and emotional anguish, medical expenses, and other injuries and damages.  See Complaint ¶¶ 120-123, at 30-31.

On February 16, 2016, the Signetics Defendants removed the case under 28 U.S.C. § 1446.  See Notice of Removal at 1, filed February 16, 2016 (Doc. 1)("Notice of Removal").  The Signetics Defendants invoke federal diversity jurisdiction pursuant to 28 U.S.C. § 1332, arguing that "[c]omplete diversity exists between the properly joined parties to this action."  Notice of Removal ¶¶ 10-16, at 3-4.  The Signetics Defendants say that, although Rinchem Co. -- a New Mexico citizen

-- is also named as a Defendant, its consent to removal is not required, because it was "fraudulently joined."  Notice of Removal ¶ 3, at 2 (citing, among others, Dutcher v. Matheson, 733 F.3d 980, 987-88 (10th Cir. 2013)).  They explain that removal cannot be defeated by fraudulent joinder of a non-diverse resident defendant against whom a plaintiff is unable to establish a cause of action.  See Notice of Removal ¶ 17, at 4 (citing Dutcher v. Matheson, 733 F.3d at 988).  Here, the Signetics Defendants argue, "New Mexico law precludes Plaintiffs from recovering against Rinchem[.]"  Notice of Removal ¶ 18, at 5.

First, they aver, the Uniform Commercial Code's four-year statute of limitations on personal injury claims predicated on breach of warranty bars the Plaintiffs' breach-of-warranty claim.  See Notice of Removal ¶¶ 19-22, at 5-6 (relying on Badilla v. Wal-Mart Stores East Inc., 2015-NMSC-029, 357 P.3d 936).  Second, they contend that New Mexico law precludes the Plaintiffs' negligence claim against Rinchem Co., because it "had no duty to warn the Plaintiffs regarding risks associated with use of any chemicals it may have delivered to the Signetics plant at any point in time," and because "Rinchem did not manufacture or blend any of the chemicals and provided Signetics . . . safety information" and warnings about the chemicals.  Notice of Removal ¶ 30, at 9-10 (relying on Parker v. E.I. Du Pont de Nemours & Co., 1995-NMCA-086, 909 P.2d 1 ("Parker"); Restatement (Second) of Torts, § 388 cmt. l (Am. Law Inst. 1965)).  The Signetics Defendants contend that, accordingly, "diversity jurisdiction exists because New Mexico law precludes Plaintiffs' putative claims against Rinchem."  Notice of Removal ¶ 17, at 4.

With respect to diversity jurisdiction's amount-in-controversy requirement, the Signetics Defendants contend that a "fair reading" of the Complaint demonstrates that the Plaintiffs' claims against them independently exceed the $75,000.00 minimum.  Notice of Removal ¶¶ 31-34, at 10-11.  They aver that the "Plaintiffs' allegations of injury are at least as significant as others that have

been found to satisfy the amount in controversy requirement." Notice of Removal ¶ 33, at 11 (relying on, among others, Gebbia v. Wal-Mart Stores, 233 F.3d 880, 881-83 (5th Cir. 2000)). The Signetics Defendants conclude that, because there is complete diversity and an amount in controversy of more than $75,000.00, this case is removable. See Notice of Removal ¶ 34, at 11.

      **1.**     **The Motion to Remand.**

On March 23, 2016, the Plaintiffs moved to remand the case to state court. See Motion at 1. The Plaintiffs assert that the Court does not have diversity-of-citizenship jurisdiction, because all the Plaintiffs, as well as Rinchem Co., are citizens of New Mexico for diversity purposes. See Motion at 2. With respect to whether Rinchem Co. was fraudulently joined, the Plaintiffs contend that "'the defendant seeking removal bears a heavy burden of proving fraudulent joinder, and all factual and legal issues must be resolved in favor of the plaintiff.'" Motion at 2 (alteration omitted)(quoting Dutcher v. Matheson, 733 F.3d at 988 (quoting Pampillonia v. RJR Nabisco, Inc., 138 F.3d 459, 461 (2d Cir. 1998))). The Plaintiffs aver that fraudulent joinder requires either (i) "actual fraud in the pleading of jurisdictional facts"; or (ii) the "inability of the plaintiff to establish a cause of action against the non-diverse party in state court." Motion at 2-3 (quoting Dutcher v. Matheson, 733 F.3d at 988 (quoting Cuevas v. BAC Home Loans Servicing, LP, 648 F.3d 242, 249 (5th Cir. 2011))(internal quotation marks omitted). The Plaintiffs argue that the Signetics Defendants have not met these standards.

First, the Plaintiffs posit that the Complaint states a viable negligence claim against Rinchem Co. See Motion at 3. The Plaintiffs interpret the Notice of Removal as asserting that the "sophisticated user" doctrine bars negligence liability on these facts. Motion at 3. The Plaintiffs argue that Parker, upon which the Signetics Defendants principally rely, "in fact demonstrates why fraudulent joinder cannot be found here." Motion at 3. The Plaintiffs note that, in Parker, the Court

of Appeals of New Mexico affirmed the trial court's grant of summary judgment as to strict liability and negligence claims asserted against Du Pont Co., a supplier of substances used in the manufacture of artificial temporomandibular joints.  See Motion at 3-4.  With respect to strict liability, the Plaintiffs assert that the Court of Appeals of New Mexico relied on "DuPont's [sic] extensive and unrebutted factual showing" that the substances it supplied were inert, safe for use and were "not inherently defective or dangerous," and that Du Pont Co. had no agency relationship with the manufacturer.  Motion at 4 (citing Parker, 1995-NMCA-086 ¶¶ 14-15, 909 P.2d at 6-7).  The Plaintiffs contend that, based on this factual showing, the Court of Appeals of New Mexico held that Du Pont Co. had no duty to perform further tests or to provide warnings to other consumers, including the plaintiffs.  See Motion at 4 (citing Parker, 1995-NMCA-086 ¶ 17, 909 P.2d at 7).  Turning to negligence, the Plaintiffs contend that the Court of Appeals of New Mexico affirmed summary judgment, because Du Pont Co. advised the manufacturer in writing that its substances "were not made for medical use" and that a medical study had found that the substance, when used in a hip replacement cup, tended to abrade.  Motion at 6 (citing Parker, 1995-NMCA-086 ¶ 36, 909 P.2d at 11-12).

The Plaintiffs assert that these holdings do not stand for an "absolute rule of immunity for suppliers in Rinchem's position; rather, their liability depends on the facts in any given case." Motion at 5.  The Plaintiffs posit, further, that this case is distinguishable from Parker, because here the Plaintiffs are suing the supplier as well as the "ultimate user of the product in question," i.e., the Signetics Defendants.  Motion at 7.  The Plaintiffs contend that the Signetics Defendants "will of course strenuously dispute plaintiffs' allegations about their knowledge of the hazards of the substances to which the employee plaintiffs were exposed."  Motion at 7.  In the Plaintiffs' view, the Signetics Defendants "have simply raised a possible defense that Rinchem may or may prove at trial,

and the Signetics Defendants will be doing all they can at trial to establish Rinchem's liability and diminish their own."  Motion at 7.

The Plaintiffs contend, moreover, that the sophisticated-user doctrine cases upon which the Signetics Defendants rely are inapposite, because none were decided in the removal context.  See Motion at 8.  The Plaintiffs argue that, rather, those cases "all concern trial or summary judgment records."  Motion at 8.  According to the Plaintiffs, "the standard for a finding of fraudulent joinder is 'more exacting than that for dismissing a claim under Rule 12(b)(6)[ of the Federal Rules of Civil Procedure],' let alone for summary judgment."  Motion at 8 (quoting Montano v. Allstate Indem. Co., 211 F.3d 1278, 2000 WL 525592, at *2 (10th Cir. 2000)(unpublished table decision)).  The Plaintiffs also argue that some courts "have recognized that the sophisticated-user and related doctrines are not appropriate for application as grounds for a finding of fraudulent joinder."  Motion at 8 (relying on Sherman v. A.J. Pegno Const. Corp., 528 F. Supp. 2d 320 (S.D.N.Y. 2007)(Sullivan, J).  Those courts, the Plaintiffs contend, hold that a determination whether a supplier gives adequate warnings to the purchaser of its product "is necessarily fact-specific, and is not suited for resolution in the removal context."  Motion at 9.

Finally on the negligence issue, the Plaintiffs argue that "there is no question that plaintiffs' pleadings set out cognizable claims for relief under New Mexico law," and that the Signetics Defendants "simply assert a defensive theory that Rinchem may itself eventually plead and prove, even as defendants themselves will be arguing the opposite."  Motion at 11.  The Plaintiffs contend that "[t]hese issues will be resolved on a fully-developed factual record in state court, but they do not form a basis for federal jurisdiction here."  Motion at 11.  The Plaintiffs conclude that, "[a]s there is 'even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that the joinder was proper and remand the

case to the state court.'"  Motion at 11 (emphasis in original)(quoting Couch v. Astec Ind., Inc., 71 F.

Supp. 2d 1145, 1147 (D.N.M. 1999)(Baldock, J.)(quoting Triggs v. John Crump Toyota, Inc., 154

F.3d 1284, 1287 (11th Cir. 1998))).

Turning second to the Complaint's breach of warranty claim against Rinchem Co., the

Plaintiffs contend that, if Rinchem Co. asserts the Uniform Commercial Code's four-year statute of

limitations as a defense, the Plaintiffs "will argue that the tolling provision of N.M. Stat. § 37-1-10

applies."  Motion at 12.  The Plaintiffs aver that this provision "tolls the running of limitations

against incapacitated persons" and that it applies here, because "the UCC provision upon which

defendants rely, N.M. Stat. § 55-2-725, provides in subsection (4) that it 'does not alter the law on

tolling of the statute of limitations.'"  Motion at 12.  Ultimately, the Plaintiffs argue, "[t]his will . . .

be a fact issue that cannot be resolved at the present state."  Motion at 12.

### 2.    __The Response__.

The Signetics Defendants responded on April 11, 2016.  See Signetics Defendants' Response

Brief in Opposition to Plaintiffs' Motion for Remand, filed April 11, 2016 (Doc. 17)("Response").

The Signetics Defendants contend that "upon specific allegations of fraudulent joinder the court may

pierce the pleadings, . . . consider the entire record, and determine the basis for joinder by any means

available."  Response at 2 (quoting Dodd v. Fawcett Pubs., Inc., 329 F.2d 82, 85 (10th Cir.

1964))(internal quotation marks and alteration omitted).  Accordingly, the Signetics Defendants

argue, the Court may "pierce" the pleadings, evaluate the sufficiency of the Complaint's factual

allegations, and assess how New Mexico law "may affect Plaintiffs' claims against Rinchem."

Response at 2.  In conducting this analysis, the Signetics Defendants assert that the Court should

consider the removal standard "in conjunction with the United States Supreme Court's recent

jurisprudence regarding the viability of complaints under a Rule 12(b)(6) analysis."  Response at 3.

The Signetics Defendants argue that "[t]his analysis requires a litigant to do more than simply recite the bare elements of a claim, and in many ways resembles that applied to remand motions where removal has been premised on a claim of fraudulent joinder."  Response at 3 (citing Ashcroft v. Iqbal, 556 U.S. 662 (2009)("Iqbal"); Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)("Twombly")).  Under these cases, the Signetics Defendants posit, the Complaint's allegations against Rinchem Co. "are deficient because the complaint sets forth a litany of labels, conclusions, and formulaic recitations, and there are glaring (and fatal) omissions in the factual predicates that might otherwise support those claims and render them 'plausible.'"  Response at 3.

Before reaching their legal argument, the Signetics Defendants proffer several facts that they deem salient to the Court's resolution of the Motion.  See Response at 4-9.  They note that R. Bellman, Jr. sustained the injuries alleged in the Complaint twenty-five years ago, and that Brett and Brittany Booth sustained their alleged injuries twenty-eight years ago, all during their respective gestation periods.  See Response at 4.  They assert that the Complaint contains no allegations of the nature and scope of J. Bellman's and V. Goss' respective employment at Signetics during their children's gestation periods, nor does the Complaint contain allegations regarding the chemicals with which J. Bellman and V. Goss would have come in contact during their children's gestation periods.  See Response at 5.  The Complaint is further deficient, they assert, in that it contains no allegations regarding how J. Bellman and V. Goss "would have acquired percipient knowledge of Rinchem's provision of any matériel to the Signetics' facility during [their children's] gestation period[s]."  Response at 5.  They note that the Complaint provides no specific allegations of (i) how or when J. Bellman and V. Goss were exposed to chemicals at Signetics Corp.; (ii) which of the chemicals to which J. Bellman and V. Goss were exposed Rinchem Co. supplied; or (iii) whether Rinchem Co. was the "sole 'supplier' of the enumerated chemical products and substances during the 'relevant'

time periods."  Response at 6.  Indeed, they assert, the Complaint's allegations with respect to Rinchem Co. are all "conclusory"; the Complaint simply asserts that Rinchem Co. had a duty to exercise reasonable care in its manufacture and supply of the "generically identified products," and that Rinchem Co. made express and implied warranties, but it does not identify which chemicals Rinchem Co. supplied, nor does it allege the terms of Rinchem Co.'s warranties.  Response at 7.

The Signetics Defendants posit a contrary version of events.  See Response at 8.  They assert that Rinchem Co. "was not a manufacturer, 'blender,' or designer of any of the chemicals enumerated in [the Complaint.]"  Response at 8 (citing Affidavit of Willaim [sic] Moore ¶ 4, at 1 (executed February 16, 2016), filed February 16, 2016 (Doc. 1-2)("Moore Aff.")).  They allow that Rinchem Co. "may have delivered certain chemicals to Signetics that were sold to Signetics by various manufacturers, but Rinchem's role was limited to the transport or delivery of the chemicals, and Rinchem was paid as a public warehouse to store, transport, and deliver the chemicals."  Response at 8 (citing Moore Aff. ¶¶ 7-8, at 2).  They aver that, although "Rinchem occasionally sold certain low purity/industrial grade chemicals that would not have been appropriate for use in semiconductor production, Rinchem has no records that any of those chemicals were ever sold to Signetics."  Response at 8 (citing Moore Aff. ¶¶ 11-12, at 2-3).  Accordingly, the Signetics Defendants assert that Rinchem Co. "could not have 'manufactured, blended, designed, marketed, distributed, sold, and supplied' any of the chemicals listed by Plaintiffs in a semiconductor quality grade."  Response at 8 (citing Moore Aff. ¶¶ 4-7, at 1-2; id. ¶¶ 10-11, at 2-3)(alterations omitted).

Turning to the Plaintiffs' negligence claim against Rinchem Co., the Signetics Defendants contend that, given the above factual analysis, the claim "is, at best, 'theoretical' and therefore insufficient to justify remand."  Response at 9 (quoting Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 312 (5th Cir. 2002)).  The Signetics Defendants assert that (i) the

"Plaintiffs have set forth a generic laundry list of chemicals and chemical categories"; (ii) the "Plaintiffs have not asserted specific allegations as to how or when Ms. Bellman and Ms. Goss came into contact with those chemicals during the 1988 and 1990 gestation periods . . . , merely asserting in conclusory fashion that they were exposed to 'some or all' of those substances"; and (iii) the Complaint proffers "a set of perfunctory 'labels and conclusions' to the effect that" Rinchem Co. formulated, distributed, and supplied "some of the . . . chemical products and substances."  Response at 9-10 (emphases omitted).  The Signetics Defendants contend that this "lack of factual specificity is precisely what the Supreme Court has warned against."  Response at 10 (citing Iqbal, 556 U.S. at 678).

The Signetics Defendants argue, moreover, that, "to defeat diversity, Plaintiffs have joined a defendant with no meaningful connection to their negligence claim."  Response at 10.  They advance that Rinchem Co. "was a warehousing and transport/delivery entity," and that it "did not 'manufacture, blend, design, market, distribute, or sell'" the chemicals to which the Complaint refers.  Response at 10.  They posit that, accordingly, the "Plaintiffs' negligence claim against Rinchem is an attempt to camouflage a kind of 'chain of distribution' strict liability theory against Rinchem without having to satisfy the requirements for such a claim."  Response at 10 (citing Smith v. Bryco Arms, 2001-NMCA-090, ¶ 10, 33 P.3d 638).  They contend that, under New Mexico law, "there is no liability imposed on all actors in the 'chain of distribution,'" and that the Plaintiffs are attempting to impose such liability "on a warehousing and delivery operation that had no legally consequential role in the industrial uses to which delivered products have been put."  Response at 11 (citations omitted).  The Signetics Defendants press that the "products cases that raise negligence claims uniformly involve defendants that actually manufactured, designed, or sold a product," and avow that they "have not identified any New Mexico case in which a viable products negligence

action was brought based on a defendant's simple transport and delivery of materials designed, manufactured, and/or sold by others."  Response at 12 (citations omitted).  The Signetics Defendants conclude that, "whether the court assesses the 'plausibility' or 'possibility' of plaintiffs' negligence claim under a sophisticated user analysis, a bulk supplier analysis, or the pleading and 'chain of distribution' analysis . . . , no negligence cause of action exists against Rinchem[.]"  Response at 13.

Regarding the Complaint's warranty claims against Rinchem Co., the Signetics Defendants maintain that the "claims arise under the Uniform Commercial Code and are time-barred."  Response at 14 (citing Badilla v. Wal-Mart Stores East Inc., 2015-NMSC-029, 357 P.3d 936).  They aver that the Plaintiffs' "tolling argument . . . lacks merit," because the Complaint "plead[s] no grounds for tolling . . . , nor have [the Plaintiffs] submitted affidavits to support such an argument."  Response at 14.  They argue, further, that the Complaint's express warranty claim is deficient, because "there are no allegations (nor could there be) that Rinchem 'sold' anything to Plaintiffs or that in the course of that non-existent sale Rinchem made express affirmations or representations to the Plaintiffs regarding the nature of any goods or products."  Response at 15.  The Signetics Defendants contend that an express warranty under New Mexico law and associated UJIs requires "a sale between a buyer and seller and some form of affirmation or representation by the seller to the buyer that forms part of the basis of the bargain."  Response at 15.  On the Complaint's implied warranty claim, the Signetics Defendants contend that, under the UCC and the UJIs, an implied warranty "customarily arises in the context of a sale, by a merchant, to a buyer."  Response at 15-16.  The Signetics Defendants advance that "there are no allegations in the complaint . . . that Rinchem and the Plaintiffs were involved in any sale or that Rinchem held itself out to Plaintiffs as a 'merchant' within the meaning of the Uniform Commercial Code."  Response at 16.  Finally, the Signetics Defendants contend that the Complaint's implied warranty claim fails as a matter of law, because the

Plaintiffs were neither in "vertical" nor "horizontal" privity with the Signetics Defendants or Rinchem Co., as the UCC requires for statutory warranties.  Response at 16-17.

    **3.**    **The Reply.**

     The Plaintiffs filed a Reply on May 9, 2016.  <u>See</u> Plaintiffs' Reply Brief in Support of Their Motion for Remand at 1, filed May 9, 2016 (Doc. 19)("Reply").  The Plaintiffs begin by asserting that the Response concedes the Motion's arguments concerning the sophisticated-user doctrine and that it impermissibly raises "entirely new grounds for removal."  Reply at 1.  The Plaintiffs contend that "[a] removing defendant cannot raise new arguments for federal jurisdiction outside the normal 30-day period for removal," nor "can a defendant present new grounds for removal for the first time in opposition to a motion for remand."  Reply at 2 (quoting <u>N.M. ex rel. Balderas v. Valley Meat Co., LLC</u>, 2015 U.S. Dist. LEXIS 72874, at *25 (D.N.M. 2015)(Browning, J.)).  Here, the Plaintiffs argue, the Signetics Defendants "have not sought leave to amend their notice of removal" and have instead "raised entirely new contentions" as well as "abandon[ed] any argument to support the theories in the notice of removal."  Reply at 2-3.  The Plaintiffs request that the Court "decline to consider the arguments raised in defendants' response, and confine its review of this motion to the original grounds for fraudulent joinder asserted in the notice of removal -- grounds which defendants have not defended."  Reply at 4 (footnote omitted).

     In any case, the Plaintiffs contend that the Signetics Defendants' "new arguments" do not establish fraudulent joinder.  Reply at 4.  The Plaintiffs concede the Signetics Defendants' assertion that "there is no automatic liability on all actors in a chain of distribution," but argue that this "truism . . . proves nothing."  Reply at 4-5.  The Plaintiffs allow that they "must establish, at trial, facts that would support a finding of negligence against Rinchem, but at the present stage defendants must establish facts that conclusively negate such a possibility."  Reply at 5.  The Plaintiffs assert that the

- 15 -

Signetics Defendants "have made no such showing," because they

> merely argue that Rinchem never *sold* any products to Signetics to which plaintiffs
> would have been exposed, but even defendants acknowledge that a defendant in a
> negligence case need not have sold a product.  As defendants state, N.M.U.J.I. 13-
> 1402 states that a supplier "must use ordinary care to warn of risk of injury."
> Response at 11.  And while defendants state that they "do not concede that Rinchem
> should even be deemed a 'supplier,'" and that "[a] transporter of a product is not
> necessarily the 'supplier' of that product[,]" *id.* at 11 n. 2, these are simply factual
> issues that remain to be controverted through discovery and trial.

Reply at 5 (emphasis and alterations in original).  Thus, the Plaintiffs request that the Court remand

the case for lack of subject-matter jurisdiction pursuant to 28 U.S.C. § 1447(c).  See Reply at 5.

### 4.    The Hearing.

The Court held a hearing on the Motion on July 11, 2016.  See Draft Transcript of Motion

Hearing (taken July 11, 2016)("Tr.").[2]  The Plaintiffs began argument by addressing the breach-of-

warranty claim against Rinchem Co.  See Tr. at 4:13-5:13 (Siegel).  The Plaintiffs contended that,

should Rinchem Co. raise a statute-of-limitations affirmative defense, they will "plead a tolling on

the basis of incapacity."  Tr. at 4:14-23 (Siegel).  The Plaintiffs thus concluded that they have a

viable breach-of-warranty claim.  See Tr. at 5:8-13 (Siegel).  As to negligence, the Plaintiffs argued

that the Court's decision in N.M. ex rel. Balderas v. Valley Meat Co., LLC provides clear guidance.

See Tr. at 5:14-25 (Siegel).  The Plaintiffs averred that the Court held that fraudulent joinder requires

a showing that "there is no possibility that the plaintiff might recover on her stated state [claim.]"

Tr. at 6:6-14 (Siegel).  The Plaintiffs asserted that the Signetics Defendants have not made such a

showing with respect to the negligence claim.  See Tr. at 6:14-15 (Siegel).  Here, they averred, there

is no evidence that would obviously and categorically preclude negligence liability against Rinchem

Co., particularly on the sophisticated-user doctrine, the primary basis upon which the Notice of

---

[2]The Court's citations to the hearing's transcript refer to the court reporter's original,
unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Removal relies for removing the case.  See Tr. at 6:25-8:11 (Siegel).  The Plaintiffs added that the Court's cases establish that "this showing is even harder than the showing required to get a case dismissed at the pleadings stage under Federal Rule 12(b)(6)."  Tr. at 8:11-15 (Siegel).  The Plaintiffs allowed that the sophisticated-user doctrine defense may be viable here, but asserted that there has not yet been a conclusive evidentiary showing that Rinchem Co. is entitled to the defense. See Tr. at 8:18-9:20 (Siegel).  The Plaintiffs maintained that, absent more extensive discovery, it would be premature to conclude at the outset that Rinchem Co. is not liable for negligence.  See Tr. at 10:20-11:10 (Siegel).  See also id. at 11:8-10 (Siegel)("[W]e don't think that is appropriate for resolution as part of a fraudulent joinder [] inquiry.").

The Court interposed, stating that it does not believe a plaintiff has "an obligation to plead all the facts [] to avoid [] the statute of limitations defense."  Tr. at 11:23-25 (Court).  The Court noted, however, that a complaint's factual allegations can establish that a claim is time-barred; for example, a complaint that pleads only dates is "subject to a [motion] to dismiss."  Tr. at 11:25-12:5 (Court). The Court noted that, here, "just from a date standpoint," the Complaint's allegations appear to be time-barred and that it is unclear whether further discovery would be "enough to avoid the statute of limitations."  Tr. at 12:10-14 (Court).  In response, the Plaintiffs stated that New Mexico state courts permit plaintiffs to allege tolling either in the complaint or in response to a motion to dismiss, and that, accordingly, failure to "affirmatively ple[a] a basis for tolling would not be fatal to our claims." Tr. at 13:1-12 (Siegel).  The Plaintiffs added that, "under the normal course of events in federal court too, we would be allowed to raise a tolling defense."  Tr. at 13:21-23 (Siegel).  See id. at 13:23-14:1 (Siegel)("[A]n affirmative defense . . . may never be[] raised by the defendant so an exception to the affirmative defense need not initially be pled by the plaintiff.").  The Plaintiffs concluded that "this sort of limbo status between the federal and state pleading practice here . . . on fraudulent joinder"

- 17 -

should not lead the Court to disregard "how this would work out under either pleading regime."  Tr. at 14:2-9 (Siegel).

The Signetics Defendants took up argument, addressing first the standard for removal.  See Tr. at 18:24 (Hardy).  The Signetics Defendants contended that "the presumption against removal," which the Court "has recognized on numerous occasions . . . [,] cannot be interpreted as hostility toward removal."  Tr. at 18:24-19:5 (Hardy).  The Signetics Defendants added that "the evidentiary standard that applies in evaluating removal jurisdiction . . . is preponderance of the evidence" and that removal on the basis of diversity jurisdiction is proper if there is no "reasonable basis for the plaintiff's claim" against a non-diverse defendant.  Tr. at 19:6-18 (Hardy)(asserting that the Court's cases have equated this standard with the "no possibility of a claim" standard that the Plaintiffs argue applies).  The Signetics Defendants also noted that "the standard for fraudulent joinder is higher than the standard that needs to be considered on a motion to dismiss."  Tr. at 19:18-22 (Hardy).

The Court interjected and speculated that it will "have to do a boatload of work to decide" the complex issue whether New Mexico state courts recognize the sophisticated-user doctrine.  Tr. at 19:23-20:7 (Court).  The Court extrapolated that, if the issue requires such extensive work, it likely does not meet fraudulent joinder's heightened standard.  See Tr. at 20:4-6 (Court).  In response, the Signetics Defendants asserted that the negligence claim must be plausible under Twombly and Iqbal. See Tr. at 20:8-16 (Hardy).  The Court observed that those cases seem inapposite in the context of a motion to remand, where fraudulent joinder is the primary issue, because in this context the Court can "consider anything," including facts that do not appear on the complaint's face.  Tr. at 20:17-21:4 (Court).  The Signetics Defendants replied that those cases "inform the standard of fraudulent joinder," because the cases that involve fraudulent joinder and removal hold that the standard is "higher[] than the standard on the motion to dismiss."  Tr. at 21:8-20 (Hardy, Court).  The Signetics

Defendants added that "whether a claim is implausible or plausible is similar to whether it's possible or impossible."  Tr. at 23:1-4 (Hardy).  The Signetics Defendants allowed, however, that these standards involve different burdens, i.e., that the Signetics Defendants have the burden of showing that the Complaint's allegations against Rinchem Co. are "impossible" while the Plaintiffs' burden is to state a "plausible" claim.  Tr. at 23:1-12 (Hardy).

The Signetics Defendants next pivoted to the issue of Rinchem Co.'s precise role in the case. See Tr. at 23:13-17 (Hardy).  The Signetics Defendants asserted that "Rinchem did not manufacture or blend any chemicals," and that "it is primarily a warehousing ground transportation and chemical waste collection company."  Tr. at 23:16-23 (Hardy, Court).  The Signetics Defendants explained that Rinchem Co.'s customers were chemical manufacturers, and that it primarily warehoused and transported chemicals for companies like Signetics Corp., but that Rinchem Co. was "paid for doing that by the chemical manufacturers, not by facilities[] such as Signetics."  Tr. at 23:20-24:6 (Hardy). In essence, the Signetics Defendants stated, Signetics Corp. purchased chemicals directly from manufacturers, and Rinchem Co. warehoused and delivered those chemicals, but it did not mix or repackage them.  See Tr. at 24:7-19 (Court, Hardy).  The Signetics Defendants acknowledged that Rinchem Co. directly sold some chemicals to facilities, but argued that "they would not have been at a semiconductor grade."  Tr. at 24:25-25:5 (Hardy).

Turning to the Complaint's negligence claims against Rinchem Co., the Signetics Defendants asserted that "the basic issue" is that "Rinchem had no duty to warn the plaintiffs of risks associated with any chemicals it delivered.  It did not manufacture or blend any of the chemicals."  Tr. at 26:24-27:2 (Hardy).  The Signetics Defendants noted that the Restatement (Second) of Torts provides that a supplier of a chattel is liable if the supplier (i) "knows, or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied"; (ii) "has no reason to believe that those

- 19 -

for whose use the chattel is supplied will realize its dangerous condition"; and (iii) "fails [to] exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous." Tr. at 28:1-15 (Hardy)(relying on Restatement (Second) of Torts, § 388). The Signetics Defendants argued that Rinchem Co. can assert a "sophisticated user defense" under these provisions, because "Signetics was a regular user of the chemicals" and had "manufacturing safety information. So Rinchem would have had no reason to believe that Signetics wasn't [aware] of the risks." Tr. at 28:16-29:12 (Hardy). Thus, the Signetics Defendants concluded, the Plaintiffs cannot recover against Rinchem Co., because "they can't establish that Rinchem was negligent." Tr. at 30:1-3 (Hardy).

The Signetics Defendants then briefly addressed Sherman v. A.J. Pegno Const. Corp., which the Plaintiffs cite for the proposition that negligence liability "can't be decided prior to discovery." Tr. at 31:1-15 (Hardy). That case is inapposite, the Signetics Defendants argued, because it involves a manufacturer and seller of a product, "so the issue was the adequacy of the warning under the bulk supplier doctrine which is similar to sophisticated user but it's a little bit different." Tr. at 31:2-10 (Hardy). The Signetics Defendants also noted that, in Parker, the Court of Appeals of New Mexico held that "the adequacy of a warning does not become a factual issue until it is first determined that a duty to warn exists." Tr. at 31:11-15 (Hardy). The Signetics Defendants contended that, here, because Rinchem Co. did not have a duty to warn pursuant to the sophisticated-user doctrine, there is no factual issue whether such a warning was adequate. See Tr. at 31:16-21 (Hardy)(arguing that "it's not a situation where discovery is required"). The Signetics Defendants asserted that this analysis resolves the Court's concern as to the complexity of the sophisticated-user doctrine's applicability in New Mexico state courts, because it illustrates that the doctrine is "clear" and "has been met." Tr. at 31:22-32:4 (Hardy). Finally regarding negligence, the Signetics Defendants

contended that the issues that the Notice of Removal raises are the same as in the Response, because they all fall under the "umbrella" of Rinchem Co.'s duty to warn.  Tr. at 32:5-16 (Hardy).

Turning to the Complaint's breach-of-warranty claims, the Signetics Defendants argued that the Plaintiffs "don't identify what the express warranties were, or to whom they were made."  Tr. at 32:17-21 (Hardy).  The Signetics Defendants contended that the Supreme Court of New Mexico has held that the UCC's four-year statute of limitations governs breach-of-warranty claims and that "those claims accrue at the time tendered, regardless of a lack of knowledge of the breach."  Tr. at 33:3-9 (Hardy)(referencing Badilla v. Wal-Mart Stores East Inc.).  The Plaintiffs' warranty claims are thus time-barred, the Signetics Defendants said, because the Plaintiffs' in utero injuries occurred between 1988 and 1991, and because "there is no evidence at all that the statute was tolled" since then, i.e., the Complaint does not allege incapacity and the Plaintiffs have not provided affidavits of incapacity.  Tr. at 33:10-21 (Hardy).  See id. at 33:21-22 (Hardy)("There is just no evidence at all on that point.").  The Signetics Defendants further contended that the Complaint's warranty allegations fail to state a claim, because the UCC's warranty provisions apply to "sellers," and "Rinchem was not a seller of any semiconductor grade chemicals."  Tr. at 34:10-19 (Hardy).  "There is also no privity between Rinchem and plaintiffs," the Signetics Defendants argued, and "there is no privity between the seller and the employees of the buyer."  Tr. at 34:10-19 (Hardy).  Finally with respect to breach of warranty, the Signetics Defendants contended that the tolling statute "applies to children -- it applies to minors and incapacitated persons" but not to fetuses, as the Plaintiffs appear to allege.  Tr. at 34:23-35:5 (Hardy).

The Signetics Defendants returned to the issue whether the Response asserts new reasons for removal that the Notice of Removal does not raise.  See Tr. at 35:10 (Hardy).  In the Signetics Defendants' view, "the case law precludes defendants from asserting a new basis for jurisdiction in

its response," e.g., a new theory or a new statute.  Tr. at 35:18-20 (Hardy).  Here, the Signetics Defendants explained, the Notice of Removal and the Response both assert "diversity based on fraudulent joinder because plaintiffs cannot [su]stain their warranty and negligence claims under New Mexico law."  Tr. at 35:20-24 (Hardy).  The Signetics Defendants stressed that the United States Court of Appeals for the Tenth Circuit "does not construe notices of removal so narrowly that defendants cannot flush them out or basically say anything else in their response to the motion to remand."  Tr. at 35:24-36:3 (Hardy).  The Signetics Defendants suggested, for example, that a defendant would be precluded from "trying to change from diversity jurisdiction to federal question jurisdiction," but that a defendant is "permitted to flush out" grounds for removal in its response to a motion for remand.  Tr. at 36:14-37:1 (Hardy).

The Court then directed Rinchem Co. to take up argument.  See Tr. at 37:25-38:2 (Court).  Rinchem Co. began by explaining that it contracted with chemical companies, such as Du Pont Co., to deliver chemicals to clients in Albuquerque, such as Signetics Corp.  See Tr. at 39:3-7 (Bisong).  Rinchem Co. averred that it did not repackage or otherwise alter the chemicals that the Complaint lists before delivering them to Signetics Corp.  See Tr. at 38:8-19 (Court, Bisong)(stating that "[i]t was simply a delivery").  The Court questioned how Rinchem Co. was paid, to which Rinchem Co. responded that Signetics Corp. directly paid the chemical supplier and that the supplier, in turn, paid Rinchem Co.  See Tr. at 39:20-40:12 (Court, Bisong)(clarifying that Rinchem Co. directly sold some chemicals to clients, but that it did not sell to Signetics Corp. during the relevant time period).  The Court asked whether Rinchem Co. "strictly warehous[ed]" chemicals, to which Rinchem Co. said "[c]orrect."  Tr. at 40:13-21 (Court, Bisong).  Finally, Rinchem Co. argued that the Complaint, while listing a host of chemicals to which J. Bellman and V. Goss were exposed at Rinchem Corp., does not specify which of those chemicals Rinchem Co. allegedly delivered to Signetics Corp., nor does it

isolate the specific chemicals that caused the children's injuries.  See Tr. at 41:2-15 (Bisong).

The Court pivoted back to the Plaintiffs and inquired why Rinchem Co. is not entitled to the sophisticated-user defense, assuming the Supreme Court of New Mexico would adopt the defense as the Restatement (Second) of Torts defines it.  See Tr. at 41:6-12 (Court).  The Plaintiffs responded that their position is not that the sophisticated-user defense is unviable, but rather that the defense is "an intensely fact laden matter" that requires further discovery to resolve.  Tr. at 41:13-17 (Siegel).  The Plaintiffs posited, however, that Rinchem Co. is unable to establish any of the sophisticated-user defense's three prongs.  See Tr. at 41:18-21 (Court, Siegel).  The Plaintiffs suggested that Rinchem Co. would have particular difficulty establishing the second prong, because there is no evidence "as to what Signetics knew or didn't know about the hazardousness" of the chemicals that Rinchem Co. supplied.  Tr. at 43:16-25 (Siegel).  The Plaintiffs allowed that the sophisticated-user defense may be viable, but argued that "it has not been established as a matter of law, and we say it can't be without discover[y]."  Tr. at 44:14-17 (Siegel).  Likewise, the Plaintiffs asserted that "there is a general duty on the part of all actors to exercise ordinary care in the circumstances" and that further discovery is necessary to determine whether Rinchem Co. breached that duty.  Tr. at 45:10-46:10 (Siegel).  Thus, the Plaintiffs averred that these issues are "not appropriate for removal and remand."  Tr. at 46:8-10 (Siegel).  Indeed, the Plaintiffs pressed, because resolution of these issues would require the Court to "plung[e] into [] complicated question[s] of state law, both legally and factually," the Court should remand the case.  Tr. at 46:24-47:2 (Siegel).

Turning briefly to the tolling issue, the Plaintiffs argued that the statute of limitations tolls when "affected children['s] . . . limitations period would start accruing" and that there is no authority "for the idea that it can't apply to people who were damaged in the womb."  Tr. at 47:3-12 (Siegel).  The Plaintiffs also argued that, contrary to the Signetics Defendant's assertion that tolling does not

apply in breach-of-warranty cases, "the breach of warranty statute itself [] says . . . it does not alter the established law of [to]lling in this state."  Tr. at 47:13-19 (Siegel).

The Court interjected and inquired whether the Plaintiffs dispute that Rinchem Co. "doesn't do anything to these chemicals" and that "it simply is a warehouse."  Tr. at 48:6-9 (Siegel).  In reply, the Plaintiffs agreed that Rinchem Co. is a warehouse, but asserted that "it also is a supplier."  Tr. at 48:10-12 (Siegel).  The Plaintiffs argued that, accordingly, Rinchem Co. can be liable for negligence as a seller or as a transporter of chemicals.  See Tr. at 48:11-14 (Siegel).  The Court questioned, as a follow-up, what the Plaintiffs intend to tell "the jury that Rinchem could do [or] should have done," e.g., "not sell the product, make a disclosure, what is it that they should have done."  Tr. at 48:25-49:4 (Court).  The Plaintiffs answered that they will tell the jury that Rinchem Co. had a duty to "[w]arn about the hazards of products that they are either warehousing and conveying or in some instances selling, or if the knowledge [] rose to a certain level" that Rinchem Co. had a duty to "stop sell[ing] or conveying the product."  Tr. at 49:5-9 (Siegel).

The Court speculated that, if New Mexico state courts adopt the sophisticated-user defense, this case's facts likely create the model circumstances in which the defense would apply.  See Tr. at 50:9-17 (Court).  In rejoinder, the Plaintiffs reiterated that they do not dispute that the defense may apply, but maintained that "it cannot be the basis for removal" on the grounds of fraudulent joinder.  Tr. at 50:18-22 (Siegel).  The Court queried why, if the Plaintiffs' joinder of Rinchem Co. was not a fraudulent attempt to defeat diversity jurisdiction, they did not also sue the chemical manufacturers.  See Tr. at 50:23-24 (Court).  See also id. at 50:1-5 (Court)("[I]f you really want to . . . defeat diversity jurisdiction why didn't you camouflage it by suing the chemical manufacturers as well that they're buying from.").  The Plaintiffs responded that their theory of the case is that the Signetics Defendants caused the chemical exposure that resulted in the Plaintiff children's birth defects, but

stated that "further discovery [may] suggest that we ought to sue the particular maker of one of those chemicals." Tr. at 6-12 (Siegel). Despite this answer, the Court maintained that "it raises a red flag" that the Plaintiffs are "not suing the manufacturers who are probably the ones that have much better knowledge about the dangerousness of these chemicals than a warehouse person." Tr. at 51:20-24 (Court).

The Court further suggested that the law does not require a warehousing operation, such as Rinchem Co., to disclose the dangerous condition of the chemicals that it supplies. See Tr. at 54:16-18 (Court). The Plaintiffs demurred, arguing that Rinchem Co. is liable if it knows or has reason to know that the chemicals it supplies are dangerous and has no reason to believe that the purchaser, i.e. Signetics Corp., realizes the dangerous condition. See Tr. at 54:19-24 (Siegel). The Plaintiffs stated that they are entitled to a chance to prove these facts through additional discovery and that, in their view, such matters are not appropriate for a fraudulent joinder finding. See Tr. at 55:2-11 (Siegel). The Court, however, posited that fraudulent joinder does not always require discovery and noted that it struggled to see how the Plaintiffs will overcome the sophisticated-user defense. See Tr. at 55:12-18 (Court). The Plaintiffs again pressed that their pleadings are not presently conclusive and that the Signetics Defendants' knowledge of the chemicals' dangerousness has not yet been established as a matter of law. See Tr. at 55:19-24 (Siegel). The Plaintiffs added that the Signetics Defendants will "challenge and dispute the idea that they were sophisticated users." Tr. at 56:19-57:5 (Siegel). The Plaintiffs posited that, in this context, where Rinchem Co. argues that the Signetics Defendants were sophisticated users, and the Signetics Defendants maintain that they were not sophisticated users, Rinchem Co.'s joinder could not be fraudulent. See Tr. at 58:4-11 (Siegel).

Having heard argument from all parties, the Court stated that it was inclined to remand the case, "because of the very high standard for fraudulent joinder." Tr. at 59:4-9 (Court). The Court

allowed that the parties' arguments at the hearing "may have tightened up the issue a little bit," but suggested that it was still inclined to remand the case. Tr. at 59:9-12 (Court). The Court noted that the existence of factual issues pertaining to the sophisticated-user defense likely will warrant remand, "because that discovery should take place in state court rather than here." Tr. at 59:16-20 (Court). Still, the Court declined to issue an oral ruling, because these issues' complexity requires careful consideration. See Tr. at 60:1-4 (Court)("[T]his is going to take a little bit of work for me to be satisfied th[at] this goes back to state court and I'm not inclined to conclude that today.").

## LAW REGARDING DIVERSITY JURISDICTION

"Subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) requires: (i) complete diversity among the parties; and (ii) that 'the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.'" Thompson v. Intel Corp., 2012 U.S. Dist. LEXIS 126311, at *12 (D.N.M. 2012)(Browning, J.)(citing 28 U.S.C. § 1332(a)). As the Court has previously explained, "[t]he Supreme Court of the United States has described this statutory diversity requirement as 'complete diversity,' and it is present only when no party on one side of a dispute shares citizenship with any party on the other side of a dispute." McEntire v. Kmart Corp., 2010 U.S. Dist. LEXIS 13373, at *3 (D.N.M. 2010)(Browning, J.)(citing Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 267-68 (1806), overruled in part by Louisville & N. R. Co. v. Mottley, 211 U.S. 149 (1908); McPhail v. Deere & Co., 529 F.3d 947, 951 (10th Cir. 2008)). The amount-in-controversy requirement is an "estimate of the amount that will be put at issue in the course of the litigation." Valdez v. Metro. Prop. & Cas. Ins. Co., 867 F. Supp. 2d 1143, 1163 (D.N.M. 2012)(Browning, J.)(citing McPhail v. Deere & Co., 529 F.3d at 956). The Court will discuss the two requirements in turn.

- 26 -

1.      **Diversity of Citizenship.**

For diversity jurisdiction purposes, a person's domicile determines citizenship.  See Crowley

v. Glaze, 710 F.2d 676, 678 (10th Cir. 1983).  "A person's domicile is defined as the place in which

the party has a residence in fact and an intent to remain indefinitely, as of the time of the filing of the

lawsuit."  McEntire v. Kmart Corp., 2010 U.S. Dist. LEXIS 13373, at *3 (citing Crowley v. Glaze,

710 F.2d at 678).  See Freeport-McMoRan, Inc. v. KN Energy, Inc., 498 U.S. 426, 428 (1991)("We

have consistently held that if jurisdiction exists at the time an action is commenced, such jurisdiction

may not be divested by subsequent events.").  If neither a person's residence nor the location where

the person has an intent to remain can be established, the person's domicile is that of his or her

parents at the time of the person's birth.  See Gates v. Comm'r of Internal Revenue, 199 F.2d 291,

294 (10th Cir. 1952)("[T]he law assigns to every child at its birth a domicile of origin. The domicile

of origin which the law attributes to an individual is the domicile of his parents. It continues until

another domicile is lawfully acquired.").  Additionally, "while residence and citizenship are not the

same, a person's place of residence is prima facie evidence of his or her citizenship."  McEntire v.

Kmart Corp., 2010 U.S. Dist. LEXIS 13373, at *3 (citing State Farm Mut. Auto. Ins. Co. v. Dyer, 19

F.3d 514, 520 (10th Cir. 1994)).  A corporation, on the other hand, is "'deemed to be a citizen of any

State by which it has been incorporated and of the State where it has its principal place of business.'"

Gadlin v. Sybron Int'l Corp., 222 F.3d 797, 799 (10th Cir. 2000)(quoting 28 U.S.C. § 1332(c)(1)).

2.      **Amount in Controversy.**

The statutory amount-in-controversy requirement, which presently stands at $75,000.00,

must be satisfied as between a single plaintiff and a single defendant for a federal district court to

have original jurisdiction over the dispute; "a plaintiff cannot aggregate independent claims against

multiple defendants to satisfy the amount-in-controversy requirement," nor can multiple plaintiffs

aggregate their claims against a single defendant to exceed the threshold.  Martinez v. Martinez, 2010 U.S. Dist. LEXIS 38109, at *18 (D.N.M. 2010)(Browning, J.).  If multiple defendants are jointly liable, or jointly and severally liable, on some of the claims, however, the amounts of those claims may be aggregated to satisfy the amount-in-controversy requirement as to all defendants jointly liable for the claims.  See Alberty v. W. Sur. Co., 249 F.2d 537, 538 (10th Cir. 1957); Martinez v. Martinez, 2010 U.S. Dist. LEXIS 38109, at *18.  Similarly, multiple plaintiffs may aggregate the amounts of their claims against a single defendant if the claims are not "separate and distinct."  Martin v. Franklin Capital Corp., 251 F.3d 1284, 1292 (10th Cir. 2001)(Seymour, C.J.), abrogated on other grounds by Dart Cherokee Basin Operating Co. v. Owens, 135 S. Ct. 547 (2014). Multiple claims by the same plaintiff against the same defendant may be aggregated, even if the claims are entirely unrelated.  See 14AA Charles A. Wright, Arthur R. Miller, Edward H. Cooper, Vikram D. Amar, Richard D. Freer, Helen Hershkoff, Joan E. Steinman, & Catherine T. Struve, Federal Practice and Procedure, Jurisdiction § 3704, at 566-95 (4th ed. 2011).  While the rules on aggregation sound complicated, they are not in practice: if a single plaintiff -- regardless whether he or she is the only plaintiff who will share in the recovery -- can recover over $75,000.00 from a single defendant -- regardless whether the defendant has jointly liable co-defendants -- then the court has original jurisdiction over the dispute between that plaintiff and that defendant.  The court can then exercise supplemental jurisdiction over other claims and parties that "form part of the same case or controversy under Article III," 28 U.S.C. § 1367(a), meaning that they "derive from a common nucleus or operative fact," United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966).

Satisfaction of the amount-in-controversy requirement must be established by a preponderance of the evidence.  See McPhail v. Deere & Co., 529 F.3d at 953.  In the context of establishing an amount-in-controversy, the defendant seeking removal could appear to be bound by

the plaintiff's chosen amount of damages in the complaint, which would seem to allow a plaintiff to avoid federal jurisdiction "merely by declining to allege the jurisdictional amount [in controversy]." McPhail v. Deere & Co., 529 F.3d at 955.  The Tenth Circuit's decision in McPhail v. Deere & Co. has foreclosed such an option from a plaintiff who wishes to remain in state court.  McPhail v. Deere & Co. holds that a defendant's burden in establishing jurisdictional facts is met if the defendant proves "jurisdictional facts that make it possible that $75,000 is in play."  529 F.3d at 955.

The Supreme Court recently clarified that a defendant seeking removal to federal court need only include in the notice of removal a plausible allegation that the amount in controversy exceeds the jurisdictional threshold.  See Dart Cherokee Basin Operating Co., LLC v. Owens, 135 S. Ct. at 554.  The district court should consider outside evidence and find by a preponderance of the evidence whether the amount in controversy is satisfied "only when the plaintiff contests, or the court questions, the defendant's allegation."  Dart Cherokee Basin Operating Co., LLP v. Owens, 135 S. Ct. at 554.

## LAW REGARDING REMOVAL AND REMAND

If a civil action filed in state court satisfies the requirements for original federal jurisdiction -- meaning, most commonly, federal-question or diversity jurisdiction -- the defendant may invoke 28 U.S.C. § 1441(a) to remove the action to the federal district court "embracing the place where such action is pending."  28 U.S.C. § 1441(a).  See Huffman v. Saul Holdings LP, 194 F.3d 1072, 1076 (10th Cir. 1999)("'When a plaintiff files in state court a civil action over which the federal district courts would have original jurisdiction based on diversity of citizenship, the defendant or defendants may remove the action to federal court.'")(quoting Caterpillar Inc. v. Lewis, 519 U.S. 61, 68 (1996)).  In a case with multiple defendants, there must be unanimous consent to removal; any one defendant may spoil removal and keep the case in state court.  See 28 U.S.C. § 1446(b)(2)(A).  Only true

defendants have removal rights: plaintiffs defending counterclaims and third-party defendants may not remove an action, and their consent is not required for removal if all the true defendants consent. See Hamilton v. Aetna Life & Cas. Co., 5 F.3d 642 (2d Cir. 1993); Wiatt v. State Farm Ins. Co., 560 F. Supp. 2d 1068 (D.N.M. 2007)(Browning, J.). "A plaintiff objecting to the removal may file a motion asking the district court to remand the case to state court." Huffman v. Saul Holdings LP, 194 F.3d at 1076 (citing Caterpillar Inc. v. Lewis, 519 U.S. at 69).

To remove a case based on diversity, the diverse defendant must demonstrate that all of the usual prerequisites of diversity jurisdiction are satisfied. Under 28 U.S.C. § 1332(a), a federal district court possesses original subject-matter jurisdiction over a case when the parties are diverse in citizenship and the amount in controversy exceeds $75,000.00. See 28 U.S.C. § 1332(a); Johnson v. Rodrigues (Orozco), 226 F.3d 1103, 1107 (10th Cir. 2000). Diversity between the parties must be complete. See Caterpillar Inc. v. Lewis, 519 U.S. at 68; Radil v. Sanborn W. Camps, Inc., 384 F.3d 1220, 1225 (10th Cir. 2004). In addition to the requirements of original jurisdiction, § 1441(b)(2) lays out the "forum-defendant rule," which provides that a case may not be removed on the basis of diversity jurisdiction if any defendant is a citizen of the state in which the state-court action was brought. The Tenth Circuit has noted

> that § 1441(b)(2) -- the so-called forum-defendant rule -- provides as a separate requirement that "[a] civil action otherwise removable solely on the basis of [diversity] jurisdiction . . . may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought."

Brazell v. Waite, 525 F. App'x 878, 884 (10th Cir. 2013)(unpublished)(alterations in original)(quoting 28 U.S.C. § 1441(b)(2))). The forum-defendant rule applies to cases removed under only diversity jurisdiction; a defendant may remove a case brought against it in its home state on the basis of federal-question jurisdiction. See 28 U.S.C. § 1441(b). Last, a case cannot be

removed if it began with a nondiverse party or a forum-citizen defendant, and only later came to satisfy the requirements of removal jurisdiction, unless: (i) the plaintiff voluntarily dismissed the removal-spoiling party, see DeBry v. Transamerica Corp., 601 F.2d 480, 488 (10th Cir. 1979);[3] Flores-Duenas v. Briones, 2013 U.S. Dist. LEXIS 173620, at *12 n.6, *26 (D.N.M. 2013)(Browning, J.)(describing the operation of the "voluntary-involuntary" rule); or (ii) the removal-spoiling party was fraudulently joined or procedurally misjoined.

### 1.    The Presumption Against Removal.

Federal courts are courts of limited jurisdiction; thus, there is a presumption against removal jurisdiction, which the defendant seeking removal must overcome. See Laughlin v. Kmart Corp., 50 F.3d 871, 873 (10th Cir. 1995); Fajen v. Found. Reserve Ins. Co., 683 F.2d 331, 333 (10th Cir. 1982); Martin v. Franklin Capital Corp., 251 F.3d at 1290; Bonadeo v. Lujan, 2009 U.S. Dist. LEXIS 45672, at *4 (D.N.M. 2009)(Browning, J.)("Removal statutes are strictly construed, and ambiguities should be resolved in favor of remand.").  The defendant seeking removal must establish that federal court jurisdiction is proper "by a preponderance of the evidence."  McPhail v. Deere & Co., 529 F.3d at 953.  See Bonadeo v. Lujan, 2009 U.S. Dist. LEXIS 45672, at *4 ("As the removing party, the defendant bears the burden of proving all jurisdictional facts and of establishing a right to removal.").  See also McPhail v. Deere & Co., 529 F.3d at 955 ("It would have been more precise to say that the defendant must affirmatively establish jurisdiction by proving jurisdictional facts . . . .").  Because federal courts are courts of limited jurisdiction, the Tenth Circuit has ruled that "courts must

---

[3]In DeBry v. Transamerica Corp., the Tenth Circuit explained:

The general effect of the [voluntary-involuntary] test is that a cause cannot be removed where the removability is a result of some development other than a voluntary act of plaintiff. The cause cannot be removed as a result of evidence from the defendant or the result of a court order rendered on the merits of the case.

601 F.2d at 488 (citation omitted).

deny such jurisdiction if not affirmatively apparent on the record." Okla. Farm Bureau Mut. Ins. Co. v. JSSJ Corp., 149 F. App'x 775, 778 (10th Cir. 2005)(unpublished), abrogated on other grounds by Dart Cherokee Basin Operating Co. v. Owens, 135 S. Ct. 547 (2014). This strict construction and presumption against removal should not, however, be interpreted as hostility toward removal cases in the federal courts. See McEntire v. Kmart Corp., 2010 U.S. Dist. LEXIS 13373, at *2 ("Strict construction does not mean judicial hostility toward removal. Congress provided for removal, and courts should not create rules that are at tension with the statute's language in the name of strict construction.")(citing Bonadeo v. Lujan, 2009 U.S. Dist. LEXIS 45672, at *12).

## 2.    The Procedural Requirements of Removal.

Section 1446 of Title 28 of the United States Code governs the procedure for removal. "Because removal is entirely a statutory right, the relevant procedures to effect removal must be followed." Thompson v. Intel Corp., 2012 U.S. Dist. LEXIS 126311, at *5. A removal that does not comply with the express statutory requirements is defective and must be remanded to state court. See Huffman v. Saul Holdings LP, 194 F.3d at 1077. See also Chavez v. Kincaid, 15 F. Supp. 2d 1118, 1119 (D.N.M. 1998)(Campos, J.)("The [r]ight to remove a case that was originally in state court to federal court is purely statutory, not constitutional.").

Section 1446(a) of Title 28 of the United State Code provides that a party seeking removal of a matter to federal court shall file a notice of removal in the district and division where the state action is pending, "containing a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action." 28 U.S.C. § 1446(a). Such notice of removal is proper if filed within thirty days from the date when the case qualifies for federal jurisdiction. See Caterpillar Inc. v. Lewis, 519 U.S. at 68-69; 28 U.S.C. § 1446(b). The Tenth Circuit has further elaborated that, for the thirty-day period to begin to run,

"this court requires clear and unequivocal notice from the [initial] pleading itself" that federal jurisdiction is available.  Akin v. Ashland Chem. Co., 156 F.3d 1030, 1036 (10th Cir. 1998).  The Tenth Circuit specifically disagrees with "cases from other jurisdictions which impose a duty to investigate and determine removability where the initial pleading indicates that the right to remove may exist."  Akin v. Ashland Chem. Co., 156 F.3d at 1036.[4]

---

[4]In 2011, Congress clarified removal jurisdiction and procedures in the Federal Courts Jurisdiction and Clarification Act of 2011, Pub. L. No. 112-63, 125 Stat. 758 (2011).  See Thompson v. Intel Corp., 2012 U.S. Dist. LEXIS 126311, at *12 n.5.

On December 7, 2011, President Obama signed into law the Federal Courts Jurisdiction and Venue Clarification Act of 2011, which is intended to clarify the operation of federal jurisdictional statutes and facilitate the identification of the appropriate state or federal courts in which actions should be brought [see Pub. L. No. 112-63, 125 Stat. 758 (2011)].

. . . .

Section 103 of the Act makes several changes to removal and remand procedures. 28 U.S.C. § 1446 is amended to cover removal procedures for civil cases only; provisions governing removal of criminal prosecutions have been moved into new 28 U.S.C. § 1455 [Pub. L. No. 112-63, § 103(b), (c), 125 Stat. 758 (2011)].

Section 103 of the Act also amends 28 U.S.C. § 1441(c) to provide that, on the removal of any civil action with both removable claims and nonremovable claims (i.e., those outside of the original or supplemental jurisdiction of the district court), the district court must sever all nonremovable claims and remand them to the state court from which the action was removed. The amendment also provides that only defendants against whom a removable claim has been asserted need to join in or consent to removal of the action. [Pub. L. No. 112-63, § 103(a), 125 Stat. 758 (2011)].

Section 103 also amends 28 U.S.C. § 1446(b) to provide that, in a multi-defendant case, each defendant will have 30 days from his or her own date of service (or receipt of initial pleading) to seek removal. Earlier-served defendants may join in or consent to removal by a later-served defendant [Pub. L. No. 112-63, § 103(a), 125 Stat. 758 (2011)]. These provisions are intended to resolve a circuit split over when the 30-day removal period begins to run in cases in which not all defendants are served at the same time [see H.R. Rep. No. 112-10, at 13-14 (2011); see, e.g., Bailey v. Janssen Pharm., Inc., 536 F.3d 1202 (11th Cir. 2008)(30-day period runs from date of service on last-served defendant, and earlier-served defendants may join in last-served

"When a civil action is removed solely under section 1441(a), [the standard removal statute, which excludes multiparty, multiforum jurisdiction,] all defendants who have been properly joined and served must join in or consent to the removal of the action."  28 U.S.C. § 1446(b)(2)(A).  The failure of all defendants to consent to removal will result in remand.  The rule of unanimity applies to all defendants, whether they are required parties under rule 19 or merely proper parties under rule 20.  The defendants who have not been served, however, need not join in removal.  See Kiro v. Moore, 229 F.R.D. 228, 230-32 (D.N.M. 2005)(Browning, J.).

### 3.      Amendment of the Notice of Removal.

In Caterpillar, Inc. v. Lewis, the Supreme Court held that a defect in subject-matter jurisdiction cured before entry of judgment did not warrant reversal or remand to state court.  See 519 U.S. at 70-78.  Citing Caterpillar, Inc. v. Lewis, the Tenth Circuit has held that "a defect in removal procedure, standing alone, is not sufficient to warrant vacating judgment and remand to

---

defendant's timely removal); Marano Enters. v. Z-Teca Rests., LP, 254 F.3d 753 (8th Cir. 2011)(each defendant has 30 days to effect removal, regardless of when or if other defendants have sought to remove); Getty Oil Corp. v. Ins. Co. of N. Am., 841 F.2d 1254 (5th Cir. 1988)(first-served defendant and all then-served defendants must join in notice of removal within 30 days after service on first-served defendant)].

Section 103 also enacts a new subdivision (c) of 28 U.S.C. § 1446, containing provisions governing the procedures for removal. These include new authorization for a notice of removal in a diversity case to assert the amount in controversy if the initial pleading seeks (1) nonmonetary relief, or (2) a money judgment when state practice either does not permit a demand for a specific sum or permits the recovery of damages in excess of the amount demanded. Also part of a new subdivision (c) of 28 U.S.C. § 1446 is a provision allowing removal of a case based on diversity of citizenship more than one year after commencement of the action if the district court finds that the plaintiff acted in bad faith in order to prevent a defendant from removing the action (such as by deliberately failing to disclose the amount in controversy) [Pub. L. No. 112-63, § 103(b), 125 Stat. 758 (2011)].

Thompson v. Intel Corp., 2012 U.S. Dist. LEXIS 126311, at *12 n.5 (quoting 16 J. Moore, D. Coquillette, G. Joseph, S. Schreiber, G. Vairo, & C. Varner, Moore's Federal Practice § 107.30[2][a][iv], at 107SA-1 to 107SA-2 (3d ed. 2013)).

state court if subject matter jurisdiction existed in the federal court." Browning v. Am. Family Mut. Ins. Co., 396 F. App'x 496, 505-06 (10th Cir. 2010)(unpublished). In McMahon v. Bunn-O-Matic Corp., 150 F.3d 651 (7th Cir. 1998)(Easterbrook, J.), the United States Court of Appeals for the Seventh Circuit noticed, on appeal, defects in the notice of removal, including that the notice of removal failed to properly allege diversity of citizenship. See 150 F.3d at 653 ("As it happens, no one paid attention to subject-matter jurisdiction . . . ."). The Seventh Circuit nevertheless permitted the defective notice of removal to be amended on appeal to properly establish subject-matter jurisdiction. See 150 F.3d at 653-54.

The Tenth Circuit has allowed defendants to remedy defects in their petition or notice of removal. See Jenkins v. MTGLQ Investors, 218 F. App'x. 719, 723 (10th Cir. 2007)(unpublished)(granting unopposed motion to amend notice of removal to properly allege jurisdictional facts); Watkins v. Terminix Int'l Co., 1997 WL 34676226, at *2 (10th Cir. 1997)(per curiam)(unpublished)(reminding the defendant that, on remand, it should move to amend the notice of removal to properly allege jurisdictional facts); Lopez v. Denver & Rio Grande W. R.R. Co., 277 F.2d 830, 832 (10th Cir. 1960)("Appellee's motion to amend its petition for removal to supply sufficient allegations of citizenship and principal place of business existing at the time of commencement of this action is hereby granted, and diversity jurisdiction is therefore present."). The Tenth Circuit has further reasoned that disallowing amendments to the notice of removal, even after the thirty-day removal window had expired, when the defendant made simple errors in its jurisdictional allegations, "would be too grudging with reference to the controlling statute, too prone to equate imperfect allegations of jurisdiction with the total absence of jurisdictional foundations, and would tend unduly to exalt form over substance and legal flaw-picking over the orderly disposition of cases properly committed to federal courts." Hendrix v. New Amsterdam Cas. Co.,

390 F.2d 299, 301 (10th Cir. 1968).  The Tenth Circuit has noted that a simple error in a jurisdictional allegation includes failing to identify a corporation's principal place of business or referring to an individual's state of residence rather than citizenship.  See Hendrix v. New Amsterdam Cas. Co., 390 F.2d at 301.  In McEntire v. Kmart Corp., when faced with insufficient allegations in the notice of removal -- allegations of "residence" not "citizenship" -- the Court granted the defendants leave to amend their notice of removal to cure the errors in some of the "formalistic technical requirements."  2010 WL 553443, at *8 (citing Hendrix v. New Amsterdam Cas. Co., 390 F.2d at 300-02).  Further, in Thompson v. Intel Corp., the Court permitted the defendant, Intel Corp., to amend its notice of removal to include missing jurisdictional elements, including evidence that its principal place of business and corporate headquarters -- the center of Intel Corp.'s direction, control, and coordination of activities -- is out of state, so that the diversity requirements were met.  See 2012 WL 3860748, at *1.

There are limits to the defects that an amended notice of removal may cure, however, as Professors Charles Alan Wright and Arthur R. Miller explain:

> [A]n amendment of the removal notice may seek to accomplish any of several objectives: It may correct an imperfect statement of citizenship, state the previously articulated grounds more fully, or clarify the jurisdictional amount.  In most circumstances, however, defendants may not add completely new grounds for removal or furnish missing allegations, even if the court rejects the first-proffered basis of removal, and the court will not, on its own motion, retain jurisdiction on the basis of a ground that is present but that defendants have not relied upon.

14 C. Wright & A. Miller, Federal Practice and Procedure § 3733, at 651-659 (4th ed. 2009)(footnotes omitted).  Professor Moore has similarly recognized: "[A]mendment may be permitted after the 30-day period if the amendment corrects defective allegations of jurisdiction, but not to add a new basis for removal jurisdiction."  16 J. Moore, D. Coquillette, G. Joseph, S. Schreiber, G. Vairo, & C. Varner, Moore's Federal Practice § 107.30[2][a][iv], at 107-317 to -18 (3d

ed. 2013).  Thus, where diversity jurisdiction is asserted as a basis for removal of an action to federal court, the district court may permit the removing defendant to amend its removal notice, if necessary, to fully allege facts that satisfy the requirements of diversity jurisdiction by a preponderance of the evidence.  See Carrillo v. MCS Indus., Inc., 2012 WL 5378300, at *14 (D.N.M. 2012)(Browning, J.)(permitting party to amend its notice of removal when the removing party did "not assert[] a new basis for jurisdiction, or a new allegation not present in its Notice of Removal; rather, the . . . Amended Notice of Removal provides greater detail regarding the same basis for jurisdiction asserted in the . . . Notice of Removal").  Cf. New Mexico ex rel. Balderas v. Valley Meat Co., 2015 WL 3544288, at *25 (D.N.M. 2015)(Browning, J.)(denying amendment when it sought to assert a new jurisdictional basis that was not raised in the notice of removal).

### 4.        Fraudulent Joinder.

A defendant may remove a case to federal court based upon diversity jurisdiction in the absence of complete diversity if a plaintiff joins a nondiverse party fraudulently to defeat federal jurisdiction.  See Am. Nat'l Bank & Trust Co. v. Bic Corp., 931 F.2d 1411, 1412 (10th Cir. 1991); Hernandez v. Menlo Logistics, Inc., 2013 U.S. Dist. LEXIS 156746, at *14-17 (D.N.M. 2013)(Browning, J.).  A defendant may remove on the basis of fraudulent joinder either while the nondiverse party is still joined or after it is dismissed from the case -- the doctrine can thus function as an exception to either complete diversity or the voluntary-involuntary rule.  "'[A] fraudulent joinder analysis [is] a jurisdictional inquiry,'" Bio-Tec Envtl., LLC v. Adams, 792 F. Supp. 2d 1208, 1214 (D.N.M. 2011)(Browning, J.)(quoting Albert v. Smith's Food & Drug Ctrs., Inc., 356 F.3d 1242, 1247 (10th Cir. 2004)), and, thus, the Tenth Circuit instructs that the district court should "pierce the pleadings, consider the entire record, and determine the basis of joinder by any means available," Dodd v. Fawcett Pubs., Inc., 329 F.2d at 85 (citations omitted).  "A district court may

disregard a nondiverse party named in the state court complaint and retain jurisdiction if joinder of the nondiverse party is a sham or fraudulent."  Baeza v. Tibbetts, 2006 U.S. Dist. LEXIS 95317, at *3 (D.N.M. 2006)(Vazquez, J.).  The Supreme Court has stated: "Merely to traverse the allegations upon which the liability of the resident defendant is rested or to apply the epithet 'fraudulent' to the joinder will not suffice: the showing must be such as compels the conclusion that the joinder is without right and made in bad faith."  Chesapeake & Ohio Ry. Co. v. Cockrell, 232 U.S. 146, 152 (1914).  The Tenth Circuit has explained that allegations of fraudulent joinder complicate the analysis whether removal is proper, because, "[w]hile a court normally evaluates the propriety of a removal by determining whether the allegations on the face of the complaint satisfy the jurisdictional requirements, fraudulent joinder claims are assertions that the pleadings are deceptive."  Nerad v. AstraZeneca Pharms., Inc., 203 F. App'x 911, 913 (10th Cir. 2006)(unpublished).

The party asserting fraudulent joinder bears the burden of proof.  See Montano v. Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592, at *1 ("The case law places a heavy burden on the party asserting fraudulent joinder.").  "To justify removal based on diversity jurisdiction, a defendant must plead a claim of fraudulent joinder with particularity and prove the claim with certainty."  Couch v. Astec Indus., Inc., 71 F. Supp. 2d at 1146-47.  Before 2013, the most recent published Tenth Circuit decision to state the burden of proof for demonstrating fraudulent joinder was issued over forty years earlier in Smoot v. Chicago, Rock Island & Pacific Railroad Co., 378 F.2d 879 (10th Cir. 1967).  The Tenth Circuit said that fraudulent joinder must be "established with complete certainty upon undisputed evidence."  Smoot v. Chi., Rock Island & Pac. R.R. Co., 378 F.2d at 882.

Actual fraud -- e.g., a plaintiff colluding with a nondiverse defendant to defeat removal[5] --

---

[5]Collusion might look something like this: a plaintiff names a nondiverse defendant under a highly dubious theory of liability; the plaintiff contacts the defendant and offers to dismiss the case at the end of the one-year limitation, see 28 U.S.C. § 1446(c), if the defendant agrees not to move to

suffices to establish fraudulent joinder, but it is not required.  See McLeod v. Cities Serv. Gas Co., 233 F.2d 242, 246 (10th Cir. 1956)("[C]ollusion in joining a resident defendant for the sole purpose of preventing removal . . . may be shown by any means available.").  In Smoot v. Chicago, Rock Island & Pacific Railroad Co., the Tenth Circuit stated two other bases for finding fraudulent joinder: (i) "[t]he joinder of a resident defendant against whom no cause of action is stated is a patent sham"; or (ii) "though a cause of action be stated, the joinder is similarly fraudulent if in fact no cause of action exists."  378 F.2d at 882 (quoting Dodd v. Fawcett Pubs., Inc., 329 F.2d at 85.  In Smoot v. Chicago, Rock Island & Pacific Railroad Co., the Tenth Circuit found fraudulent joinder, because the joined party's non-liability was "established with complete certainty upon undisputed evidence." 378 F.2d at 882.  "This does not mean that the federal court will pre-try, as a matter of course, doubtful issues of fact to determine removability; the issue must be capable of summary determination and be proven with complete certainty."  Smoot v. Chi., Rock Island & Pac. R.R. Co., 378 F.2d at 882.  In Smoot v. Chicago, Rock Island & Pacific Railroad Co., the plaintiff died when his car collided with a freight train.  See 378 F.2d at 881. The plaintiff's estate sued the railroad company and joined a non-diverse alleged employee as a defendant.  See 378 F.2d at 881.  It was undisputed that the diversity-destroying party's employment with the railroad company had "terminated almost fifteen months before the collision and that he was in no way connected with the acts of negligence ascribed to him."  378 F.2d at 881.

In recent unpublished decisions, the Tenth Circuit has adopted different articulations of the burden of proof for fraudulent joinder, two of which are from the United States Court of Appeals for the Fifth Circuit.  In Montano v. Allstate Indemnity Co., the Tenth Circuit quoted favorably Hart v.

---

dismiss before the one-year mark; and the defendant agrees to the arrangement to save litigation costs, as well as to avoid any slim chance that the court decides to recognize the plaintiff's theory of liability against it.

Bayer Corp., 199 F.3d 239 (5th Cir. 2000), which states:

> To prove their allegation of fraudulent joinder [the removing parties] must demonstrate that there is no possibility that [plaintiff] would be able to establish a cause of action against [the joined party], in state court. In evaluating fraudulent joinder claims, we must initially resolve all disputed questions of fact and all ambiguities in the controlling law in favor of the non-removing party. We are then to determine whether that party has any possibility of recovering against the party whose joinder is questioned.

Montano v. Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592, at *4-5 (alterations in original)(quoting Hart v. Bayer Corp., 199 F.3d at 246)(internal quotation marks omitted). The Tenth Circuit stated that the standard for proving fraudulent joinder "is more exacting than that for dismissing a claim under Fed. R. Civ. P. 12(b)(6); indeed, the latter entails the kind of merits determination that, absent fraudulent joinder, should be left to the state court where the action commenced." Montano v. Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592, at *2. The Tenth Circuit in Montano v. Allstate Indemnity Co. also quoted from Batoff v. State Farm Insurance Co., 977 F.2d 848 (3d Cir. 1992), which states: "A claim which can be dismissed only after an intricate analysis of state law is not so wholly insubstantial and frivolous that it may be disregarded for purposes of diversity jurisdiction." 977 F.2d at 853.

In Nerad v. AstraZeneca Pharmaceuticals, Inc., the Tenth Circuit adopted a different articulation of the burden of proof. The Tenth Circuit stated that, where fraudulent joinder is asserted, "the court must decide whether there is a reasonable basis to believe the plaintiff might succeed in at least one claim against the non-diverse defendant." Nerad v. AstraZeneca Pharmaceuticals, Inc., 203 F. App'x at 913 (citing Badon v. RJR Nabisco, Inc., 224 F.3d 382, 393 (5th Cir. 2000)). The Tenth Circuit explained that "[a] 'reasonable basis' means just that: the claim need not be a sure-thing, but it must have a basis in the alleged facts and the applicable law." Nerad v. AstraZeneca Pharmaceuticals, Inc., 203 F. App'x at 913.

The Fifth Circuit recognized the inconsistencies in various articulations of the standard for fraudulent joinder and directly addressed the problem in Travis v. Irby, 326 F.3d 644 (5th Cir. 2003):

> Neither our circuit nor other circuits have been clear in describing the fraudulent joinder standard. The test has been stated by this court in various terms, even within the same opinion. For example, the Griggs [v. State Farm Lloyds, 181 F.3d 694 (5th Cir. 1999),] opinion states,
>
>> To establish that a non-diverse defendant has been fraudulently joined to defeat diversity, the removing party must prove . . . that there is absolutely no possibility that the plaintiff will be able to establish a cause of action against the non-diverse defendant in state court.
>
> 181 F.3d at 699 (emphasis added)(citing Burden v. Gen. Dynamics Corp., 60 F.3d 213, 217 (5th Cir. 1995)). The Griggs opinion later restates that test as follows --
>
>> Stated differently, we must determine whether there is any reasonable basis for predicting that [the plaintiff] might be able to establish [the non-diverse defendant's] liability on the pleaded claims in state court.
>
> 181 F.3d at 699 (emphasis added). Similarly, in summing up federal law, Moore's Federal Practice states at one point: "To establish fraudulent joinder, a party must demonstrate . . . the absence of any possibility that the opposing party has stated a claim under state law." 16 Moore's Federal Practice § 107.14[2][c][iv][A] (emphasis added). It then comments: "The ultimate question is whether there is arguably a reasonable basis for predicting that state law might impose liability on the facts involved." Although these tests appear dissimilar, "absolutely no possibility" vs. "reasonable basis," we must assume that they are meant to be equivalent because each is presented as a restatement of the other.

326 F.3d at 647 (emphases in original). The Fifth Circuit has settled upon this phrasing:

> [T]he test for fraudulent joinder is whether the defendant has demonstrated that there is no possibility of recovery by the plaintiff against an in-state defendant, which stated differently means that there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against an in-state defendant.

Smallwood v. Ill. Cent. R.R. Co., 385 F.3d 568, 573 (5th Cir. 2004)("To reduce possible confusion, we adopt this phrasing of the required proof and reject all others, whether the others appear to describe the same standard or not.").

In Zufelt v. Isuzu Motors Am., L.L.C., 727 F. Supp. 2d 1117 (D.N.M. 2009)(Browning, J.),

- 41 -

the Court addressed the standard that courts should use when addressing fraudulent joinder and

concluded that, to establish that a party was fraudulently joined, a defendant has the burden of

demonstrating that "there is no possibility that the plaintiff would be able to establish a cause of

action" against the party alleged to be fraudulently joined.  727 F. Supp. 2d at 1124-25 (citing

Montano v. Allstate Indem. Co., 211 F.3d 1278, 2000 WL 525592, at *4-5).  The Court explained:

> [T]his District has consistently adopted the "possibility" standard when assessing
> fraudulent joinder claims.  See Allen v. Allstate Ins. Co., 2008 U.S. Dist. LEXIS
> 108948 (D.N.M. 2008)(Browning, J.)(holding that the claims asserted against the
> non-diverse defendant were "possibly viable under New Mexico law, and . . .
> sufficient to preclude federal jurisdiction"); Baeza v. Tibbetts, 2006 U.S. Dist.
> LEXIS 95317, at *11, (stating that "[r]emand is required if any one of the claims
> against [the defendant] is possibly viable"); Provencio v. Mendez, 2005 U.S. Dist.
> LEXIS 39012, at *25 (D.N.M. 2005)(Browning, J.)(stating that "there must be no
> possibility the [p]laintiffs have a claim against [the non-diverse defendant]"); Couch
> v. Astec Indus., Inc., 71 F. Supp. 2d at 1147 (stating that, to defeat removal
> jurisdiction, "[t]he plaintiff need only demonstrate the possibility of the right to
> relief").  This Court, in Couch v. Astec Indus., Inc., noted with approval the language
> of the United States Court of Appeals for the Eleventh Circuit, which states that "if
> there is even a possibility that a state court would find that the complaint states a
> cause of action against any one of the resident defendants, the federal court must find
> that the joinder was proper and remand the case to the state court."  Couch v. Astec
> Indus., Inc., 71 F. Supp. 2d at 1147 (quoting Triggs v. John Crump Toyota, Inc., 154
> F.3d 1284, 1287 (11th Cir. 1998))(emphasis in original).

Zufelt v. Isuzu Motors Am., L.L.C., 727 F. Supp. 2d at 1129.

In Brazell v. Waite, the Tenth Circuit stated that the "removing party must show that the

plaintiff has 'no cause of action' against the fraudulently joined defendant," but it did not further

elaborate on that burden.  525 F. App'x. at 881 (citing Dodd v. Fawcett Pubs., Inc., 329 F.2d at 85;

Roe v. Gen. Am. Life Ins. Co., 712 F.2d 450, 452 n.* (10th Cir. 1983)).

In 2013, the Tenth Circuit published its first opinion since 1946 regarding the burden of

proof for demonstrating fraudulent joinder:  "'To establish fraudulent joinder, the removing party

must demonstrate either:  (1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the

plaintiff to establish a cause of action against the non-diverse party in state court.'"  Dutcher v.

- 42 -

Matheson, 733 F.3d at 988 (quoting Cuevas v. BAC Home Loans Servicing, LP, 648 F.3d at 249).

In Dutcher v. Matheson, the Tenth Circuit reviewed a district court's holding that it had diversity

jurisdiction over a case where Utah citizens sued ReconTrust, a Texas-based national bank, Stuart T.

Matheson, a Utah citizen, and Matheson's law firm.  See 733 F.3d at 983, 987.  The plaintiffs

alleged that Matheson and his law firm enabled ReconTrust to conduct an illegal nonjudicial

foreclosure by holding the foreclosure sales on behalf of the Texas-based bank.  See 733 F.3d at 983.

The defendants removed the case to federal court and alleged that the plaintiffs fraudulently joined

the Utah defendants.  See 733 F.3d at 983.  The district court agreed that the plaintiffs had been

fraudulently joined, concluding that, under Utah law, "an attorney cannot be held liable to a non-

client absent fraud, collusion or privity of contract."  733 F.3d at 988.  The Tenth Circuit disagreed

with that characterization of Utah law, finding instead that, in the case on which the defendants

relied, the Supreme Court of Utah "has simply limited the circumstances in which a lawyer owes a

duty of care to non-clients from actions arising out of the provision of legal services."  733 F.3d at

988.  In rejecting the claim of fraudulent joinder, the Tenth Circuit said

> that does not mean that the plaintiffs have stated a valid claim against Matheson and
> his law firm. Or even that Matheson and his law firm are not somehow fraudulently
> joined.  But the defendants needed to clear a high hurdle to prove something they
> have yet to prove, i.e., fraudulent joinder.

733 F.3d at 989.

The Tenth Circuit did not elaborate on the defendant's burden to show fraudulent joinder,

except to say that it is "a high hurdle."  733 F.3d at 989.  It quoted, however, Cuevas v. BAC Home

Loans Servicing, LP, a Fifth Circuit opinion that repeats the clarified standard from the Smallwood

v. Illinois Central Railroad Co. case.  See Dutcher v. Matheson, 733 F.3d at 988 (quoting Cuevas v.

BAC Home Loans Servicing, LP, 648 F.3d at 249).  In Cuevas v. BAC Home Loans Servicing, LP,

the Fifth Circuit states:

Under the second way, the test is "whether the defendant has demonstrated that there is no possibility of recovery by the plaintiff against an in-state defendant, which stated differently means that there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against an instate defendant." [Smallwood v. Ill. Cent. R.R. Co., 385 F.3d at 573.] If there is no reasonable basis of recovery, then the court can conclude that the plaintiff's decision to join the in-state defendant was indeed improper, unless that showing compels the dismissal of all defendants. There is no improper joinder if the defendants' showing compels the same result for the resident and nonresident defendants, because this simply means that the plaintiff's case is ill founded as to all of the defendants. Such a defense is more properly an attack on the merits of the claim, rather than an inquiry into the propriety of the joinder of the in-state defendant.

Cuevas v. BAC Home Loans Servicing, LP, 648 F.3d at 249 (emphasis in original)(citations and internal quotation marks omitted). Based on the Tenth Circuit's history of relying on Fifth Circuit analysis in fraudulent joinder cases, it is likely that it would approve this additional explanation of the fraudulent joinder standard. The Court will accordingly use the following standard for fraudulent joinder: whether the defendant has demonstrated that there is no possibility that the plaintiff will obtain a judgment against an in-state defendant. Cf. Zufelt v. Isuzu Motors Am., L.C.C., 727 F. Supp. 2d at 1124-25 (concluding that fraudulent joinder occurs when "there is no possibility that the plaintiff would be able to establish a cause of action" against the party alleged to be fraudulently joined). No case sets forth the burden of proof that applies to (much rarer) allegations of actual fraud, such as plaintiff-defendant collusion, but the Court concludes that the clear-and-convincing standard -- the usual standard for fraud -- is appropriate. See, e.g., United States v. Thompson, 279 F.2d 165, 167 (10th Cir. 1960)("An allegation of fraud is a serious matter; it is never presumed and must be proved by clear and convincing evidence.")(citations omitted).

A district court's order to remand based on a finding of fraudulent joinder is not reviewable by the Tenth Circuit. See Nerad v. AstraZeneca Pharms., Inc., 203 F. App'x at 913 (holding that, because the district court remanded based on its conclusion that it lacked subject-matter jurisdiction at the time of removal, 28 U.S.C. § 1447(d) precluded the Tenth Circuit from reviewing the order).

The fraudulent joinder inquiry on a motion to remand is a subject-matter jurisdiction inquiry.  See Albert v. Smith's Food & Drug Ctrs., Inc., 356 F.3d at 1247.

## LAW REGARDING DIVERSITY JURISDICTION AND CHOICE OF LAW

When a court's jurisdiction rests on diversity of citizenship under 28 U.S.C. § 1332, the court should look to the forum state's choice-of-law rules to determine which state's substantive law to apply.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); Pepsi-Cola Bottling Co. v. PepsiCo., Inc., 431 F.3d 1241, 1255 (10th Cir. 2005).  In New Mexico, choice-of-law analysis is a two-step process.  See Mosely v. Titus, 762 F. Supp. 2d 1298, 1314 (D.N.M. 2010)(Browning, J.)(citing Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 14, 142 P.3d 374, 377).  "First, the Court must characterize the 'area of substantive law -- e.g., torts, contracts, domestic relations -- to which the law of the forum assigns a particular claim or issue.'"  Mosely v. Titus, 762 F. Supp. 2d at 1314 (quoting Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 11, 142 P.3d at 377).  The next step is to apply New Mexico's choice-of-law rule.  See Mosely v. Titus, 762 F. Supp. 2d at 1314 (citing Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 15, 142 P.3d at 377).

"In tort actions, New Mexico courts follow the doctrine of lex loci delicti commissi and apply the law of the place where the wrong took place."  Mosely v. Titus, 762 F. Supp. 2d at 1314 (citing Torres v. State, 1995-NMSC-025, ¶ 13, 894 P.2d 386, 390).  The place of the wrong is the location of the last act necessary to complete the injury.  See Mosely v. Titus, 762 F. Supp. 2d at 1314 (citing Torres v. State, 1995-NMSC-025, ¶ 13, 894 P.2d at 390).  "Where the elements of the underlying claim include harm, the place of the wrong is the place where the harm occurred."  Mosely v. Titus, 762 F. Supp. 2d at 1314 (citing First Nat'l Bank v. Benson, 1976-NMCA-072, ¶ 6, 553 P.2d 1288, 1289).

Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), a federal district court

- 45 -

sitting in diversity applies "state law with the objective of obtaining the result that would be reached

in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem.

Hosp. v. Healthcare Realty Trust Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held

that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico

"opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict

how the Supreme Court of New Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply

Intern., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). "Just as a court engaging

in statutory interpretation must always begin with the statute's text, a court formulating an Erie

prediction should look first to the words of the state supreme court." Peña v. Greffet, 110 F. Supp.

3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[6] If the Court finds only an opinion from the Court of

Appeals of New Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s']

---

[6]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014)(Browning, J.). Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts. The factors to which a federal court should look before making an Erie prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times. See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17. In short, a state supreme court case that a federal court Erie predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d at 1332 (noting that where the only opinion on point is "from the Court of Appeals, [] the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it")(citing Wade v. EMCASCO Ins. Co., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")).[7] The Court may

_____

[7]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

> . . . We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

> . . . .

> The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of

also rely on decisions by the Tenth Circuit interpreting New Mexico law.  See Anderson Living

Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d at 1243 & n.30.[8]  Ultimately, "the Court's task is

_____

       diversity of citizenship.  In the absence of any contrary showing, the rule [set forth
       by two New Jersey trial courts, but no appellate courts] appears to be the one which
       would be applied in litigation in the state court, and whether believed to be sound or
       unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Trust Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The
Supreme Court has softened this position over the years; federal courts are no longer bound by state
trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest
court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing
King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm.
Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Moore's")("Decisions of
intermediate state appellate courts usually must be followed . . . [and] federal courts should give
some weight to state trial courts decisions.")(emphasis and title case omitted).

      [8]In determining the proper weight to accord Tenth Circuit precedent interpreting New
Mexico law, the Court must balance the need for uniformity between federal court and state court
interpretations of state law with the need for uniformity among federal judges.  If the Court adheres
too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing
years, then parties litigating state law claims will be subject to a different body of substantive law,
depending on whether they litigate in state court or federal court.  This result frustrates the purpose
of Erie, which held that federal courts must apply state court interpretations of state law, rather than
their own, in part so that parties achieve a consistent result regardless of the forum.  This
consideration pulls the Court in the direction of according Tenth Circuit precedent less weight, and
according state court decisions issued in the ensuing years more weight.  On the other hand, when
the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to
its proper interpretation.  Otherwise, different federal judges within the same circuit -- or even the
same district, as district courts' decisions are not binding, even upon themselves -- would be free to
adopt differing interpretations of a state's law.  This consideration pulls the Court towards a stronger
respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it
accurately reflects state law -- at least provides consistency at the federal level, so long federal
district judges are required to follow it.
      The Court must decide how to weigh Tenth Circuit case law against more-recent state court
decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth
Circuit precedent unless there is intervening case law directly on point from the state's highest court,
on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as
persuasive authority, on the other.  In striking this balance, the Court notes that it is generally more
concerned about systemic inconsistency between the federal courts and the state courts than it is
about inconsistency among federal judges.  Judges, even those within a jurisdiction with ostensibly
identical governing law, sometimes interpret and apply the law differently from one another; this
inconsistency is part and parcel of a common-law judicial system.  More importantly, litigants
seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such

inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal.  All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would.  Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency.  When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

        The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law.  Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' are.  More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do.   As such, Tenth Circuit precedent can lag behind developments in state law -- developments that the district courts may be nimble enough to perceive and adopt.  Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted.  Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look.  Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit.  Every federal judicial district in the nation, except the District of Wyoming, covers at most one state.  It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states.

        Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess.  A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based <u>only</u> on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.

        When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that $x$ is the law in New Mexico; it holds that the <u>proper interpretation</u> of New Mexico law, at the time the opinion is released, is $x$.  Its holdings are descriptive, not prescriptive -- interpretive, not normative.  Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law.  The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing

body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

The purpose of Erie is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." Moore's § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.")(citation and internal quotation marks omitted). This may not be the most precise formulation if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see Abbott Laboratories v. Granite State Ins. Co., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. See Allstate Ins. Co. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree. In

---

Wankier v. Crown Equipment Corp., the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.).  From this passage, it seems clear the Tenth Circuit only permits a district court to deviate from its view of state law on the basis of a subsequent case "of the state's highest court."  See The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that").  A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation in order to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional.  Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts.  Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition.  In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [*v. Minnstar, Inc.*, 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law."  Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

Whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it.  In Kokins v. Teleflex, Inc., the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law.  See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir. 2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided *Biosera[, Inc. v. Forma Scientific, Inc.*, 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest court*.'")(emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine.  More importantly, the Tenth Circuit's view may be at

to predict what the state supreme court would do."  Wade v. EMCASCO Ins. Co., 483 F.3d at 666.

Accord Mosley v. Titus, 762 F. Supp. 2d at 1332 (citation omitted); Rimbert v. Eli Lilly & Co., 577

F. Supp. 2d 1174, 1188-89 (D.N.M. 2008)(Browning, J.)(quoting Wade v. EMCASCO Ins. Co., 483

F.3d at 665-66).

## NEW MEXICO LAW REGARDING NEGLIGENCE

Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff,

breach of that duty, which is typically based on a standard of reasonable care, and the breach being a

cause-in-fact and proximate cause of the plaintiff's damages.  See Coffey v. United States, 870 F.

Supp. 2d 1202, 1225 (D.N.M. 2012)(Browning, J.)(citing Herrera v. Quality Pontiac, 2003-NMSC-

018, ¶ 6, 73 P.3d 181, 185-86).   "In New Mexico, negligence encompasses the concepts of

foreseeability of harm to the person injured and of a duty of care toward that person."  Ramirez v.

Armstrong, 1983-NMSC-104, ¶ 8, 673 P.2d 822, 825, overruled on other grounds by Folz v. State,

1990-NMSC-075, ¶ 3, 797 P.2d 246, 249.  Generally, negligence is a question of fact for the jury.

See Schear v. Bd. of Cnty Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d 728, 729.  "A finding of

negligence, however, is dependent upon the existence of a duty on the part of the defendant."  Schear

v. Bd. of Cnty Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d at 729.  "Whether a duty exists is a

question of law for the courts to decide."  Schear v. Bd. of Cnty Comm'rs, 1984-NMSC-079, ¶ 4,

687 P.2d at 729 (citation omitted).  Once courts recognize that a duty exists, that duty triggers "a

legal obligation to conform to a certain standard of conduct to reduce the risk of harm to an

_____

tension with the above-quoted Supreme Court precedent, as well as its own prior case law.  Moore's
lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal
appellate decision [interpreting state law] is persuasive."  Moore's § 124.22[4] (citing State Farm
Mut. Auto. Ins. Co. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)).  Still, the Court is
bound to abide by the Tenth Circuit's interpretation of Erie.  This scheme may be inefficient,
because the plaintiffs may appeal, after trial, the Court's ruling on the marketable condition rule.
The Tenth Circuit may certify the question to the Supreme Court of New Mexico, and the Tenth
Circuit may then have to reverse the Court after a full trial on the merits.

individual or class of persons." Baxter v. Noce, 1988-NMSC-024, ¶ 11, 752 P.2d 240, 243.

New Mexico courts have stated that foreseeability of a plaintiff alone does not end the inquiry into whether the defendant owes a duty to the plaintiff. See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 7, 73 P.3d at 186. New Mexico courts have recognized that, "[u]ltimately, a duty exists only if the obligation of the defendant [is] one to which the law will give recognition and effect." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 9, 73 P.3d at 187 (internal quotation marks omitted). To determine whether the defendant's obligation is one to which the law will give recognition and effect, courts consider legal precedent, statutes, and other principles of law. See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 9, 73 P.3d at 186.

"As a general rule, an individual has no duty to protect another from harm." Grover v. Stechel, 2002-NMCA-049, ¶ 11, 45 P.3d 80, 84. "[C]ertain relationships, however, that give rise to such a duty [include]: (1) those involving common carriers, innkeepers, possessors of land; and (2) those who voluntarily or by legal mandate take the custody of another so as to deprive the other of his normal opportunities for protection." Grover v. Stechel, 2002-NMCA-049, ¶ 11, 45 P.3d at 84. "[W]hen a person has a duty to protect and the third party's act is foreseeable, 'such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the [person who has a duty to protect] from being liable for harm caused thereby.'" Reichert v. Atler, 1994-NMSC-056, ¶ 11, 875 P.2d 379, 382.

"[T]he responsibility for determining whether the defendant has breached a duty owed to the plaintiff entails a determination of what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 194. "The finder of fact must determine whether Defendant breached the duty of ordinary care by

considering what a reasonably prudent individual would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances of the present case . . . ."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 195.

"A proximate cause[9] of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.  "It need not be the only cause, nor the last nor nearest cause."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.  "It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.

## NEW MEXICO LAW REGARDING STRICT PRODUCTS LIABILITY

"Under the 'product liability' claim, a supplier in the business of putting a product on the market is liable for harm caused by an unreasonable risk of injury resulting from a condition of the product or from a manner of its use."  N.M.R.A., Civ. UJI 13-1406.  See Stang v. Hertz Corp., 1972-NMSC-031, ¶ 6, 497 P.2d 732, 734;  Trujillo v. Berry, 1987-NMCA-072, ¶ 5 n.1, 738 P.2d 1331, 1333 n.1 (stating that "the purpose behind the strict products liability doctrine is to allow an injured user . . . to recover against a supplier . . . without the requirement of proving negligence.").  For a plaintiff to recover under strict products liability, the plaintiff must prove:

(1) that the product was sold in a defective condition unreasonably dangerous to the

---

[9]The 2004 amendments to Uniform Jury Instruction 13-305 eliminated the word "proximate" within the instruction.  See Use Note, N.M. Rul. Amend. Civ. UJI 13-305.  The drafters added, however, that the change was "intended to make the instruction clearer to the jury and do[es] not signal any change in the law of proximate cause."  Editor's Notes, N.M. Rul. Amend. Civ. UJI 13-305.

user or consumer or to his property;

(2) that the seller was engaged in the business of selling such a product; and

(3) that the product was expected to and did reach the consumer without substantial change in the condition in which it was sold.

Standhardt v. Flintkote Co., 1973-NMSC-040, ¶ 14, 508 P.2d 1283, 1290.  "Seller" is not an exclusive, restrictive term for identifying potential defendants in a strict products liability action. New Mexico's Uniform Jury Instructions use the term "supplier" to identify a liable party under strict products liability, and the term is used with particular purpose.  N.M.R.A., Civ. UJI 13-1406 cmt.  The committee commentary to the jury instruction states that "certain commercial promotions or other transactions do not involve the business of selling a product, [thus] the committee chose 'business of putting the product on the market'" rather than simply "seller."  N.M.R.A., Civ. UJI 13-1406 cmt.  The committee stated that "supplier" captures the Supreme Court of New Mexico's rationale for adopting strict products liability better than "seller," because holding those who put a defective product on the market liable serves the risk-balancing goal of strict products liability. N.M.R.A., Civ. UJI 13-1406 cmt. (citing Escola v. Coca Cola Bottling Co., 150 P.2d 436, 440-41 (Cal. 1944) for its discussion of risk-distribution, in which the Supreme Court of California states that: "public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inhere in defective products that reach the market").

While the Supreme Court of New Mexico has allowed plaintiffs to recover from manufacturers, retailers, and wholesalers, New Mexico courts have specifically declined to hold an employer strictly liable for harm caused by a product that employees use in their course of work. Compare AALCO Mfg. Co. v. City of Espanola, 1980-NMSC-088, ¶¶ 3-6, 618 P.2d 1230, 1231 (stating that strict liability applies to manufacturers, wholesalers, and retailers), with Trujillo v. Sonic Drive-In/Merritt, 1996-NMCA-106, ¶ 29, 924 P.2d 1371, 1377 ("[W]e are not persuaded that, under

the doctrine of strict products liability, Employer would be considered the supplier . . . thus making it strictly liable for injuries caused by a defect in [an ice cream machine]."). In Trujillo v. Sonic Drive-In/Merritt, the Court of Appeals of New Mexico cited N.M.R.A., Civ. UJI 13-1406, and held that an employer could not be held strictly liable for the injuries a defective ice-cream machine caused to employees, because the employer was not a "supplier" of the machine. 1996-NMCA-106, ¶¶ 29-30, 924 P.2d at 1377-78. The Court of Appeals of New Mexico distinguished a prior case that held that the operator of a car wash could be strictly liable for the injuries that machinery used at the car wash inflicted on a customer. See 1996-NMCA-106, ¶¶ 29-30, 924 P.2d at 1378 (distinguishing Trujillo v. Berry (holding that a car-wash operator may be strictly liable for injuries caused by machinery used on its property, if a trial court determines that the car-wash operator was a "supplier" of the defective machine)). The Court of Appeals of New Mexico explained that the prior case "would only have [imposed strict products liability] if the car-wash defendant was later determined by the trial court to be a supplier," a determination which the trial court did not make in that case. 1996-NMCA-106, ¶ 29, 924 P.2d at 1378. The Court of Appeals of New Mexico ruled, therefore, that the employer was not strictly liable for owning a defective machine which inflicted injuries on an employee while the employee operated it. See 1996-NMCA-106, ¶¶ 29-30, 924 P.2d at 1378.

The Court has interpreted New Mexico strict-products liability law to foreclose recovery against parties that do not place an allegedly defective product on the market. See Provencio v. Ford Motor Co., 2005 WL 3662957, at *8 (D.N.M. 2005)(Browning, J.). The Court explained that, in Arenivas v. Continental Oil Co., 1983-NMCA-104, 692 P.2d 31, an operator and part-owner of an oil field was not the supplier of a pumping unit used on the land, because it "did not in any way place the pumping unit in the stream of commerce." Provencio v. Ford Motor Co., 2005 WL 3662957, at *8 (quoting Arenivas v. Continental Oil Co., 1983-NMCA-104, ¶ 15, 692 P.2d at 34).

The Court also explained that, in <u>Livingston v. Begay</u>, 1982-NMSC-121, 652 P.2d 734, the Supreme

Court of New Mexico concluded that "a motel operator is not strictly liable for defects in the fixtures

and furnishings of the rooms he holds out to the public," because the motel operator has not

introduced those items into the "stream of commerce." <u>Provencio v. Ford Motor Co.</u>, 2005 WL

3662957, at *8 (quoting <u>Livingston v. Begay</u>, 1982-NMSC-121, ¶ 29, 652 P.2d at 739). "The thread

that binds these cases is that, in each case, the alleged supplier did not sell the defective product to

anyone." <u>Provencio v. Ford Motor Co.</u>, 2005 WL 3662957, at *8. Accordingly, a party who does

not sell or otherwise place an allegedly defective product in the stream of commerce may not be

strictly liable for any alleged harm the product caused, and, thus, may not be jointly and severally

liable for harm the product causes under New Mexico's strict products liability law. <u>See</u> <u>Livingston</u>

<u>v. Begay</u>, 98 N.M. at 716-17, 652 P.2d at 739.

## **LAW REGARDING BREACH OF WARRANTIES**

Under the UCC, there are at least two warranties that the manufacturer makes: (i) the implied

warranty of fitness for a particular purpose; and (ii) the implied warranty of merchantability. In

<u>Perfetti v. McGhan Medical</u>, 1983-NMCA-032, 662 P.2d 646, the Court of Appeals of New Mexico,

in considering the claim of an express warranty, stated: "Any express warranty made with respect to

the surgeon would inure to plaintiff's benefit on the basis that the surgeon was acting as plaintiff's

agent in the use of the prosthesis." 1983-NMCA-032, ¶ 26, 662 P.2d at 652. The Court of Appeals

of New Mexico concluded that there was no evidence of an express warranty that was breached. <u>See</u>

1983-NMCA-032, ¶ 35, 662 P.2d at 653. In discussing the claim of an implied warranty, the Court

of Appeals of New Mexico explained that the defendant was "incorrect in urging a congruence

between products liability and the implied warranty of fitness for a particular purpose. Products

liability requires a defect . . . . [T]he implied warranty of fitness for a particular purpose does not

require a defect."  1983-NMCA-032, ¶ 44, 662 P.2d at 653.

1.      **Breach of the Implied Warranty of Fitness for a Particular Purpose.**

Under the UCC, it is the sale of goods that brings the implied-warranty provisions into operation.  See Ortiz v. Gas Co., 1981-NMCA-128, ¶ 13, 636 P.2d 900, 903.  A "sale" is defined as "the passing of title from the seller to the buyer for a price." N.M. Stat. Ann. § 55-2-106(1).  To succeed on a breach of the implied warranty of fitness for a particular purpose, the plaintiff must prove: (i) a sale; (ii) that the seller had knowledge of the particular use for which a good was purchased; (iii) that the buyer relied on the seller's skill or judgment regarding the selection of goods; and (iv) that the buyer purchased a product with a particular purpose for that product in mind. See Daniell v. Ford Motor Co., Inc., 581 F.Supp 728, 731 (D.N.M. 1984)(Baldock, J.)(citing N.M. Stat. Ann. § 55-2-314(2)(c)); Spectron Dev. Lab. v. Am. Hollow Boring Co., 1997-NMCA-025, ¶ 40, 936 P.2d 852, 861 (citing N.M. Stat. Ann. § 55-2-314).  N.M. Stat. Ann. § 55-2-315 provides:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

N.M. Stat. Ann. § 55-2-315.  The Court of Appeals of New Mexico has stated that, under the implied warranty of fitness for a particular purpose, a plaintiff must prove: (i) that, at the time of contracting, the seller had reason to know the buyer's particular purpose for which the item was being ordered; (ii) that the buyer relied on the seller's skill or judgment; and (iii) that the item was not fit for that purpose.  See Lieb v. Milne, 1980-NMCA-125, ¶ 11, 625 P.2d at 1237.

2.      **Breach of the Implied Warranty of Merchantability.**

New Mexico recognizes that the implied warranty of merchantability is implied by law and is independent of express warranties.  See International Paper Co. v. Farrar, 1985-NMSC-046, ¶ 13,

700 P.2d at 645.  To establish a claim for breach of the implied warranty of merchantability, a plaintiff must prove that the seller sold goods or products that fail to meet the statutory definition of "merchantable."  N.M. Stat. Ann. § 55-2-314; N.M.R.A. 2008, Civ. UJI 13-1430.  N.M. Stat. Ann. § 55-2-314 defines "merchantable":

> (1) Unless excluded or modified (Section 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.
>
> (2) Goods to be merchantable must be at least such as:
>
>> (a) pass without objection in the trade under the contract description; and
>>
>> (b) in the case of fungible goods, are of fair average quality within the description; and
>>
>> (c) are fit for the ordinary purposes for which such goods are used; and
>>
>> (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
>>
>> (e) are adequately contained, packaged and labeled as the agreement may require; and
>>
>> (f) conform to the promises or affirmations of fact made on the container or label if any.
>
> (3) Unless excluded or modified (Section 2-316) other implied warranties may arise from course of dealing or usage of trade.

N.M. Stat. Ann. § 55-2-314.

"[A] supplier breaches this warranty if the product is defective and is not fit for the ordinary purposes for which such product is used." See Pac. Indem. Co. v. Therm-O-Disc, Inc., 476 F. Supp. 2d 1216, 1225 (D.N.M. 2006)(Hansen, J.)("A manufacturer must use ordinary care in the designing, making, inspecting, and packaging of the product.  N.M.R.A. 2006, UJI 13-1410.  Ordinary care is

that care which a reasonably prudent supplier would use in the conduct of its business.")(citing N.M.R.A. 2006, UJI 13-1404).  A breach of the implied warranty of merchantability claim "thus requires proof of a defect."  Pacific Indem Co. v. Therm-O-Disc, Inc., 476 F. Supp. 2d at 1225 (citing Perfetti v. McGhan Medical, 1983-NMCA-032, ¶ 44, 662 P.2d at 654).  Moreover, a breach of the implied warranty of merchantability claim also requires proof of proximate cause.  See N.M. Stat. Ann. § 55-2-314 cmt. 13; Jesko v. Stauffer Chemical Co., 1976-NMCA-117, 558 P.2d 55.  Comment 13 to § 55-2-314 states: "In an action based on breach of warranty, it is of course necessary to show not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained."  N.M. Stat. Ann. § 55-2-314 cmt. 13.  New Mexico Uniform Civil Jury Instruction No. 130-1430 provides:

A supplier breaches the implied warranty of merchantability:

[1. If the goods sold would be rejected by someone knowledgeable in the trade for failure to meet the contract description]; [or]

[2. If goods sold in bulk are not of fair average quality for the type of goods described by the contract. The goods need not be the best quality but they must pass without objection in the trade]; [or]

[3. If the [goods] [products] are defective and are not fit for the ordinary purposes for which such [goods] [products] are used]; [or]

[4. If the goods do not run within variations permitted by the contract for the reason that there are wide differences in type, quality and quantity within delivered units and among all units involved]; [or]

[5. If the [goods] [products] are not adequately contained, packaged and labeled as required by the contract]; [or]

[6. If the [goods] [products] do not conform to the promises or statements made by the seller on the container or label]; [or]

[7. If the food or drink is unwholesome or unfit for human consumption].

N.M.R.A. 2008, Civ. UJI 13-1430.  The directions for use of this instruction state: "Select the

bracketed material which fits the actual issues and evidence involved in the case.  With this instruction, UJI 13-1429 must also be used.  This list of items is not exclusive.  Reference should be made to the Uniform Commercial Code 55-2-314 N.M. Stat. Ann. 1978 for further specifications."

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(Brorby, J.).  The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)(Briscoe, J.)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)(McKay, J.)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" is insufficient. Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the

assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 663 (citing Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(Kelly, J.)(emphasis omitted). The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(McConnell, J.)(citations omitted)(quoting Twombly, 550 U.S. at 570).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions. First, a defendant can argue an affirmative defense on a motion to dismiss where the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss. See Robbins v. Oklahoma, 519 F.3d at 1247; Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009)). Second, the defendant can raise the defense on

a motion to dismiss where the facts establishing the affirmative defense are apparent on the complaint's face.  See Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)(Hill, J.)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim. If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule."). The limitations defense is the affirmative defense that the complaint's uncontroverted facts are most likely to establish.  See 5 Charles Alan Wright et al., Federal Practice & Procedure: Civil § 1277, at 643 (3d ed. 2004).  If the complaint sets forth dates that appear, in the first instance, to fall outside of the statutory limitations period, then the defendant may move for dismissal under rule 12(b)(6).  See Rohner v. Union P. R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955)(Wallace, J.); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945)(Phillips, J.); Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.).

The plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute.  The Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be argued in response to the motion.  Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954)(Major, J.)(holding that, once a plaintiff has pled facts in the complaint indicating that the statute of limitations is a complete or partial bar to an action, the plaintiff must plead facts establishing an exception to the affirmative defense).  It appears that, from case law in several Courts of Appeals, the plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by refraining from pleading specific or identifiable dates.  See Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007)(Niemeyer, J.); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006)(Ripple, J.). Although the Tenth Circuit has not squarely addressed this practice, the Court has permitted this practice.  See Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d at 1188.

## ANALYSIS

The Signetics Defendants invoke federal diversity jurisdiction pursuant to 28 U.S.C. § 1332 as the basis for removing this case,[10] arguing that "[c]omplete diversity exists between the properly joined parties to this action." Notice of Removal ¶¶ 10-16, at 3-4.[11] The Signetics Defendants contend that Rinchem Co., a non-diverse Defendant and citizen of New Mexico, the forum in which the Plaintiffs originally filed this action, was fraudulently joined and thus cannot defeat removal. See Notice of Removal ¶ 17, at 4 (citing Dutcher v. Matheson, 733 F.3d at 988). Having "pierce[d] the pleadings, consider[ed] the entire record, and determine[d] the basis of joinder by any means available," Dodd v. Fawcett Pubs., Inc., 329 F.2d at 85 (citations omitted), the Court concludes that the Signetics Defendants have not shown that "there is no possibility" that the Plaintiffs could establish a cause of action against Rinchem Co., Zufelt v. Isuzu Motors Am., L.L.C., 727 F. Supp. 2d at 1124-25 (citing Montano v. Allstate Indem. Co., 211 F.3d 1278, 2000 WL 525592, at *4-5). Accordingly, because the Signetics Defendants have not met the "exacting" standard for fraudulent joinder, Montano v. Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592, at *2, the Court concludes that it lacks subject matter jurisdiction and remands the case to the First Judicial District

---

[10]The "rule of unanimity," found in 28 U.S.C. § 1446(b)(2)(A), provides that "all defendants who have been properly joined and served must join in or consent to the removal of the action." Although Rinchem Co. did not specifically join in the Signetics Defendants' Notice of Removal, Rinchem Co. has indicated its consent to removal. See Tr. at 41:16-23 (Court, Bisong)(stating "Yes" in response to the Court's query whether Rinchem Co. "consented to the removal"). Accordingly, the rule of unanimity is not a bar to removal of this action.

[11]The Signetics Defendants also contend that a "fair reading" of the Complaint demonstrates that the Plaintiffs' allegations against them independently meet diversity jurisdiction's $75,000.00 amount-in-controversy requirement. Notice ¶¶ 31-34, at 10-11 (explaining that the "Plaintiffs' allegations of injury are at least as significant as others that have been found to satisfy the amount in controversy requirement"). The Plaintiffs do not dispute that their claims against only the Signetics Defendants meet the amount-in-controversy requirement; they argue only that the Court does not have diversity jurisdiction, because the parties are not completely diverse. See Motion at 1-12.

Court, County of Santa Fe, State of New Mexico.

A defendant may remove a civil action brought in state court to federal court if "the district courts of the United States have original jurisdiction" over the action.  28 U.S.C. § 1441(a).  Because federal courts are courts of limited jurisdiction, there is a "presumption against removal jurisdiction."  Anderson v. Lehman Bros. Bank, FSB, 528 F. App'x 793, 795 (10th Cir. 2013)(citing Laughlin v. Kmart Corp., 50 F.3d at 873).  A defendant seeking removal has the burden of proof to establish that federal court jurisdiction is proper "by a preponderance of the evidence," McPhail v. Deere & Co., 529 F.3d at 953, and "courts must deny such jurisdiction if not affirmatively apparent on the record," Okla. Farm Bureau Mut. Ins. Co. v. JSSJ Corp., 149 F. App'x at 778.

Original diversity jurisdiction under 28 U.S.C. § 1332(a), the asserted basis for removal here, requires complete diversity of citizenship among the parties and an amount in controversy exceeding $75,000.00.  See Johnson v. Rodrigues (Orozco), 226 F.3d at 1107.  Complete diversity of citizenship "exists only if no plaintiff and no defendant are citizens of the same state." Middleton v. Stephenson, 749 F.3d 1197, 1200 (10th Cir. 2014).  For diversity jurisdiction purposes, "a person is a citizen of a state if the person is domiciled in that state," i.e., if the "person resides there and intends to remain there indefinitely." Middleton v. Stephenson, 749 F.3d at 1200 (citing Crowley v. Glaze, 710 F.2d at 678).  See Miss. Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 48 (1989).  A corporation is "'deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business.'"  Gadlin v. Sybron Int'l Corp., 222 F.3d at 799 (quoting 28 U.S.C. § 1332(c)(1)).  In determining a corporation's principal place of business, "a court should look to the 'total activity of the company' or the 'totality of the circumstances,' considering 'the character of the corporation, its purposes, the kind of business in which it is engaged, and the situs of its operations.'"  Gadlin v. Sybron Int'l Corp., 222 F.3d at 799 (quoting

Amoco Rocmount Co. v. Anschutz Corp., 7 F.3d 909, 915 & n.2 (10th Cir. 1993)).

Here, it is undisputed that the parties are not completely diverse.  The Complaint alleges, and the Signetics Defendants agree, that the Plaintiffs are all New Mexico citizens.  See Complaint ¶¶ 1-7, at 1-2 (alleging that R. Bellman, Jr., Brett Booth, Brittany Booth, J. Bellman, R. Bellman, and A. Booth are residents of Sandoval County, New Mexico, and that V. Goss is a resident of Bernalillo County, New Mexico); Notice of Removal ¶ 11, at 3 (concluding that, "[o]n information and belief, Plaintiffs are citizens of New Mexico").  Regarding the Defendants, the parties agree that (i) NXP Semiconductors USA, Inc., is a foreign corporation incorporated in the State of Delaware with a principal place of business in the State of California, see Complaint ¶ 8, at 2 (stating this allegation); Notice of Removal ¶ 12, at 3 (agreeing); (ii) Philips Electronics North America Corp. is a foreign corporation incorporated in the State of Delaware with a principle place of business in the State of Massachusetts, see Complaint ¶ 9, at 2 (stating this allegation); Notice of Removal ¶ 13, at 3 (agreeing); (iii) Philips Semiconductors, Inc., is a foreign corporation incorporated in the State of Delaware with a principal place of business in the State of California, see Complaint ¶ 10, at 2 (stating this allegation); Notice of Removal ¶ 14, at 4 (agreeing); and (iv) Rinchem Co. is a domestic corporation with a principle place of business in the State of New Mexico, see Complaint ¶ 11, at 2 (stating this allegation, but not alleging Rinchem Co.'s state of incorporation); Notice of Removal ¶ 15, at 4 (agreeing).  Accordingly, although the Plaintiffs and the Signetics Defendants are completely diverse, the Plaintiffs and Rinchem Co. are citizens of New Mexico and are thus non-diverse.[12]  On

---

[12]It is noteworthy that Rinchem Co. is also a citizen of the forum state in which this action was originally filed.  The "forum-defendant rule" articulated in 28 U.S.C. § 1441(b)(2) provides as an additional requirement that "[a] civil action otherwise removable solely on the basis of [diversity] jurisdiction . . . may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought."  Brazell v. Waite, 525 F. App'x at 884 (quoting 28 U.S.C. § 1441(b)(2))(alterations in original)(internal quotation marks omitted).  The forum-defendant rule, however, "is not jurisdictional and may therefore be waived."  Brazell v.

these facts, the Court lacks subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1).  See Johnson v. Rodrigues (Orozco), 226 F.3d at 1107.

Nevertheless, the Signetics Defendants aver that the Court has diversity jurisdiction over the case, because "[c]omplete diversity exists between the properly joined parties to this action."  Notice of Removal ¶¶ 10-16, at 3-4 (emphasis added).  According to the Signetics Defendants, Rinchem Co. is "fraudulently joined," and the fraudulent joinder of a non-diverse resident defendant against whom a plaintiff is unable to establish a cause of action cannot defeat removal.  See Notice of Removal ¶ 17, at 4 (citing Dutcher v. Matheson, 733 F.3d at 988).  Here, they contend, "New Mexico law precludes Plaintiffs from recovering against Rinchem."  Notice of Removal ¶ 18, at 5.  The Court therefore must determine whether the Plaintiffs fraudulently joined Rinchem Co.

Absent complete diversity, a defendant may still invoke diversity jurisdiction as grounds for removal if it can demonstrate that the plaintiff fraudulently joined a non-diverse defendant to defeat diversity jurisdiction.  See Anderson v. Lehman Bros. Bank, FSB, 528 F. App'x at 795 (citing Dodd v. Fawcett Pubs., Inc., 329 F.2d at 85).  Fraudulent joinder exists if (i) there is "actual fraud in the pleading of jurisdictional facts"; or (ii) the plaintiff is unable to "establish a cause of action against the non-diverse party in state court."  Dutcher v. Matheson, 733 F.3d at 988 (quoting Cuevas v. BAC Home Loans Servicing, LP, 648 F.3d at 249)(internal quotation marks omitted).  The no-cause-of-action test requires that "there is no possibility that the plaintiff would be able to establish a cause of

_____

Waite, 525 F. App'x at 884 (citing Lively v. Wild Oats Markets, Inc., 456 F.3d 933, 940 (9th Cir. 2006)).  See Bank of Am., N.A. v. Lebreton, 2015 U.S. Dist. LEXIS 64339, *99-103 (D.N.M. 2015)(Browning, J.)(concluding that the forum-defendant rule is procedural, not jurisdictional, and citing cases demonstrating that "the overwhelming majority of courts have concluded that the forum-defendant rule is procedural").  Here, the Plaintiffs have moved to remand the case and have thus not waived the forum-defendant rule.  Accordingly, because Rinchem Co. is a "forum defendant," its presence in the suit prevents removal to federal court -- even if diversity were established -- unless the Signetics Defendants can demonstrate that Rinchem Co. was fraudulently joined.

action" against the party alleged to be fraudulently joined.  Zufelt v. Isuzu Motors Am., L.L.C., 727

F. Supp. 2d at 1124-25 (citing Montano v. Allstate Indem. Co., 211 F.3d 1278, 2000 WL 525592, at

*4-5).  "[S]tated differently," the no-possibility standard "means that there is no reasonable basis for

the district court to predict that the plaintiff might be able to recover against an instate defendant."

Cuevas v. BAC Home Loans Servicing, LP, 648 F.3d at 249 (quoting Smallwood v. Ill. Cent. R.R.

Co., 385 F.3d at 573)(internal quotation marks omitted).  Accord Nerad v. AstraZeneca Pharms.,

Inc., 203 F. App'x at 913 ("[T]he court must decide whether there is a reasonable basis to believe the

plaintiff might succeed in at least one claim against the non-diverse defendant.")(citing Badon v.

RJR Nabisco, Inc., 224 F.3d at 393).

      "The defendant seeking removal bears a heavy burden of proving fraudulent joinder, and all

factual and legal issues must be resolved in favor of the plaintiff."  Dutcher v. Matheson, 733 F.3d at

988 (citing Pampillonia v. RJR Nabisco, Inc., 138 F.3d at 461)(internal quotation marks omitted).

See Chesapeake & Ohio Ry. Co. v. Cockrell, 232 U.S. at 152 ("[T]he showing must be such as

compels the conclusion that the joinder is without right and made in bad faith.").  Moreover, whether

a party is fraudulently joined is a "jurisdictional inquiry," Bio-Tec Envtl., LLC v. Adams, 792 F.

Supp. 2d at 1214 (quoting Albert v. Smith's Food & Drug Ctrs., Inc., 356 F.3d at 1247)(internal

quotation marks omitted), that requires a reviewing court to "pierce the pleadings, consider the entire

record, and determine the basis of joinder by any means available," Dodd v. Fawcett Publications,

Inc., 329 F.2d at 85 (internal citations omitted).  If a court determines that joinder of the non-diverse

party is fraudulent, the court may disregard that party and retain jurisdiction over the case.  See

Baeza v. Tibbets, 2006 U.S. Dist. LEXIS 95317, at *3.

      The Signetics Defendants do not allege actual fraud, e.g., that the Plaintiffs and Rinchem Co.

colluded to defeat removal; rather, they contend that the Plaintiffs are "unable to establish a cause of

action" against Rinchem Co. under New Mexico law.  Notice of Removal ¶¶ 17-18, at 5-6 (relying on Dutcher v. Matheson).  Accordingly, the Signetics Defendants have the "heavy burden," Dutcher v. Matheson, 733 F.3d at 988 (citation omitted), of demonstrating that there is "no possibility" that the Plaintiffs would be able to establish a cause of action against Rinchem Co. in state court, Zufelt v. Isuzu Motors Am., L.L.C., 727 F. Supp. 2d at 1124-25 (citation omitted).  The Court's objective, however, "is not to pre-try the merits of the plaintiff's claims. . . . 'A claim which can be dismissed only after an intricate analysis of state law is not so wholly insubstantial and frivolous that it may be disregarded for purposes of diversity jurisdiction.'"  Brazell v. Waite, 525 F. App'x at 881 (alteration omitted)(quoting Batoff v. State Farm Insurance Co., 977 F.2d at 853).  At the same time, the Court is not "compelled to believe whatever the plaintiff says in his complaint."  Brazell v. Waite, 525 F. App'x at 881.

In determining whether the Plaintiffs have established a cause of action against Rinchem Co., the Signetics Defendants argue that the Court should consider the removal standard "in conjunction with the . . . Supreme Court's recent jurisprudence regarding the viability of complaints under a Rule 12(b)(6) analysis."  Response at 3 (relying on Twombly and Iqbal).  Thus, they contend, the Court should find fraudulent joinder if it concludes that the Plaintiffs' claims against Rinchem Co. do not "cross the line from conceivable to plausible."  Response at 3 (emphasis omitted)(reasoning that, if a "'conceivable' claim is deemed insufficient under a Rule 12(b)(6) analysis, then a theoretically 'possible' claim should be equally infirm under a remand analysis").  They argue that Twombly and Iqbal "inform the standard of fraudulent joinder," Tr. at 21:8-20 (Hardy), and elaborate that "whether a claim is implausible or plausible is similar to whether it's possible or impossible," Tr. at 23:1-4 (Hardy).  They conclude that, under the Twombly/Iqbal standard, the "Plaintiffs' claims against Rinchem are deficient because the complaint sets forth a litany of labels, conclusions, and formulaic

recitations," and because those claims are not "plausible."  Response at 4.

These arguments overlook key distinctions between rule 12(b)(6) and fraudulent joinder. First, although a "pleading that offers 'labels and conclusions'" fails to state a claim under rule 12(b)(6), Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555), a court is not confined to the allegations that appear on a complaint's face when evaluating whether a plaintiff has fraudulently joined a non-diverse defendant to defeat removal.  Rather, "upon allegations of fraudulent joinder designed to prevent removal, federal courts may look beyond the pleadings to determine if the joinder, although fair on its face, is a sham or fraudulent device to prevent removal."  Brazell v. Waite, 525 F. App'x at 881 (quoting Smoot v. Chicago, Rock Island and Pac. R.R. Co., 378 F.2d at 881-82).  Thus, it is immaterial for fraudulent joinder purposes whether the Complaint "sets forth a litany of labels, conclusions, and formulaic recitations," Response at 4, as the Court is empowered to look beyond the Complaint's face to determine whether there is any "possibility that the [Plaintiffs] would be able to establish a cause of action" against Rinchem Co., Zufelt v. Isuzu Motors Am., L.L.C., 727 F. Supp. 2d at 1124-25 (emphasis added)(citation omitted).

Second, the Twombly/Iqbal plausibility standard is inapposite, because it involves different burdens and requires a lesser quantum of proof than fraudulent joinder's no-possibility standard.  As the Tenth Circuit has long held, the fraudulent joinder test "is more exacting than that for dismissing a claim under Fed. R. Civ. P. 12(b)(6)."  Montano v. Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592, at *2.  See Tr. at 21:8-20 (Hardy)(agreeing that the cases involving fraudulent joinder hold that the standard is "higher[] than the standard on the motion to dismiss").  Under rule 12(b)(6), a plaintiff must state a "plausible claim for relief," which is "more than a sheer possibility," but less than a "'probability requirement.'"  Iqbal, 556 U.S. at 678.  In evaluating plausibility, a court must construe the complaint's allegations in the light most favorable to the plaintiff and dismiss a claim

"only if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  Proving a "sheer possibility" is, of course, simpler than proving "plausibility."  That, however, is the point.  Fraudulent joinder requires that the defendant prove that "there is no possibility that the plaintiff would be able to establish a cause of action" against the non-diverse party.  Zufelt v. Isuzu Motors Am., L.L.C., 727 F. Supp. 2d at 1124-25 (emphasis added)(citation omitted).  The defendant therefore bears the "heavy burden" of demonstrating that the plaintiff's claims cannot meet the simpler "possibility" standard, while the court, as in the rule 12(b)(6) context, must still resolve "all factual and legal issues . . . in favor of the plaintiff."  Dutcher v. Matheson, 733 F.3d at 988 (citation omitted).  Accord Montano v. Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592, at *2 (stating that the court "must initially resolve all disputed questions of fact and all ambiguities in the controlling law in favor of the non-removing party")(citation omitted).  Moreover, in contrast with rule 12(b)(6), the defendant must overcome a presumption against removal, see Laughlin v. Kmart Corp., 50 F.3d at 873, while the court may look beyond the pleadings to determine whether a "possibly viable" claim exists, Montano v. Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592, at *2.  Finally, whereas the court should dismiss a claim under rule 12(b)(6) "only if a reasonable person could not draw" an inference of plausibility, Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322, a removing defendant must establish a claim's impossibility for fraudulent joinder purposes "with complete certainty upon undisputed evidence," Smoot v. Chi., Rock Island & Pac. R.R. Co., 378 F.2d at 882.

Third, from a mechanical standpoint, the Twombly/Iqbal standard would not work well in the fraudulent joinder context.  New Mexico state courts have not adopted Twombly/Iqbal's heightened pleading standard.  See Isengard v. N.M. Pub. Educ. Dep't, 2009 U.S. Dist. LEXIS 118183, at *16 (D.N.M. 2009)(Browning, J.)("Courts in New Mexico have not adopted the pleading requirements of

the Federal Rules of Civil Procedure that the Supreme Court . . . enunciated in [Twombly/Iqbal.]").
Rather, New Mexico uses notice pleading, which requires that plaintiffs allege facts sufficient only
to put the defendant on fair notice of their claims.  See Taylor v. L&P Bldg. Supply of Las Cruces,
Inc., 2015 U.S. Dist. LEXIS 162692, at *24 n.5 (D.N.M. 2015)(Browning, J.)(citing rule 1-008(A)
NMRA; Schmitz v. Smentowski, 1990-NMSC-002, ¶ 9, 785 P.2d 726, 729-30).  A complaint filed in
New Mexico state court is thus subject to a relaxed pleading standard; once the case is removed to
federal court, however, the complaint is subject to the more rigorous Twombly/Iqbal standard.  See
Taylor v. L&P Bldg. Supply of Las Cruces, Inc., 2015 U.S. Dist. LEXIS 162692, at *24 n.5
(citations omitted).  Although a complaint crafted to meet the state's notice pleading standard may
survive a motion to dismiss in that forum, upon removal it might fail to state a claim under the more
rigorous federal standard.  The Court has previously noted that it may grant a motion to dismiss in
that context, but that it would dismiss without prejudice to allow the plaintiffs an opportunity to
amend their complaint to comply with Twombly/Iqbal.  See Archuleta v. Taos Living Ctr., LLC, 791
F. Supp. 2d 1066, 1076 (D.N.M. 2011)(Browning, J.).

     This process, however, would not work in the fraudulent joinder context, where the central
question is whether the case belongs in federal court in the first place.  If the Court's remand analysis
was confined to the complaint's four corners, and a plaintiff had additional evidence to offer,
fairness would require that the Court allow amendment before determining whether the complaint --
originally drafted to comply with state notice-pleading -- met Twombly/Iqbal's heightened pleading
standard.  Such a process would waste judicial resources, unduly delay resolution of the matter, and
incentivize formalistic pleading practice.  Well-established Tenth Circuit precedent on fraudulent
joinder provides better guidance.  When evaluating fraudulent joinder, the proper inquiry is whether
a plaintiff can state a "possibly viable" claim.  Montano v. Allstate Indemnity Co., 211 F.3d 1278,

2000 WL 525592, at *2.  The Court has previously explained that "[a] claim is 'possibly viable' if[] with amendment it would state a cause of action."  Archuleta v. Taos Living Ctr., LLC, 791 F. Supp. 2d at 1076.  Thus, here, rather than require amendment if the Plaintiffs' claims against Rinchem Co. are not facially "plausible" under Twombly/Iqbal, the Court can more efficiently evaluate fraudulent joinder by inquiring whether there is a possibility that any of the Plaintiffs' claims against Rinchem Co. could be viable under an amended Complaint.  Cf. Archuleta v. Taos Living Ctr., LLC, 791 F. Supp. 2d at 1076 ("The Court will thus determine whether there is a possibility that any of J. Archuleta's claims against Reid are viable, either in state court, or in federal court under an amended complaint.").  The rules for remand and not just the rules for fraudulent joinder dictate this liberal rule.  See Pritchett v. Office Depot, Inc., 404 F.3d 1232, 1235 (10th Cir. 2005)("[S]tatutes conferring jurisdiction upon the federal courts, and particularly removal statutes, are to be narrowly construed in light of our constitutional role as limited tribunals.").

In short, "[i]n addressing whether a non-diverse party was fraudulently joined, [] the Court does not apply the same standard that it must apply in addressing a motion to dismiss."  Archuleta v. Taos Living Ctr., LLC, 791 F. Supp. 2d at 1075 (citations omitted).  Thus, the Signetics Defendants are incorrect in contending that the Plaintiffs' claims against Rinchem Co. fail because they are not "plausible."  Response at 4.  Plausibility is not the test for fraudulent joinder, and the Signetics Defendants' reliance on that test contravenes the Court's long-established conclusion that fraudulent joinder requires that there is "no possibility" of a claim against the non-diverse defendant.  Zufelt v. Isuzu Motors Am., L.L.C., 727 F. Supp. 2d at 1124-25 (citation omitted).  As the preceding analysis illustrates, the "no possibility" test carries a heavier burden than rule 12(b)(6)'s plausibility standard, because a "possible" claim is simpler to establish than a "plausible" one.  The Signetics Defendants must demonstrate the impossibility of the Complaint's claims against Rinchem Co. "with complete

certainty upon undisputed evidence." Smoot v. Chi., Rock Island & Pac. R.R. Co., 378 F.2d at 882.

In evaluating the Complaint's allegations against Rinchem Co., the Court must resolve all factual

and legal issues in the Plaintiffs' favor, see Dutcher v. Matheson, 733 F.3d at 988 (citation omitted),

and "may look beyond the pleadings" to determine whether the Plaintiffs' joinder of Rinchem Co.

was proper, Brazell v. Waite, 525 F. App'x at 881 (citation omitted).  If either of the claims against

Rinchem Co. is "possibly viable," then "remand is required."  Montano v. Allstate Indemnity Co.,

211 F.3d 1278, 2000 WL 525592, at *2.

Having clarified the proper standard for fraudulent joinder, the Court turns to the Plaintiffs'

claims against Rinchem Co.  The Court will address first the Plaintiffs' negligence claim and then

turn to the breach-of-warranty claim.

## I.   THE SIGNETICS DEFENDANTS HAVE NOT DEMONSTRATED WITH COMPLETE CERTAINTY THAT THE PLAINTIFFS HAVE NO POSSIBILITY OF A NEGLIGENCE CLAIM AGAINST RINCHEM CO.

The Complaint's Count III asserts a negligence claim against Rinchem Co.  See Complaint

¶¶ 94-98, at 24-26.  The Plaintiffs contend that Rinchem Co. "supplied, transported, formulated, re-

formulated, mixed, sold and/or distributed" some of the chemicals that Signetics Corp. used in the

manufacture of semiconductor products or components.  Complaint ¶ 11, at 2; id. ¶¶ 22-23, at 5-6.

The Plaintiffs further assert that Rinchem Co. breached a duty (i) to "exercise reasonable care in the

manufacture, blending, design, marketing, distribution, sale and supply" of the chemicals; and (ii) to

"advise and warn purchasers, users and persons who might reasonably be expected to be exposed to

said products of the dangers and hazards posed by such exposure," and, if pregnant, to warn "their

unborn children" who were later discovered.  Complaint ¶¶ 95-96, at 24-25.  The Plaintiffs contend,

finally, that R. Bellman, Jr., Brett Booth, and Brittany Booth's in utero injuries "were a direct and

proximate result of the unreasonable, careless and negligent conduct of Rinchem . . . ."  Complaint ¶

98, at 26.  The Court concludes that these allegations state a "possibly viable" claim.  Montano v.

Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592, at *2.

       Under New Mexico law, a negligence claim requires the existence of a duty from a defendant

to a plaintiff, a breach of that duty, and that the breach is a cause-in-fact and proximate cause of the

plaintiff's damages.  See Coffey v. United States, 870 F. Supp. 2d at 1225 (citing Herrera v. Quality

Pontiac, 2003-NMSC-018, ¶ 6, 73 P.3d at 185-86).  "A finding of negligence . . . is dependent upon

the existence of a duty," which is a "question of law for the courts to decide."  Schear v. Bd. of Cnty

Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d at 729 (citation omitted).  A plaintiff's foreseeability does

not end the inquiry whether a defendant owed that plaintiff a duty; "[u]ltimately, a duty exists only if

the obligation of the defendant [is] one to which the law will give recognition and effect."  Herrera v.

Quality Pontiac, 2003-NMSC-018, ¶¶ 7-9, 73 P.3d at 186-87 (internal quotation marks omitted).  To

determine whether the law gives recognition and effect to such an obligation, courts consider legal

precedent, statutes, and other principals of law.  See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶

9, 73 P.3d at 186.  If the court finds that there is a legal duty, it must inquire whether the defendant

breached that duty by "considering what a reasonably prudent individual would foresee, what an

unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light

of all surrounding circumstances of the present case . . . ."  Herrera v. Quality Pontiac, 2003-NMSC-

018, ¶ 33, 73 P.3d at 195.

       Under New Mexico negligence law, "manufacturers and distributors of products have a duty

to use ordinary care in producing products so as to avoid a foreseeable risk of injury caused by a

condition of the product or manner in which it is used."  Smith ex rel. Smith v. Bryco Arms, 2001-

NMCA-090, ¶ 19, 33 P.3d at 645.  In products liability actions based on negligent-failure-to-warn,

New Mexico courts have relied on § 388 of the Restatement (Second) of Torts, which imposes a

duty on a "supplier" of chattels "to warn buyer of a dangerous condition of the product sold." Eichel

v. Goode, Inc., 1984-NMCA-035, ¶ 11, 680 P.2d 627, 630 (citing Fabian v. E.W. Bliss Co., 582 F.2d

1257 (10th Cir. 1978); Richards v. Upjohn Co., 1980-NMCA-062, 625 P.2d 1192).  See, e.g.,

Parker, 1995-NMCA-086, ¶¶ 33-37, 909 P.2d at 130-31 (holding that a bulk supplier of raw

materials had no duty to warn under § 388); Villanueva v. Nowlin, 1966-NMSC-248, ¶ 7, 420 P.2d

764, 765 (holding that a lender of an obviously dangerous welding machine had no duty to warn

under § 388).  Section 388 provides:

> § 388. Chattel Known to be Dangerous for Intended Use
>
> One who supplies directly or through a third person a chattel for another to use is
> subject to liability to those whom the supplier should expect to use the chattel with
> the consent of the other or to be endangered by its probable use, for physical harm
> caused by the use of the chattel in the manner for which and by a person for whose
> use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the
> use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will
> realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of
> the facts which make it likely to be dangerous.

Eichel v. Goode, Inc., 1984-NMCA-035, ¶ 11, 680 P.2d at 630 (quoting Restatement (Second) of

Torts § 388).  The Court of Appeals of New Mexico has noted that § 388 "applies to sellers, lessors,

donors, or lenders, irrespective of whether the chattel is made by them or by a third party." Eichel v.

Goode, Inc., 1984-NMCA-035, ¶ 11, 680 P.2d at 630 (citing Restatement (Second) of Torts § 388

cmt. c).  "Thus, a 'supplier' for Section 388 purposes is 'any person who for any purpose or in any

manner gives possession of a chattel for another's use . . . without disclosing his knowledge that the

chattel is dangerous for the use for which it is supplied . . . .'" Eichel v. Goode, Inc., 1984-NMCA-

035, ¶ 11, 680 P.2d at 630 (quoting Restatement (Second) of Torts § 388 cmt. c).

Here, there is some dispute whether Rinchem Co. qualifies as a "supplier" under § 388 and, thus, whether it had an attendant legal duty to warn.  Notice of Removal at 8 ("Defendants [] do not concede that Rinchem was a supplier of any chattels to the Signetics Defendants.").  The Signetics Defendants contend that "Rinchem's role more closely resembles that of the provider of a service, namely transport and delivery, rather than a 'supplier' in the sense of a company involved in the actual design, manufacture or sale of products or goods."  Response at 11 n.2.  They cite the Moore Aff., which states that, during the relevant period, Rinchem Co.'s primary business functions were "warehousing, ground transportation and chemical waste collection," and that Rinchem Co. "did not manufacture, blend or design any of the chemicals listed in the Plaintiffs' Complaint . . . ."  Moore Aff. ¶¶ 3-4, at 1.  The Moore Aff. alleges that, to the extent Rinchem Co. transported or delivered those chemicals to Signetics Corp., it "was paid as a public warehouse by the various chemical manufacturers to store, transport and deliver the chemicals."  Moore Aff. ¶ 8, at 2.  Relying on these statements, the Signetics Defendants conclude that Rinchem Co.'s "role was simply that of a transport or delivery service," and that a "transporter of a product is not necessarily the 'supplier' of that product."  Response at 10, 11 n.2.

These objections are immaterial to § 388's definition of "supplier."  Comment c provides in broad terms that a "supplier" is "any person who for any purpose or in any manner gives possession of a chattel for another's use, . . . irrespective of whether the chattel is made by them or by a third person."  Restatement (Second) of Torts § 388 cmt. c.  Accordingly, that Rinchem Co. "did not manufacture, blend or design any of the chemicals listed in the Plaintiffs' Complaint," Moore Aff. ¶¶ 3-4, at 1, is irrelevant; Rinchem Co. transported and delivered, i.e., gave possession of, chemicals to Signetics Corp. for use in its manufacture of semiconductor products or components.  The Court of Appeals of New Mexico has expressly relied on comment c's broad definition to hold a supermarket

liable as a "supplier" of a cardboard box baler/compactor that it operated on its premises, despite that the supermarket was not the chattel's manufacturer.  Eichel v. Goode, Inc., 1984-NMCA-035, ¶ 12, 680 P.2d at 630.  See Parker, 1995-NMCA-086, ¶ 24, 909 P.2d at 9 (distinguishing suppliers from manufacturers of chattels and stating that § 388 applies to both).  It is likewise irrelevant that "various chemical manufacturers" and not Signetics Corp. paid Rinchem Co., Moore Aff. ¶ 8, at 2, because § 388 does not require that an entity sell a chattel for it to be a "supplier," Restatement (Second) of Torts § 388 cmt. c (providing that a supplier is a person who "in any manner gives possession of a chattel for another's use")(emphasis added).

The Signetics Defendants submit, however, that Rinchem Co. is not a supplier within § 388's meaning, because its "simple transport and delivery of materials designed, manufactured, and/or sold by others" makes it a "bulk supplier."  Response at 12.  The Signetics Defendants aver that the Court of Appeals of New Mexico in Parker held that a "'bulk supplier of materials' is not a 'supplier' of chattels" and therefore owes "no duty to warn subsequent users of products fashioned from those bulk materials of potential dangers."  Response at 12.  This reading of Parker is inaccurate.  There, the Court of Appeals of New Mexico noted that § 388 "has been held to extend to a party who supplies chattels that are or are likely to be dangerous, as well as those who manufacture them." Parker, 1995-NMCA-086, ¶ 24, 909 P.2d at 9 (citation omitted).  The Court Appeals concluded that, because the plaintiffs failed to establish that the manufacturer's bulk supply of raw materials was "inherently defective or unsafe" -- indeed, the materials were "inert" and not "inherently dangerous" -- § 388 did not apply.  Parker, 1995-NMCA-086, ¶ 24, 909 P.2d at 9 ("Du Pont owed no duty to Plaintiffs for supplying Vitek with an inert material.").  Here, by contrast, there is no genuine dispute as to the danger of the chemicals Rinchem Co. delivered or as to its knowledge of those dangers. See Restatement (Second) of Torts § 388 cmt. c (noting that a supplier must have "knowledge that

the chattel is dangerous"). Further, the application of the "bulk supplier doctrine" on these facts is suspect. That doctrine provides a "defense to a claim that the supplier failed to warn an ultimate consumer about a possible danger associated with a particular product that had been manufactured from a number of component parts and had undergone substantial change." Parker, 1995-NMCA-086, ¶ 25, 909 P.2d at 9 (citations omitted). It is unlikely that this defense applies, because the Plaintiffs do not allege that exposure to a substantially changed end product, which was manufactured from a number of the chemicals that Rinchem Co. supplied, caused their injuries; rather, the Plaintiffs argue that exposure to individual chemicals that Rinchem Co. supplied caused their injuries and that such exposure occurred during the manufacture of semiconductor products.

Ultimately, further issues regarding Rinchem Co.'s status as a "supplier" likely will develop as this litigation progresses; for example, Rinchem Co. might dispute that the chemicals it supplied were inherently dangerous or that it had sufficient knowledge of any dangers. The Court's present fraudulent joinder inquiry, however, requires that it construe all factual and legal issues -- including Rinchem Co.'s knowledge of the chemicals' dangerousness -- in the Plaintiffs' favor. See Dutcher v. Matheson, 733 F.3d at 988. Construing the record in this manner, the Court concludes that Rinchem Co. gave possession of dangerous chemicals to Signetics Corp. and is thus a "supplier" under § 388.

The Signetics Defendants contend that, even if Rinchem Co. is a supplier, it had no duty to warn the Plaintiffs of the risks associated with the chemicals it delivered to Signetics Corp., because Signetics Corp. knew of the chemicals' risks and because it gave Signetics Corp. safety information regarding those chemicals. See Notice of Removal ¶ 30, at 9-10. Citing § 388, the Supreme Court of New Mexico has stated that "[t]here is no duty to warn of dangers actually known to the user of a product[.]" Garrett v. Nissen Corp., 1972-NMSC-046, ¶ 16, 498 P.2d 1359, 1364, overruled on

other grounds by Klopp v. Wackenhut Corp., 1992-NMSC-008, ¶ 12, 824 P.2d 293, 297.  In an early decision relying on § 388, the Supreme Court of New Mexico illustrated this principle by explaining the interrelationship between clauses (b) and (c):

> If defendant had no reason to believe that plaintiff would realize the dangerous condition . . . , then defendant was required to exercise reasonable care to inform plaintiff of the dangerous condition.  If, however, defendant did have reason to believe plaintiff would realize the dangerous condition, then defendant was not required to inform plaintiff of the condition.

Villanueva v. Nowlin, 1966-NMSC-248, ¶ 7, 420 P.2d at 765.  The Supreme Court of New Mexico noted that comment k to clause (b), entitled "When warning of defects unnecessary," supports this interpretation.  Villanueva v. Nowlin, 1966-NMSC-248, ¶ 7, 420 P.2d at 765.  Comment k provides that, while only "persons of special experience" may realize a condition's dangerousness, a supplier must inform users of the risk only if it has "no reason to believe that those who use it will have special experience as will enable them to perceive the danger."  Restatement (Second) of Torts § 388 cmt. k.  Likewise, a supplier has no duty to warn of a "condition which a mere casual looking over will disclose, unless the circumstances over which the chattel is supplied are such as to make it likely that even so casual an inspection will not be made."  Restatement (Second) of Torts § 388 cmt. k. The latter scenario arose in Villanueva v. Nowlin, where a worker sued for injuries he sustained when the moving fan blades on a welding machine that the defendants had loaned to the worker's employer for use on a construction project struck his fingers.  See 1966-NMSC-248, ¶ 2, 420 P.2d at 764.  Relying on comment k, the Supreme Court of New Mexico held that the defendants had no duty to warn, because a "casual looking over" would have revealed the machine's dangerous condition.  Villanueva v. Nowlin, 1966-NMSC-248, ¶¶ 8-9, 420 P.2d at 765-66.

Comment *l* to clause (c) states that a supplier's duty is "to exercise reasonable care to inform those for whose use the article is supplied of dangers which are peculiarly within his knowledge.  If

he has done so, he is not subject to liability, even though the information never reaches those for whose use the chattel is supplied."  Restatement (Second) of Torts § 388 cmt. *l*.  Comment n, entitled "Warnings given to third persons," outlines the general circumstances under which a supplier may reasonably rely on intermediaries to transmit the safety information that comment *l* requires to be given to users.  Restatement (Second) of Torts § 388 cmt. n.  Comment n states that, when a product is supplied for the use of persons other than the original purchaser, the question may arise "whether the person supplying the chattel is exercising that reasonable care, which he owes to those who are to use it, by informing the third person through whom the chattel is supplied of its actual character." Restatement (Second) of Torts § 388 cmt. n.  Giving the third person "all the information necessary to [the chattel's] safe use is not in all cases sufficient to relieve the supplier from liability"; rather, the method must provide "a reasonable assurance that the information will reach those whose safety depends upon their having it."  Restatement (Second) of Torts § 388 cmt. n.  Factors to consider include the third person's known or knowable character, i.e., whether the third person will reliably communicate the product's dangerousness to those who use it, and the magnitude of risk or the seriousness of the likely harm.  See Restatement (Second) of Torts § 388 cmt. n.  The greater the risk of serious injury, the greater the supplier's duty to exercise reasonable care in communicating the product's hazardous potential.  See Restatement (Second) of Torts § 388 cmt. n.

Courts have read these comments as establishing "sophisticated user" and "sophisticated intermediary" defenses to liability under § 388.  Under the sophisticated-user defense, when the user of a product knows or has reason to know of the product's hazards, the supplier's duty to warn is discharged.  See Johnson v. Am. Standard, Inc., 179 P.3d 905, 910 (Cal. 2008)("[S]ophisticated users need not be warned about dangers of which they are already aware or should be aware."); Billsborrow v. Dow Chem., U.S.A., 579 N.Y.S. 2d 728, 733 n.* (App. Div. 1992)(stating that there

is no duty to warn where the "user knows or has reason to know of the dangerous propensities of the product independent of the information supplied to him by the manufacturer or distributor")(citations omitted); Duncan v. Louisiana Power & Light Co., 532 So. 2d 968, 972 (La. Ct. App. 1988)("There is no duty to warn a sophisticated user of dangers of which he may be presumed to know through his familiarity with the product.")(citations omitted); Grady v. Am. Optical Corp., 702 S.W.2d 911, 915 (Mo. Ct. App. 1985)("If the user of a product knows or reasonably may be expected to know of a particular danger, strict liability will not result from a failure to warn of that danger.").  Courts routinely employ an objective standard when determining whether the end user was aware of the product's danger.  See Johnson v. Am. Standard, Inc., 179 P.3d at 916 (rejecting the argument that a supplier's duty to warn "should turn on the individual plaintiff's actual understanding of the risk"). This standard requires "general predictions of the anticipated user population's knowledge, not case-by-case hindsight examinations of the particular plaintiff's subjective state of mind."  Johnson v. Am. Standard, Inc., 179 P.3d at 916.

The sophisticated-intermediary or sophisticated-purchaser defense provides that "suppliers do not have a duty to warn employees or customers of knowledgeable industrial purchasers as to product-related hazards."  Lambert v. B.P. Prods. N. Am., Inc., 2006 U.S. Dist. LEXIS 16756, at *5 (S.D. Ill. 2006)(Murphy, C.J.)(citing Ritchie v. Glidden Co., 242 F.3d 713, 724 (7th Cir. 2001)).  See Akin v. Ashland Chem. Co., 156 F.3d at 1037 ("This exception absolves suppliers of the duty to warn purchasers who are already aware or should be aware of the potential dangers.")(citing O'Neal v. Celanese Corp., 10 F.3d 249, 251-52 (4th Cir. 1993)).  In other words,

> suppliers have no duty to warn where the plaintiff's employer is a sophisticated user of the product and is in the best position to warn employees of the product's dangers; the supplier remains under a duty to warn end-users, but it can rely on a knowledgeable employer to convey the warnings of the hazard.

Lambert v. B.P. Prods. N. Am., Inc., 2006 U.S. Dist. LEXIS 16756, at *5 (citing Restatement

(Second) of Torts § 388 cmt. n).  For the exception to apply, "the intermediary must have knowledge or sophistication equal to that of the manufacturer, and the manufacturer must be able to rely reasonably on the intermediary to warn the ultimate consumer."  Triplett v. 3M, 422 F. Supp. 2d 779, 786 (W.D. Ky. 2006)(Simpson, J.)(citation omitted).  Reasonable reliance is typically determined by balancing the "reliability of the employer as a conduit of necessary information about the product; the magnitude of the risk involved; and the burdens imposed on the supplier by requiring it to directly warn the ultimate users."  Newson v. Monsanto Co., 869 F. Supp. 1255, 1259 (E.D. Mich. 1994)(Edmunds, J.)(citation omitted).  See Restatement (Second) of Torts § 388 cmt. n (outlining the same factors).

No New Mexico court has squarely adopted the sophisticated-user or sophisticated-purchaser doctrines.  Nevertheless, the Signetics Defendants aver that these doctrines apply to preclude liability against Rinchem Co.[13]  The Signetics Defendants principally rely on Parker where, they contend, the Court of Appeals of New Mexico held that Du Pont Co., a supplier of Teflon, did not have a duty to warn ultimate consumers when it supplied Teflon in bulk to Vitek Inc. for use in the manufacture of artificial medical implants.  See Notice of Removal ¶ 24, at 7.  They aver that Du Pont Co. provided warnings to Vitek Inc., and that Vitek Inc. "was a sophisticated purchaser who was aware of the nature and properties of the raw materials."  Notice of Removal ¶ 24, at 7.  On these facts, they aver, the Court of Appeals of New Mexico, relying on comment l to § 388, held that, "when a supplier provides materials to a sophisticated purchaser along with the safety information that is in its possession, no further duty to warn exists."  Notice of Removal ¶¶ 24-25, at 7-8 (citing Parker, 1995-

---

[13]Throughout their briefings and at the hearing, the Signetics Defendants appear to conflate these doctrines, asserting that Signetics Corp. is both a sophisticated user and a sophisticated purchaser.  Because these defenses are conceptually distinct, the Court will treat them separately and evaluate Rinchem Co.'s potential liability under both doctrines.

NMCA-086, ¶¶ 35-36, 909 P.2d at 130-31).  Extrapolating from this reasoning, they contend that

Rinchem Co. can assert a sophisticated-user defense, because "Signetics was a regular user of the

chemicals" and had "manufacturing safety information.  So Rinchem would have had no reason to

believe that Signetics wasn't [aware] of the risks."  Tr. at 28:16-29:12 (Hardy).

      The Signetics Defendants read <u>Parker</u> too expansively.[14]  First, as explained above, the Court

of Appeals of New Mexico held that Du Pont Co. had no duty to warn ultimate consumers, because

the materials it supplied were "inert" and not "inherently dangerous."  <u>Parker</u>, 1995-NMCA-086, ¶

24, 909 P.2d at 9.  The Court of Appeals of New Mexico reasoned:

> [A] supplier of a component part or raw material which is not inherently defective
> or dangerous at the time it leaves the manufacturer's control, and which part or
> material is used in the manufacture or making of another product, does not owe a
> duty to an ultimate consumer to issue a warning concerning the suitability or safety
> of the finished product; in such situation any duty to warn rests upon the
> manufacturer of the device or finished product.

1995-NMCA-086, ¶ 16, 909 P.2d at 7 (citations omitted).  Accordingly, the Court of Appeals of

New Mexico's' holding did not turn on the adequacy of Du Pont Co.'s warning in light of the user's

sophistication; rather, the Court of Appeals of New Mexico held that Du Pont Co. had no § 388 duty

to warn in the first instance, because it did not supply dangerous products.  <u>See</u> 1995-NMCA-086, ¶

22, 909 P.2d at 9 ("[T]he adequacy of a warning does not become a material, factual issue until it is

first determined that a duty to warn exists.")(citation omitted).  Indeed, the Court of Appeals of New

Mexico suggested that Du Pont Co., as a supplier of inert bulk materials, was not even a "supplier"

within § 388's meaning.  1995-NMCA-086, ¶ 36, 909 P.2d at 12.

---

[14]It is noteworthy that the opinion uses the word "sophisticated" only twice, both in reference to the parties' arguments regarding the company's knowledge.  <u>Parker</u>, 1995-NMCA-086, ¶ 7, 909 P.2d at 5 ("Du Pont also contended that . . . Vitek was a sophisticated user who possessed knowledge of the risks associated with such product."); 1995-NMCA-086, ¶ 22, 909 P.2d at 8 ("Du Pont argued that Vitek was a sophisticated purchaser with extensive knowledge . . . .").  The Court of Appeals does not explicitly conclude that Vitek Inc. was sophisticated.

Second, to the extent the Court of Appeals of New Mexico held that Du Pont Co. discharged any duty to warn by providing Vitek Inc. with the "safety information" in its possession, Notice of Removal ¶¶ 24-25, at 7-8, that conclusion was unrelated to Vitek Inc.'s sophistication. In evaluating the plaintiffs' negligence claim against Du Pont Co., the Court of Appeals of New Mexico observed that § 388(c) imposes liability on a supplier of a chattel who "fails to exercise reasonable care to inform [the user] of its dangerous condition . . . ." Parker, 1995-NMCA-086, ¶ 34, 909 P.2d at 11. The Court of Appeals of New Mexico then quoted comment *l* to clause (c) for the proposition that a supplier is not subject to liability if it has "exercise[d] reasonable care to inform those for whose use the article is supplied of dangers which are peculiarly within its knowledge." 1995-NMCA-086, ¶ 35, 909 P.2d at 11. Turning to the case's facts, the Court of Appeals of New Mexico noted that, after Vitek Inc. "subjected the raw materials to extensive processing in order to fabricate its patented product," Du Pont Co. advised Vitek Inc. that its materials -- although inert in raw form -- were not safe for use in that product. 1995-NMCA-086, ¶ 36, 909 P.2d at 12. The Court of Appeals of New Mexico implied, without expressly holding, that this action was sufficient to discharge Du Pont Co.'s duty to warn Vitek Inc. See 1995-NMCA-086, ¶ 36, 909 P.2d at 12 (explicitly holding only that Du Pont Co. "owed no duty" to warn the ultimate users). Thus, the Court of Appeals of New Mexico's analysis focused on clause (c), i.e., the adequacy of the supplier's warning, and not clause (b), i.e., the user's knowledge or sophistication.

If anything, this analysis suggests that Vitek Inc. was not sophisticated. As the Supreme Court of New Mexico has explained, the duty to "exercise reasonable care to inform the plaintiff of the dangerous condition" under clause (c) arises only if the supplier has "no reason to believe that plaintiff would realize the dangerous condition." Villanueva v. Nowlin, 1966-NMSC-248, ¶ 7, 420 P.2d at 765. If the supplier has "reason to believe plaintiff would realize the dangerous condition,"

e.g., because the plaintiff is sophisticated, then the supplier is not required to warn.  Villanueva v. Nowlin, 1966-NMSC-248, ¶ 7, 420 P.2d at 765.  In Parker, the Court of Appeals of New Mexico did not state that Vitek Inc., as a sophisticated user, knew or should have known that its use of Du Pont Co.'s otherwise inert raw material in its patented product was unsafe, and therefore, that Du Pont Co. had no duty to warn as to that danger; rather, the Court of Appeals of New Mexico's implied gloss on Du Pont Co.'s warning suggests that Vitek Inc. was not sophisticated.  See Parker, 1995-NMCA-086, ¶ 36, 909 P.2d at 12.  Accordingly, the Court concludes that Parker did not apply, much less adopt, the sophisticated-user or sophisticated-purchaser defenses.

All the above notwithstanding, the Court is confident that the Supreme Court of New Mexico would recognize the sophisticated-user and sophisticated-purchaser defenses in a negligent failure-to-warn case.  The Supreme Court of New Mexico has clearly adopted § 388 as an authoritative statement of the general principles regarding negligent failure-to-warn in New Mexico.  See Villanueva v. Nowlin, 1966-NMSC-248, ¶¶ 7-12, 420 P.2d at 765-66 (stating that "[t]he liability of a supplier of a chattel known to be dangerous for intended use is stated in . . . § 388" and discussing that section in depth).  The sophisticated-user/purchaser defenses logically follow from § 388's text and structure, which impose a duty to warn only when a supplier "has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition."  Restatement (Second) of Torts § 388(b).  Comment k to clause (b) states that a user's sophistication with respect to a chattel, as well as a chattel's obvious dangers, suggest that the user "will realize its dangerous condition."  Restatement (Second) of Torts § 388(b) cmt. k.  In Villanueva v. Nowlin, the Supreme Court of New Mexico cited comment k in holding that, because a welding machine was obviously dangerous, a warning was unnecessary.  See 1966-NMSC-248, ¶¶ 8-9, 420 P.2d at 765-66 (citing Restatement (Second) of Torts § 388(b) cmt. k).  It is likely that the Supreme Court of New Mexico would apply

- 86 -

the same logic and conclude that there is no duty to warn where "persons of special experience," i.e., sophisticated users, would realize a condition's dangerousness.  Restatement (Second) of Torts § 388 cmt. k.  As the Supreme Court of California stated in adopting the sophisticated-user defense, "[j]ust as a manufacturer need not warn ordinary consumers about generally known dangers, a manufacturer need not warn members of a trade or profession (sophisticated users) about dangers generally known to that trade or profession."  Johnson v. Am. Standard, Inc., 179 P.3d at 912.  Moreover, in addition to flowing from § 388's text and structure, the sophisticated-user/purchaser defenses logically follow from the general rule that there is no duty to warn as to a product's known risks or obvious dangers.  See Garrett v. Nissen Corp., 1972-NMSC-046, ¶ 16, 498 P.2d at 1364 ("There is no duty to warn of dangers actually known to the user of a product[.]").  Accordingly, the Court concludes that New Mexico courts likely would adopt the sophisticated-user/purchaser defenses.

Nevertheless, while these defenses likely are viable in New Mexico state court, the Signetics Defendants have not established "with complete certainty upon undisputed evidence," Smoot v. Chi., Rock Island & Pac. R.R. Co., 378 F.2d at 882, that they bar any possibility of a negligence claim against Rinchem Co., see Zufelt v. Isuzu Motors Am., L.L.C., 727 F. Supp. 2d at 1124-25 (citation omitted).  As to the sophisticated-user defense, a threshold issue exists whether New Mexico courts would treat Signetics Corp. or the Plaintiffs as the relevant "users" for purposes of the doctrine.  The weight of authority in other courts looks at the sophistication of the "ultimate user" of the product -- ordinarily an employee or consumer.  See, e.g., Donahue v. Phillips Petroleum Co., 866 F.2d 1008, 1012 (8th Cir. 1989)(focusing on consumers' sophistication regarding a chemical additive in their propane gas).  In rare circumstances, however, courts treat employers as ultimate users and therefore inquire whether the employers are sophisticated users.  See, e.g., Taylor v. Airco, Inc., 503 F. Supp. 2d 432, 444 (D. Mass. 2007)(Ponsor, J.)(holding that Monsanto Company was a sophisticated user

of vinyl chloride).  Such courts blend the sophisticated-user and sophisticated-purchaser doctrines, inquiring whether the employer's status as a sophisticated user relieves the supplier of a duty to warn employees.  See, e.g., Parker v. Schmiede Mach. & Tool Corp., 445 F. App'x 231, 234 (11th Cir. 2011)(holding that Lockheed Martin was a sophisticated user of beryllium and was responsible for warning employees of beryllium's risks); Taylor v. Airco, Inc., 503 F. Supp. 2d at 444 (holding that Monsanto Co. was a sophisticated user of vinyl chloride and was responsible for warning employees of vinyl chloride's risks).  This approach, however, is materially identical to the sophisticated-purchaser doctrine; both approaches inquire whether an intermediary's sophistication is sufficient to relieve the supplier of its duty to warn end user employees.  See Jodway v. Kennametal, Inc., 525 N.W.2d 883, 889 (Mich. App. 1994)(holding that cobalt dust suppliers "could reasonably rely on the purchaser/employer to warn its employees," because the employer was a sophisticated user of cobalt dust).  The distinction is thus in form and not in substance.  Accordingly, if New Mexico courts conclude that the employer is the relevant user for sophisticated-user purposes, they functionally would adopt one, and not both, defenses, i.e., the sophisticated-purchaser defense (albeit under the "sophisticated user" title).  Because the Court analyzes Rinchem Co.'s liability under both defenses, the Court anticipates either possible outcome in New Mexico state court.  Nonetheless, because the majority approach is that the relevant user is the consumer or employee, the Court is confident that New Mexico courts would adopt that approach.

There is arguably a third approach -- that employees are merely the intermediary company's agents and servants, and, if the intermediary overall is a sophisticated user, the employees are also sophisticated users.  In other words, if some people -- e.g., managers -- at the intermediary company are sophisticated users, their status imputes sophistication to most employees at that company, and the real individuals whom products liability law protects are the ultimate consumers of the product --

the public.  Under this approach, suppliers would have a duty to warn the intermediary in such a way that ensures consumers -- but not employees -- are apprised of any product-related dangers.  Thus, the essence of this approach is that suppliers have no duty to warn employees of a sophisticated-user company, only a duty to warn consumers.  The Court's review of the relevant case law does not find any support for this approach; indeed, the case law at least implicitly rejects this approach by holding that, even where an intermediary company is sophisticated, a supplier's duty to warn is not absolved unless the intermediary reliably will communicate such warnings.  See, e.g., Jodway v. Kennametal, Inc., 525 N.W.2d at 889.  Such an approach, moreover, does not make sense in the present context, where employees are injured by what is arguably a component part -- a chemical -- of a substantially altered product with which the public will eventually interact -- a semiconductor.  The public does not interact with the dangerous chemicals to which the employees are exposed during the product's manufacture, and thus, products liability law is not concerned with protecting the public from the risks that those chemicals pose.  Therefore, to the extent a supplier has a duty to warn in this context, that duty is owed to the employees, the only relevant end-users of the chemicals.[15]

Here, the Signetics Defendants focus on Signetics Corp.'s sophistication and not on the Plaintiffs' sophistication.  See Tr. at 28:16-29:12 (Hardy)(avering that Signetics Corp. "was a regular user of the chemicals" and was thus aware of the chemicals' risks).  Because the issue whether Signetics Corp. is a "sophisticated user" is materially the same as whether it is a "sophisticated purchaser," the Court will review Signetics Corp.'s sophistication under a sophisticated-purchaser

---

[15]It is also worth mentioning that this approach would likely amount to a total bar to recovery for employees of sophisticated user companies in jurisdictions where workers' compensation laws preclude recovery against the employer.  Cf. In re Brooklyn Navy Yard Asbestos Litig. (Joint E. & S. Dist. Asbestos Litig.), 971 F.2d 831, 837-39 (2d Cir. 1992)(noting that naval employees were barred under the workers' compensation statute from pursuing a tort remedy against the United States for asbestos exposure, but concluding that the employees could pursue a negligent failure-to-warn claim against the manufacturers).

analysis.  First, however, the Court will analyze whether the Plaintiffs, the end users of the chemicals

that Rinchem Co. supplied, were sophisticated users of those chemicals.

The sophisticated-user defense precludes liability for failure to warn when "'the *user* of a

product knows or reasonably may be expected to know of a particular danger.'"  Donahue v. Phillips

Petroleum Co., 866 F.2d at 1012 (emphasis in original)(quoting Grady v. Am. Optical Corp., 702

S.W.2d at 915).  As explained above, this doctrine focuses on the sophistication of "ultimate users,"

ordinarily consumers or employees.  In Donahue v. Phillips Petroleum Co., for example, the United

States Court of Appeals for the Eighth Circuit held that consumers whose water heaters were fueled

by propane gas enhanced by an odorizing chemical were the relevant users of the chemical and not

the gas supplier.  See 866 F.2d at 1012.  The Eighth Circuit concluded that, because the consumers

were unaware of the chemical's risks, the manufacturer had a duty to warn the consumers and not

just the gas supplier.  See Donahue v. Phillips Petroleum Co., 866 F.2d at 1012.  See also Russell v.

Ashland, Inc., 574 F. Supp. 2d 957, 958 (W.D. Ark. 2008)(Barnes, J.)(rejecting the argument that the

plaintiff's employer was a sophisticated user of benzene, because "proof that the intermediary knew

that the product was dangerous does not . . . absolve the supplier of a duty to warn ultimate users").

In the employment context, courts hold that suppliers have no duty to warn of risks that professionals

know or should know about.  For example, in Johnson v. Am. Standard, Inc., phosphene gas injured

the plaintiff, a certified HVAC technician with years of training and experience, while he was

servicing a commercial air conditioning system.  See 179 P.3d at 908-09.  In declining to hold liable

the manufacturer of a component part used in the system, the Supreme Court of California concluded

that the HVAC professional "could reasonably be expected to know of the hazard . . . of phosphene

gas."  Johnson v. Am. Standard, Inc., 179 P.3d at 916-17.  See Beck v. Somerset Technologies, Inc.,

882 F.2d 993, 997 (5th Cir. 1989)(concluding that a paper mill operator was sophisticated as to the

dangers posed by unguarded rotating steel cylinders on a rewinding machine); Loughan v. Firestone

Tire & Rubber Co., 749 F.2d 1519, 1525 (11th Cir. 1989)(holding that a tire manufacturer had no

duty to inform an experienced mechanic about the hazards of mismatching multipiece rim-wheel

assemblies); Baughman v. General Motors Corp., 627 F. Supp. 871, 877 (D.S.C. 1985)(Hamilton,

J.)(finding no duty to warn a print shop employee about risk of injury from a printing press), aff'd,

780 F.2d 1131 (4th Cir. 1986).

Here, although J. Bellman and V. Goss "worked with, in proximity to and/or were exposed

to" the chemicals that Rinchem Co. supplied and that Signetics Corp. used in the manufacture of

semiconductor products or components, Complaint ¶ 20, at 4, the evidence does not suggest that they

were sophisticated users of those chemicals.  To the contrary, it appears that J. Bellman and V. Goss

could not reasonably have been "expected to know of a particular danger" that the chemicals posed.

Donahue v. Phillips Petroleum Co., 866 F.2d at 1012 (citation omitted).  The record indicates that,

although Signetics Corp. instituted "industrial hygiene policies and procedures," those policies "did

not include any warnings to workers about the potential for reproductive harm resulting from

exposure to the [] chemical[s]" that the facility used.  Complaint ¶¶ 37-38, at 9.  Likewise, although

Signetics Corp. implemented training programs for its employees, those programs did not include

warnings about reproductive harm that might result from chemical exposure, such as "miscarriage,

stillbirth and/or birth defects[] among their offspring."  Complaint ¶¶ 43-44, at 10.  Thus, it does not

appear that J. Bellman and V. Goss had "special experience," Restatement (Second) of Torts § 388

cmt. K, that would enable them to realize the risks inherent in using the chemicals.  Nor is there any

evidence that the chemicals were obviously dangerous such that a "casual" inspection, Restatement

(Second) of Torts § 388 cmt. K, would reveal their dangerous propensities.  Such evidence may later

arise; construing the present record in the Plaintiffs' favor, however, see Dutcher v. Matheson, 733

F.3d at 988, the Court concludes that the Signetics Defendants have not shown by a preponderance of the evidence and "with complete certainty," Smoot v. Chi., Rock Island & Pac. R.R. Co., 378 F.2d at 882, that J. Bellman and V. Goss were sophisticated users of the chemicals that Rinchem Co. supplied.[16]

Whether Signetics Corp. is a sophisticated purchaser is more complex.  The sophisticated-purchaser defense precludes liability for failure to warn "employees or customers of knowledgeable industrial purchasers as to product-related hazards."  Lambert v. B.P. Prods. N. Am., Inc., 2006 U.S. Dist. LEXIS 16756, at *5 (citing Ritchie v. Glidden Co., 242 F.3d at 724).  It is likely that Signetics Corp., as a manufacturer of semiconductor products or components, is a knowledgeable industrial purchaser of the chemicals it uses in the manufacturing process.  Indeed, the Plaintiffs allege that Signetics Corp. operated with "notice and knowledge of" extensive information about the chemicals' "potential for adverse reproductive outcomes."  Complaint ¶¶ 34-35, at 7-9 (referencing statements, warnings, and studies regarding the chemicals).  The Signetics Defendants, for their part, argue that "Signetics was a regular consumer of the chemicals," and that it "was familiar with the nature and properties of the chemicals based on its own uses and was a sophisticated user of the chemicals."  Notice of Removal ¶ 29, at 9.  Nevertheless, to prevail on the sophisticated-purchaser defense, there must be evidence that Signetics Corp. had "knowledge or sophistication equal to that of [Rinchem Co.], and [Rinchem Co.] must be able to rely reasonably on [Signetics Corp.] to warn the ultimate consumer."  Triplett v. 3M, 422 F. Supp. 2d at 786 (citation omitted).  On the present record, the Signetics Defendants have not conclusively demonstrated these requirements.

First, it unclear whether Signetics Corp. had "knowledge or sophistication equal to that of"

---

[16]It is worth noting that J. Bellman and V. Goss' children -- R. Bellman, Jr., Brett Booth, Brittany Booth -- were not users of the chemicals at all.  It is difficult to imagine the Supreme Court of New Mexico applying the sophisticated-user defense to them.

Rinchem Co.  Triplett v. 3M, 422 F. Supp. 2d at 786 (citation omitted).  The parties only generically allege that Signetics Corp. "was familiar with the nature and properties of the chemicals," Notice of Removal ¶ 29, at 9, but it is unclear the extent to which Signetics Corp. actually understood the risks inherent in the chemicals it used, cf. Parker v. Schmiede Mach. & Tool Corp., 445 F. App'x at 235 (noting the "overwhelming evidence that Lockheed Martin was a sophisticated user of beryllium and a learned intermediary," e.g., that it produced aircraft containing beryllium parts for sixty years). Cases applying the sophisticated-purchaser doctrine use a fact-intensive, case-by-case analysis to determine the intermediary's knowledge.  For example, in Taylor v. Airco, Inc., the district court concluded that Monsanto Co. was sophisticated as to vinyl chloride's risks, because it had a library of materials on vinyl chloride's potential health effects, had a company-wide medical department, was a member of a chemical industry trade group, and participated in the trade group's research programs.  See 503 F. Supp. 2d at 444.  The court reasoned that all these facts demonstrated that Monsanto Co. had access to "precisely the same information" as the chemical's manufacturer and supplier.  Taylor v. Airco, Inc., 503 F. Supp. 2d at 444.  Similarly, in Genereux v. Amer. Beryllia Corp., 518 F. Supp. 2d 306 (D. Mass 2007)(Tauro, J.), the district court held that an employer was sophisticated, because of the "knowledge held by employees, the employer's policies and internal memoranda, and warnings provided to the employer by its suppliers."  518 F. Supp. 2d at 313.

Here, by contrast, there is little evidence regarding Signetics Corp.'s precise knowledge of the chemicals' risks beyond that it "was familiar with the nature and properties of the chemicals," Notice of Removal ¶ 29, at 9, and that it was on notice of statements, warnings, and studies about the chemicals, see Complaint ¶¶ 34-35, at 7-9.  The Signetics Defendants speculate that Rinchem Co. "would have supplied Signetics with Material Safety Data Sheets ('MSDS') [] given to Rinchem by the manufacturers for any chemicals it may have delivered to Signetics," and assert that those sheets

"contained safety information and warnings, if any, regarding the chemicals." Notice of Removal ¶ 28, at 9. This assertion, however, illustrates why the Signetics Defendants have not yet established Signetics Corp.'s sophistication. While evidence that Rinchem Co. provided Signetics Corp. with manufacturer safety information would go far to demonstrate that Signetics Corp. had "knowledge or sophistication equal to that of the manufacturer," Triplett v. 3M, 422 F. Supp. 2d at 786 (citation omitted), the Signetics Defendants have not (i) proffered evidence that Rinchem Co. actually gave Signetics Corp. such information sheets; or (ii) demonstrated that the information sheets contained warnings. Rather, the Signetics Defendants simply assert that Rinchem Co. "would have supplied Signetics" with information sheets and that those sheets would have contained "warnings, if any, regarding the chemicals." Notice of Removal ¶ 28, at 9 (emphases added). Thus, although further discovery likely will establish Signetics Corp.'s precise knowledge as to the chemicals' dangers, the present record provides little guidance.

Second, that Rinchem Co. provided Signetics Corp. with manufacturer safety information does not, alone, conclusively establish the sophisticated-purchaser defense. Cf. Notice of Removal ¶¶ 24-25, at 7-8 (arguing that, when a "supplier provides materials to a sophisticated purchaser along with the safety information that is in its possession, no further duty to warn exists")(citation omitted). Comment n to § 388(c) states that giving a purchaser "all the information necessary to [the chattel's] safe use is not in all cases sufficient to relieve the supplier from liability. It is merely a means by which this information is to be conveyed to those who are to use the chattel." The dispositive issue, rather, is "whether this method gives a reasonable assurance that the information will reach those whose safety depends upon their having it." Restatement (Second) of Torts § 388 cmt. n. The "manufacturer must be able to rely reasonably on the intermediary to warn the ultimate consumer," Triplett v. 3M, 422 F. Supp. 2d at 786, which turns on the "reliability of the employer as

a conduit of necessary information about the product; the magnitude of the risk involved; and the burdens imposed on the supplier by requiring it to directly warn the ultimate users," Newson v. Monsanto Co., 869 F. Supp. at 1259 (citation omitted).  See Restatement (Second) of Torts § 388 cmt. n (outlining the same factors).  All three factors preclude a finding, on the present record, that Rinchem Co. is entitled to a sophisticated-purchaser defense.

Initially, there is no evidence as to Signetics Corp.'s reliability as a "conduit of necessary information" about the chemicals Rinchem Co. supplied.  Newson v. Monsanto Co., 869 F. Supp. at 1259 (citation omitted).  If anything, the evidence suggests that Signetics Corp. was an unreliable conduit, because its hygiene policies and training programs "did not include any warnings to workers about the potential for reproductive harm resulting from exposure to the [] chemicals."  Complaint ¶¶ 37-44, at 9-10.  In short, there presently is no evidence that Signetics Corp. relayed necessary safety information to employees or that it could reasonably be relied upon to relay such information.  The "magnitude of the risk involved," Newson v. Monsanto Co., 869 F. Supp. at 1259 (citation omitted), moreover, presents further issues.  As comment n to § 388(c) explains, "the magnitude of the risk is determined not only by the chance that some harm may result but also the serious or trivial character of the harm which is likely to result."  The greater the risk of serious injury, the greater the supplier's duty to exercise reasonable care in transmitting the product's hazardous potential.  See Restatement (Second) of Torts § 388 cmt. n.  Here, Signetics Corp. allegedly used known teratogenic, genotoxic, and reproductively toxic chemicals which, judging by the Plaintiffs' injuries, risked severe and not trivial harm.  See Complaint ¶¶ 69-80, at 16-18.  Thus, Rinchem Co. likely had a heightened duty to take precautions to ensure that Signetics Corp. employees had access to relevant safety information.  See Restatement (Second) of Torts § 388 cmt. n.  The Court cannot determine, on the present record, whether such precautions were taken; indeed, that Rinchem Co. "would have supplied Signetics"

- 95 -

with manufacturer safety sheets, Notice of Removal ¶ 28, at 9, does not show that it took sufficient action calculated to ensure the information was communicated to <u>employees</u>.  As to the third factor, there is no evidence that would enable the Court to determine the "burdens imposed on the supplier by requiring it to directly warn the ultimate users."  <u>Newson v. Monsanto Co.</u>, 869 F. Supp. at 1259 (citation omitted).  Absent such evidence, the Court cannot determine whether it would have been prohibitively burdensome for Rinchem Co. to directly warn Signetics Corp. employees.

In short, the record is too underdeveloped for the Court to determine with "complete certainty," <u>Smoot v. Chi., Rock Island & Pac. R.R. Co.</u>, 378 F.2d at 882, that the sophisticated-user and sophisticated-purchaser defenses bar liability against Rinchem Co.  Additional discovery may provide such certainty; indeed, as the Court observed at the hearing, it may be that Rinchem Co. can prevail on the sophisticated-purchaser defense.  <u>See</u> Tr. at 59:16-20 (Court).  At this stage, however, the Signetics Defendants have not met their "heavy burden," <u>Dutcher v. Matheson</u>, 733 F.3d at 988 (citation omitted), of demonstrating that there is "no possibility" that the Plaintiffs would be able to establish a negligence claim against Rinchem Co., <u>Zufelt v. Isuzu Motors Am., L.L.C.</u>, 727 F. Supp. 2d at 1124-25 (citation omitted).

The Court is mindful, moreover, of the Tenth Circuit's admonition that, in inquiring whether a party is fraudulently joined, the "objective . . . is not to pre-try the merits of the plaintiff's claims." <u>Brazell v. Waite</u>, 525 F. App'x at 881.  "As the Third Circuit put it, 'a claim which can be dismissed only after an intricate analysis of state law is not so wholly insubstantial and frivolous that it may be disregarded for purposes of diversity jurisdiction.'" <u>Brazell v. Waite</u>, 525 F. App'x at 881 (brackets omitted)(quoting <u>Batoff v. State Farm Insurance Co.</u>, 977 F.2d at 853).  Here, the Court's analysis of New Mexico law, <u>supra</u>, suggests that the Plaintiffs' negligence claim is not "wholly insubstantial" or "frivolous."  A determination of that claim's merits should therefore "be left to the state court

where the action commenced." Montano v. Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592, at *2.

Accordingly, the Court concludes that remand is required, because the Plaintiffs have stated a "possibly viable" claim for negligence against Rinchem Co. Montano v. Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592, at *2. Although brief, the Plaintiffs' allegations -- that Rinchem Co.'s failure to "exercise reasonable care" in handling the chemicals, and to warn "of the dangers and hazards posed" by exposure to the chemicals, directly and proximately caused the Plaintiffs' injuries, Complaint ¶¶ 94-98, at 24-26 -- are adequate to state a claim for fraudulent joinder purposes. Cf. Sherman v. A.J. Pegno Const. Corp., 528 F. Supp. 2d at 329 (concluding that allegations that the plaintiff's injuries "were 'proximately caused by the defendants' negligent actions in that . . . they negligently designed, processed, manufactured, packaged, distributed, delivered and/or installed the asbestos-containing products to which the plaintiff was exposed . . .'" were "more than adequate to withstand defendants' assertion of fraudulent joinder")(footnote and citation omitted). To the extent these allegations lack specificity as to which chemicals Rinchem Co. supplied and the chemicals to which the Plaintiffs were exposed, see Response at 9-10 (objecting to this lack of specificity), the Court concludes that an amended complaint would resolve those issues and would therefore state a possibly viable claim, see Archuleta v. Taos Living Ctr., LLC, 791 F. Supp. 2d at 1076. Regardless, the Court concludes that even the Complaint's current allegations are sufficiently specific to satisfy Twombly and Iqbal's heightened pleading standard without specifying, at this stage, the chemicals that Rinchem Co. supplied or the precise chemicals to which the Plaintiffs were exposed.

## II.    THE SIGNETICS DEFENDANTS HAVE NOT DEMONSTRATED WITH COMPLETE CERTAINTY THAT THE PLAINTIFFS HAVE NO POSSIBILITY OF A BREACH-OF-WARRANTY CLAIM AGAINST RINCHEM CO.

The Complaint's Count IV asserts a claim for breach of express and implied warranties

against Rinchem Co.  See Complaint ¶¶ 99-103, at 26.  The Plaintiffs contend that Rinchem Co. "expressly and impliedly warranted" that the chemicals it supplied to Signetics Corp. "were of merchantable quality, fit and safe for the purposes for which they were manufactured, blended, sold supplied or distributed."  Complaint ¶ 101, at 26.  The Plaintiffs assert that Rinchem Co. breached these warranties by failing to provide "adequate warnings and instructions concerning their harmful nature and the serious health hazards, including birth defects, and they were defectively designed, as a safer alternative design was feasible."  Complaint ¶ 102, at 26.  The Plaintiffs conclude that these breaches directly and proximately caused R. Bellman, Jr., Brett Booth, and Brittany Booth's injuries. See Complaint ¶ 103, at 26.  The Court concludes that, although these allegations do not state a "possibly viable" claim for breach of express warranty or breach of the implied warranty of fitness-for-a-particular-purpose, they state a possible implied warranty of merchantability claim.  Montano v. Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592, at *2.

UCC Article 2, codified in New Mexico at N.M. Stat. Ann. §§ 55-2-101 to -725, governs sales of goods.  See Badilla v. Wal-Mart Stores East Inc., 2015-NMSC-029, ¶ 21, 357 P.3d at 941. "A 'sale' consists in the passing of title from the seller to the buyer for a price," N.M. Stat. Ann. § 55-2-106(1), while "'[g]oods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale," N.M. Stat. Ann. § 55-2-105(1).  UCC Article 2 sets out the various warranties that apply to transactions for sales of goods, including, among others, express warranties and implied warranties of merchantability and fitness for a particular purpose.  See N.M. Stat. Ann. §55-2-313 to -315.  Here, in addition to alleging breach of an express warranty, the Plaintiffs allege that Rinchem Co. breached the implied warranties of merchantability and fitness for a particular purpose.  See Complaint ¶¶ 99-103, at 26.  The Court reviews these alleged breaches in turn.

As a threshold matter, however, there is no evidence that Rinchem Co. "sold" anything to the Plaintiffs. To the extent Rinchem Co. sold any chemicals, those transactions were between Rinchem Co. and Signetics Corp. Likewise, the evidence does not suggest that the Plaintiffs were in "privity" of contract with Rinchem Co. such that they would enjoy the benefit of any warranties that Rinchem Co. made regarding the chemicals it supplied. "It is a general rule of law that one who is not a party to a contract cannot maintain a suit upon it." Fleet Mortg. Corp. v. Schuster, 1991-NMSC-046, ¶ 4, 811 P.2d 81, 49 (citing Staley v. New, 1952-NMSC-102, ¶ 7, 250 P.2d 893, 894). "An exception to the general rule is a third-party beneficiary." Woody Inv., LLC v. Sovereign Eagle, LLC, 2015-NMCA-111, ¶ 34, 362 P.3d 107, 115 (citing Permian Basin Inv. Corp. v. Lloyd, 1957-NMSC-048, ¶ 22, 312 P.2d 533, 536). Under UCC § 2-318, certain non-privity plaintiffs are provided standing to sue as third-party beneficiaries of the warranties that a buyer receives under a sales contract. Section 2-318 presents three alternative versions for states to adopt:

> Alternative A
>
> A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty. . . .
>
> Alternative B
>
> A seller's warranty whether express or implied extends to any natural person who may reasonably be expected to use, consume or be affected by the goods and who is injured in person by breach of the warranty. . . .
>
> Alternative C
>
> A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty. . . .

UCC § 2-318 (bolding omitted). These three versions reflect, respectively, "conservative, moderate, and liberal solutions to the problem of the proper scope of warranty protection to afford nonprivity

plaintiffs under the Code."  William L. Stallworth, <u>An Analysis of Warranty Claims Instituted by</u> <u>Non-Privity Plaintiffs in Jurisdictions That Have Adopted Uniform Commercial Code Section 2-318</u> <u>(Alternative A)</u>, 20 Pepp. L. Rev. 1, 1229 (1993).

When it adopted the UCC, the New Mexico Legislature "chose the most restrictive" of these alternatives -- <u>i.e.</u>, "Alternative A."  <u>Armijo v. Ed Black's Chevrolet Ctr., Inc.</u>, 1987-NMCA-014, ¶ 7, 733 P.2d 870, 871.  N.M. Stat. Ann. § 55-2-318, entitled "[t]hird-party beneficiaries of warranties express or implied," provides:

> A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty.

Comment 2 to § 55-2-318 explains that "[t]he purpose of this section is to give certain beneficiaries the benefit of the same warranties which the buyer received in the contract of sale, thereby freeing any such beneficiaries from any technical rules as to 'privity.'"  Comment 3 adds that "the section . . . is neutral and is not intended to enlarge or restrict the developing case law on whether the seller's warranties, given to his buyer who resells, extend to other persons in the distributive chain."  N.M. Stat. Ann. § 55-2-318 cmt. 3.  The Court of Appeals of New Mexico has interpreted this language to mean that § 55-2-318 "only addresses horizontal privity, leaving vertical privity to judicial decision." <u>Armijo v. Ed Black's Chevrolet Ctr., Inc.</u>, 1987-NMCA-014, ¶ 7, 733 P.2d at 872.  That is, § 55-2-318 defines the scope of warranty protection for "horizontal" non-privity plaintiffs, <u>i.e.</u>, "not a buyer within the distributive chain but one who consumes or uses or is affected by the goods," and leaves to judicial determination the scope of warranty protection for "vertical" non-privity plaintiffs, <u>i.e.</u>, "a buyer within the distributive chain who did not buy directly from the defendant."  <u>Armijo v. Ed</u> <u>Black's Chevrolet Ctr., Inc.</u>, 1987-NMCA-014, ¶ 7, 733 P.2d at 871 (quoting J. White and R. Summers, <u>Uniform Commercial Code</u>, § 11-2 at 399 (2d ed. 1980))(internal quotation marks

omitted).  Although the Supreme Court of New Mexico has not squarely addressed this issue, this interpretation accords with the weight of authority in jurisdictions that have adopted Alternative A to UCC § 2-318.  See, e.g., Old Albany Estates, Ltd. v. Highland Carpet Mills, Inc., 604 P.2d 849 (Okla. 1979)(interpreting Alternative A as leaving problems of vertical privity to judicial resolution); Nobility Homes of Texas, Inc. v. Shivers, 557 S.W.2d 77 (Tex. 1977)(same); Morrow v. New Moon Homes, Inc., 548 P.2d 279 (Alaska 1976)(same).  See also Stallworth, supra at 1231 ("Alternative A leaves problems of vertical privity to be resolved by the courts.").  The Court has not located any authority that interprets this language differently.

New Mexico courts have offered few "judicial decisions" interpreting the scope of warranty protection afforded to "vertical" non-privity plaintiffs.  In Perfetti v. McGhan Medical, the Court of Appeals of New Mexico concluded that a breast implant manufacturer could be held liable for breach of the implied warranty of merchantability "without regard to privity of contract" between the manufacturer and either the patient or her surgeon.  1983-NMCA-032, ¶ 35, 662 P.2d at 653.  The Court of Appeals of New Mexico reasoned that warranties "made with respect to the surgeon would inure to plaintiff's benefit on the basis that the surgeon was acting as plaintiff's agent in the use of the prosthesis."  Perfetti v. McGhan Medical, 1983-NMCA-032, ¶ 26, 662 P.2d at 652.  For its part, the Supreme Court of New Mexico has suggested that privity analysis is unnecessary with respect to subsequent purchasers.  In Badilla v. Wal-Mart Stores East Inc., the plaintiff sued Wal-Mart and its store manager for breach of express and implied warranties after he purchased a pair of work boots that later fell apart, causing him to trip and injure his back.  See 2015-NMSC-029, ¶ 2, 357 P.3d at 937.  In determining which statute of limitations governed the plaintiff's claim, the Supreme Court of New Mexico observed in dicta that the "New Mexico Legislature has effectively eliminated the need for analysis of privity in the context of express or implied warranties under the UCC."  Badilla

- 101 -

v. Wal-Mart Stores East Inc., 2015-NMSC-029, ¶ 18 n.2, 357 P.3d at 940 n.2 (citing N.M. Stat. Ann.

§ 55-2-318).  Thus, it is likely that New Mexico courts would interpret broadly the scope of warranty

protections afforded to subsequent purchasers.

Despite this liberal approach, it does not appear that the Plaintiffs qualify as "vertical" non-

privity plaintiffs, because they are not "buyer[s] within the distributive chain."  Armijo v. Ed Black's

Chevrolet Ctr., Inc., 1987-NMCA-014, ¶ 7, 733 P.2d at 871 (citation omitted).  Although J. Bellman

and V. Goss worked with the chemicals that Signetics Corp. purchased from Rinchem Co., there is

no evidence that they were subsequent purchasers of those chemicals.  There certainly is no evidence

that their children -- R. Bellman, Jr., Brett Booth, and Brittany Booth -- purchased the chemicals, as

they were gestating at the time of the alleged injuries.  Likewise, the Plaintiffs do not appear to be

"horizontal" non-privity plaintiffs within § 55-2-318's meaning, because they were neither "family"

nor "guests" in Signetics Corp.'s "household."  Cf. Armijo v. Ed Black's Chevrolet Ctr., Inc., 1987-

NMCA-014, ¶ 7, 733 P.2d at 871 (excluding an employee from manufacturer warranty protections

on the purchase of a defective work truck, because he was not a person within his employer's family

or household or a guest in his employer's home).  Indeed, the Court of Appeals of New Mexico has

decided that "employees of a purchaser are excluded from the manufacturer's warranty protections

offered by provisions comparable to Section 55-2-318."  Armijo v. Ed Black's Chevrolet Ctr., Inc.,

1987-NMCA-014, ¶ 9, 733 P.2d at 872 (citations omitted).  This conclusion accords with the weight

of authority in jurisdictions that have adopted Alternative A to UCC § 2-318.  See, e.g., Cowens v.

Siemens-Elema AB, 837 F.2d 817 (8th Cir. 1988); Watkins v. Barber-Colman Co., 625 F.2d 714

(5th Cir. 1980); Brendle v. General Tire & Rubber Co., 505 F.2d 243 (4th Cir. 1974); Anderson v.

Watling Ladder Co., 472 F.2d 576 (6th Cir. 1973); Laclair v. Siberline Mfg. Co., 393 N.E.2d 867

(Mass. 1979); Parzini v. Center Chem. Co., 214 S.E.2d 700 (Ga. 1975); Hester v. Purex Corp, 534

P.2d 1306 (Okla. 1975); Hargrove v. Newsom, 470 S.W.2d 348 (Tenn. 1971). See also Stallworth, supra at 1230 (collecting cases and concluding that "Alternative A is generally no help to the buyer's employees"). Accordingly, it is not possible that J. Bellman and V. Goss, employees of a purchaser of chemicals, can succeed on their breach-of-warranty claims against the chemicals' supplier.

It is possible, however, that the children are "horizontal" non-privity plaintiffs within § 55-2-318's meaning. The Supreme Court of New Mexico has noted that § 55-2-318 evinces a legislative intent to "eliminate[] the need for analysis of privity" with respect to the classes of individuals that the section identifies. Badilla v. Wal-Mart Stores East Inc., 2015-NMSC-029, ¶ 18 n.2, 357 P.3d at 940 n.2. In accordance with this liberal interpretation, it is possible that the Supreme Court of New Mexico would treat the children, at the time still gestating in their mothers' wombs, as "guests" in Signetics Corp.'s "household," although such an interpretation is unlikely under § 55-2-318's plain meaning. It is also possible that the Supreme Court of New Mexico would abolish the limitations in § 55-2-318 on horizontal privity and permit "any person" to sue a party in the distributive chain for breach of warranty, as some courts in states that have adopted Alternative A to UCC § 2-318 have done. See, e.g. JKT Co., Inc. v. Hardwick, 265 S.E.2d 510, 512 (S.C. 1980); Salvador v. Atl. Steel Boiler Co., 319 A.2d 903, 904 (Pa. 1974). Indeed, the Supreme Court of New Mexico has observed that "the law today has moved drastically away from the strict limitations of privity of contract." Russell v. Protective Ins. Co., 1988-NMSC-025, ¶ 15, 751 P.2d 693, 697 (citing Restatement (Second) of Contracts § 313(2)(b)), superseded by statute on other grounds as stated in Meyers v. Western Auto, 2002-NMCA-089, 54 P.3d 79. Given these statements, as well as the absence of controlling case law on point, the Court cannot conclude with certainty that the Supreme Court of New Mexico would not treat R. Bellman, Jr., Brett Booth, and Brittany Booth as "horizontal" non-privity plaintiffs. The Court will thus analyze whether the children have stated a "possibly viable,"

Montano v. Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592, at *2, breach-of-warranty claim against Rinchem Co.

Under New Mexico law, a seller expressly warrants goods in a commercial transaction when it (i) makes an affirmation of fact or promise to the buyer "which relates to the goods and becomes part of the basis of the bargain"; (ii) describes the goods in a way that "is made part of the basis of the bargain"; or (iii) provides a "sample or model which is made part of the basis of the bargain." N.M. Stat. Ann. § 55-2-313. Thus, an express warranty requires an affirmation or representation by the seller to the buyer which forms the basis of the sale. "If the goods provided are not as warranted, the goods are in breach of warranty." Badilla v. Wal-Mart Stores East Inc., 2015-NMSC-029, ¶ 21, 357 P.3d at 941. "'A breach of warranty presents an objective claim that the goods do not conform to a promise, affirmation, or description[.]'" Badilla v. Wal-Mart Stores East Inc., 2015-NMSC-029, ¶ 21, 357 P.3d at 941 (quoting Jaramillo v. Gonzales, 2002-NMCA-072, ¶ 13, 50 P.3d 554, 228).

Here, there is no evidence that Rinchem Co. made any express affirmation or representation to the Plaintiffs or to Signetics Corp. regarding the chemicals that it supplied. Indeed, aside from perfunctorily alleging in the Complaint that Rinchem Co. "expressly" warranted the chemicals that it supplied, Complaint ¶ 101, at 26, the Plaintiffs never explain the manner in which Rinchem Co. made such a warranty or identify the warranty's precise terms, nor do they respond to the Signetics Defendants' arguments concerning the warranty's non-existence, see Reply at 4 n.1 (responding only to the Signetics Defendants' tolling arguments); Tr. at 13:1-14:9 (Siegel, Court)(same). Thus, the Court cannot conclude, on the record before it, that Rinchem Co. made any express warranty, nor can it conclude, absent knowledge of the alleged warranty's terms, whether Rinchem Co. breached those terms. While the Court is empowered to "pierce the pleadings" to determine a claim's viability for fraudulent joinder purposes, Dodd v. Fawcett Publications, Inc., 329 F.2d at 85, the Court cannot

and should not fiat into existence an express warranty that has no basis in the record, nor can the Court fairly and accurately ascertain such a hypothetical warranty's terms, and decide whether those terms were possibly breached.  The Court, accordingly, concludes that the Plaintiffs have not stated a "possibly viable" claim, Montano v. Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592, at *2, that Rinchem Co. breached an express warranty.

Under UCC Article 2 and New Mexico law, warranties of fitness for a particular purpose and merchantability are implied in transactions for sales of goods.  See International Paper Co. v. Farrar, 1985-NMSC-046, ¶ 13, 700 P.2d at 645 ("New Mexico recognizes that the implied warranties of merchantability and fitness for a particular purpose are implied by law and are independent of express warranties.")(citation omitted).  To establish a breach of the implied warranty of fitness for a particular purpose, a plaintiff must prove (i) that, at the time of contracting, the seller had reason to know the buyer's particular purpose for which the item was being ordered; (ii) that the buyer relied upon the seller's skill or judgment; and (iii) that the item was not fit for that purpose.  See Lieb v. Milne, 1980-NMCA-125, ¶ 13, 625 P.2d at 1237.  These requirements are codified in N.M. Stat. Ann. § 55-2-315, the commentary to which provides that "normally the warranty will arise only where the seller is a merchant with the appropriate 'skill or judgment,'" although "it can arise as to non-merchants where this is justified by the particular circumstances."  N.M. Stat. Ann. § 55-2-315 cmt. 4.  The UCC defines "merchant" as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction . . . ."  N.M. Stat. Ann. § 55-2-104(1).

Given these requirements, the Plaintiffs' implied warranty of fitness-for-a-particular-purpose claim is flawed.  Construing the record in the Plaintiffs' favor, see Dutcher v. Matheson, 733 F.3d at 988, it is possible that Rinchem Co. is a "merchant" with the "appropriate 'skill or judgment'" as to

the chemicals it supplied to Signetics Corp., N.M. Stat. Ann. § 55-2-315 cmt. 4, although its status as

a primarily warehousing/delivery operation intermediating between chemical manufacturers and

their buyers, see Moore Aff. ¶¶ 3-4, at 1, raises doubts whether it meets the UCC's definition.  In any

event, it is possible that this case's "particular circumstances" justify a finding that Rinchem Co.'s

transactions with Signetics Corp. gave rise to the implied fitness-for-a-particular-purpose warranty.

N.M. Stat. Ann. § 55-2-315 cmt. 4.  It is also possible, if not likely, that Rinchem Co. had reason to

know of Singetics Corp.'s "particular purpose" for using the chemicals and that the Plaintiffs, as

unsophisticated users of the chemicals, relied upon Rinchem Co.'s skill/judgment.  N.M. Stat. Ann.

§ 55-2-315.  See International Paper Co. v. Farrar, 1985-NMSC-046, ¶ 13, 700 P.2d at 645 (stating

that the "implied warrant of fitness for a particular purpose requires reliance by the buyer on the

seller's skill or judgment").

There is no indication, however, that the chemicals which Rinchem Co. supplied were unfit

for their intended purpose, i.e., use in the manufacture of semiconductor products or components.

See N.M. Stat. Ann. § 55-2-315.  Comment 2 to § 55-2-315 explains that

> [a] "particular purpose" differs from the ordinary purpose for which the goods are
> used in that it envisages a specific use by the buyer which is peculiar to the nature of
> his business whereas the ordinary purposes for which goods are used are those
> envisaged in the concept of merchantability and go to uses which are customarily
> made of the goods in question.  For example, shoes are generally used for the
> purpose of walking upon ordinary ground, but a seller may know that a particular
> pair was selected to be used for climbing mountains.

In light of this explanation, the Supreme Court of New Mexico has stated that the "crux of this issue"

is "were these 'shoes for walking' or 'shoes for climbing mountains[.]'"  C.E. Alexander & Sons,

Inc. v. DEC Int'l, Inc., 1991-NMSC-049, ¶ 19, 811 P.2d 899, 904 (citing Lieb v. Milne, 1980-

NMCA-125, ¶ 13, 625 P.2d at 1237).  In other words, the "critical issue" is whether a product "did

what it was supposed to do."  Lieb v. Milne, 1980-NMCA-125, ¶ 13, 625 P.2d at 1237.  Here, the

Plaintiffs do not contend that the chemicals were unworkable in Signetics Corp.'s manufacturing process, or that their use in that process resulted in defective semiconductor products or components; the Plaintiffs allege only that the chemicals were not "fit and safe for the purpose for which they were manufactured," because they did not contain adequate warnings and because "they were defectively designed, as a safer alternative design was feasible." Complaint ¶¶ 99-103, at 26. These arguments wrongly "urg[e] a congruence between products liability and the implied warranty of fitness for a particular purpose." Perfetti v. McGhan Medical, 1983-NMCA-032, ¶ 44, 662 P.2d at 653. As the Court of Appeals of New Mexico has explained, whereas products liability "requires a defect," the implied warranty of fitness-for-a-particular purpose "does not require a defect." Perfetti v. McGhan Medical, 1983-NMCA-032, ¶ 44, 662 P.2d at 653. Accordingly, that the chemicals were "defective" in the sense that they were dangerous does not demonstrate that they were unfit for their intended purpose, i.e., use in semiconductor manufacturing. Lieb v. Milne, 1980-NMCA-125, ¶ 13, 625 P.2d at 1237. Essentially, because the "particular purpose" for which the chemicals were supplied was not to promote "health" or "safety," the Plaintiffs' allegations do not establish that the chemicals did not do "what [they were] supposed to do." Lieb v. Milne, 1980-NMCA-125, ¶ 13, 625 P.2d at 1237. The Court concludes, accordingly, that the Plaintiffs' implied warranty of fitness-for-a-particular-purpose claim is not "possibly viable." Montano v. Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592, at *2.

Finally, to establish a claim for breach of the implied warranty of merchantability, a plaintiff must demonstrate that the "product is defective and is not fit for the ordinary purposes for which such product is used." Pac. Indem. Co. v. Therm-O-Disc, Inc., 476 F. Supp. 2d at 1225. Unlike the implied warranty of fitness-for-a-particular-purpose, therefore, this warranty "requires proof of a defect." Pac. Indem. Co. v. Therm-O-Disc, Inc., 476 F. Supp. 2d at 1225 (citing Perfetti v. McGhan

- 107 -

Medical, 1983-NMCA-032, ¶ 44, 662 P.2d at 654).  In this respect, breach of the implied warranty

of merchantability resembles ordinary products liability claims; indeed, the Court of Appeals of New

Mexico has squarely held that, "in a personal injury case, the products liability claim and the claim

concerning the implied warranty of merchantability may be identical."  Perfetti v. McGhan Medical,

1983-NMCA-032, ¶ 44, 662 P.2d at 654.  New Mexico law recognizes three types of defects: (i)

manufacturing defects; (ii) design defects; and (iii) warning defects.  See Fernandez v. Ford Motor

Co., 1994-NMCA-063, ¶ 27, 879 P.2d 101, 110 (relying on Restatement (Second) of Torts, § 402A).

"The ultimate test for determining if a product is defective as a result of improper design is whether

the product constitutes an unreasonable risk of injury."  Fernandez v. Ford Motor Co., 1994-NMCA-

063, ¶ 37, 879 P.2d at 113.  Indeed, the Supreme Court of New Mexico has repeatedly "rejected the

definitions of 'defect'" such as "consumer expectations," "reasonable alternative," or "risk-utility,"

instead concluding that the "unreasonable-risk-of-injury" test subsumes those definitions.  Brooks v.

Beech Aircraft Corp., 1995-NMSC-043, ¶ 31, 902 P.2d 54, 61.  As with the implied warranty of

fitness-for-a-particular-purpose, this warranty arises where "the seller is a merchant with respect to

goods of that kind."  N.M. Stat. Ann. § 55-2-314(1).

As discussed above, it is possible that the Supreme Court of New Mexico would conclude

that a supplier in Rinchem Co.'s position is a "merchant" as to the chemicals it supplied.  The Court

concludes that, if Rinchem Co. qualifies as a "merchant," the Plaintiffs have stated a possibly viable

claim for breach of the implied warranty of merchantability.  Montano v. Allstate Indemnity Co.,

211 F.3d 1278, 2000 WL 525592, at *2.  The Plaintiffs allege design and warning defects, asserting

that Rinchem Co. failed to provide "adequate warnings and instructions concerning [the chemicals']

harmful nature and the serious health hazards, including birth defects, and [that the chemicals] were

defectively designed, as a safer alternative design was feasible."  Complaint ¶ 102, at 26.  Whether

these defects "constitute[] an unreasonable risk of injury" is the "ultimate test." Fernandez v. Ford Motor Co., 1994-NMCA-063, ¶ 37, 879 P.2d at 113. See Brooks v. Beech Aircraft Corp., 1995-NMSC-043, ¶ 31, 902 P.2d at 61. Regarding the Plaintiffs' warning-defect allegation, the Court's analysis of the Plaintiffs' negligent failure-to-warn claim, supra, demonstrates that this claim is viable. See Perfetti v. McGhan Medical, 1983-NMCA-032, ¶ 44, 662 P.2d at 654 (concluding that a plaintiff can prevail on "identical" products liability and implied warranty of merchantability claims). It is possible that Rinchem Co.'s failure to warn the Plaintiffs with respect to the chemicals' reproductive hazards caused the Plaintiffs to incur an unreasonable risk of injury by further exposure to those chemicals. Likewise, the existence of safer alternative chemical designs suggests that the risk of injury posed by the chemicals that Rinchem Co. supplied was unreasonable. The Plaintiffs allege, and the Signetics Defendants do not presently dispute, that, in 1984, "chemical manufacturer Hoechst Celanese developed less reproductively toxic process chemicals to be substituted in the manufacturing process of semiconductors, and began actively promoting and marketing the products as safer alternatives to the semiconductor industry[.]" Complaint ¶ 34.j, at 9. Whether these alternative designs were direct substitutes for the chemicals that Rinchem Co. supplied, and whether they were much safer such that they did not also pose an unreasonable risk of injury, requires further factual development. At this stage, however, construing factual and legal issues in the Plaintiffs' favor, see Dutcher v. Matheson, 733 F.3d at 988, the Court concludes that the Plaintiffs have stated a possibly viable claim for breach of the implied warranty of merchantability, see Montano v. Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592, at *2.

Despite this claim's viability in the abstract, however, it appears that the claim is time-barred under the applicable statute of limitations. The Supreme Court of New Mexico has concluded that the UCC's four-year statute of limitations "governs actions for breach of warranty seeking personal

injury damages[.]"  Badilla v. Wal-Mart Stores East Inc., 2015-NMSC-029, ¶ 47, 357 P.3d at 948.

The Plaintiffs argue that, should Rinchem Co. assert that the Plaintiffs' breach-of-warranty claim is

time-barred under this provision, they will "argue that the tolling provision of N.M. Stat. § 37-1-10

applies."  Motion at 12.   That provision tolls the applicable statute of limitations "in favor of minors

and incapacitated persons . . . so that they shall have one year from and after the termination of such

incapacity within which to commence said actions."  N.M. Stat. Ann. § 37-1-10.  The UCC's four-

year statute of limitations, codified at N.M. Stat. Ann. § 55-2-725, expressly provides that it "does

not alter the law on tolling of the statute of limitations," and thus, N.M. Stat. Ann. § 37-1-10 remains

a viable defense.  The Signetics Defendants, in response, argue that the Plaintiffs' proposed "tolling

argument . . . lacks merit," because the Complaint "plead[s] no grounds for tolling."  Response at 14.

As the Court has already explained, however, the relevant inquiry at the fraudulent joinder stage is

whether it is possible that a claim could be viable under an amended complaint.  See Archuleta v.

Taos Living Ctr., LLC, 791 F. Supp. 2d at 1076.  The Signetics Defendants' objection is therefore

immaterial, because the Court can consider whether an amended complaint which pleads tolling

would state a viable breach-of-warranty claim.  Thus, the Court will consider whether the Plaintiffs

possibly could prevail on a tolling theory under § 37-1-10 on the basis of the children's status as (i)

minors; or as (ii) "incapacitated persons."

       The Court concludes that it is not possible that the children's minority status would save their

breach-of-warranty claim.  The Supreme Court of New Mexico has held that a "'breach of warranty

occurs when tender of delivery is made. . . . A cause of action accrues when the breach occurs,

regardless of the aggrieved party's lack of knowledge of the breach.'"  Badilla v. Wal-Mart Stores

East Inc., 2015-NMSC-029, ¶ 23, 357 P.3d at 941 (quoting N.M. Stat. Ann. § 55-2-725(2)).  Here,

Brett Booth and Brittany Booth were born on December 29, 1988, see Complaint ¶¶ 15-16, at 3, and

R. Bellman, Jr. was born on January 21, 1991, see Complaint ¶ 14, at 3.  Accordingly, any breach of warranty necessarily would have occurred during the children's respective gestation periods in 1988 and 1990.  See Response at 4 (noting that Brett Booth and Brittany Booth's nine-month gestation periods lasted from approximately March 29, 1988 to December 29, 1988, and that R. Bellman, Jr.'s gestation period lasted from approximately April 21, 1990, to January 21, 1991).  It follows that the UCC's four-year limitations period, having started to accrue during the children's gestation periods, ran its full course by 1992 with respect to Brett Booth and Brittany Booth, and by 1994 with respect to R. Bellman, Jr.  Pursuant to § 37-1-10, however, the children had one year from their eighteenth birthdays within which to sue -- Brett Booth and Brittany Booth had until December 29, 2007, and J. Bellman, Jr. had until January 21, 2010.  Cf. Gomez v. Chavarria, 2009-NMCA-035, ¶ 7, 206 P.3d 157, 160 (holding that a "plain reading" of § 37-1-10 reveals that, when a limitations period "runs its full course during minority status, Section 37-1-10 gives the minor a year from his or her eighteenth birthday within which to sue").  See Romero v. N.M. Health & Envtl. Dep't, 1988-NMSC-073, ¶ 14, 760 P.2d 1282, 1286 (holding that, under § 37-1-10, a minor has "until one year after his eighteenth birthday to commence [suit]").  The Plaintiffs commenced this action on January 8, 2016.  See Complaint at 1.  Thus, this action commenced roughly eight years after the termination of Brett Booth and Brittany Booth's tolling period, and six years after the termination of R. Bellman, Jr.'s tolling period.  Essentially, § 37-1-10 gave the children until age nineteen to bring their breach-of-warranty claims, but, on January 8, 2016, when they filed this action, Brett Booth and Brittany Booth were twenty-eight years old and R. Bellman, Jr. was twenty-five years old.[17]

---

[17]An alternative approach yields the same result: Assuming that the children's minority status somehow tolled the four-year statute of limitations in § 55-2-725 such that it did not begin to accrue until the children's eighteenth birthdays, that would only extend the period within which to file to at most five years -- one year under § 37-1-10 plus four years under § 55-2-725.  That five years would still have expired before the Plaintiffs commenced this action on January 8, 2016 -- the five years

The Court concludes, however, that it is possible that the children qualify as "incapacitated persons" such that § 37-1-10's tolling provision extended through January 8, 2016.  "New Mexico courts have explained that a person is incapacitated when she 'is unable to manage [her] business affairs or estate, or to comprehend [her] legal rights or liabilities."  Varnell v. Dora Consol. School Dist., 756 F.3d 1208, 1214 (10th Cir. 2014)(brackets in original)(citing Lent v. Emp't Sec. Comm'n, 1982-NMCA-147, ¶ 13, 658 P.2d 1134, 1137).  Here, given the serious injuries that the Plaintiffs allege, it is possible that those injuries incapacitated R. Bellman, Jr., Brett Booth, and Brittany Booth within § 37-1-10's meaning.  Although the children's injuries, on the Complaint's face, appear to be physical and not mental, see, e.g., Complaint ¶ 76, at 17 (alleging that R. Bellman Jr. suffers from several tumors and internal injuries), the Court cannot conclude, on the record before it, that the children's alleged injuries are not incapacitating under § 37-1-10.  According to the Plaintiffs, R. Bellman, Jr., Brett Booth, and Brittany Booth meet § 37-1-10's definition of incapacitation.  See Motion at 12.  Construing this statement and the Complaint's allegations concerning the children's injuries in the light most favorable to the Plaintiffs, see Dutcher v. Matheson, 733 F.3d at 988, the Court concludes that it is possible that § 37-1-10 tolled the UCC's limitations period through the commencement of this action, see Zufelt v. Isuzu Motors Am., L.L.C., 727 F. Supp. 2d at 1124-25. The Court notes that, under New Mexico law, "exceptions to statutes of limitation must be construed strictly."  Slade v. Slade, 1970-NMSC-064, ¶ 4, 468 P.2d 627, 628 (citations omitted).  On remand, the Plaintiffs may be unable to proffer evidence sufficient to meet the exception in § 37-1-10; at the fraudulent joinder stage, however, the Plaintiffs need demonstrate only a mere possibility that they would prevail on that exception.

---

would have ended on December 29, 2011, for Brett Booth and Brittany Booth and on January 21, 2014, for R. Bellman, Jr.

The Court concludes that there is "no possibility" that the Plaintiffs could prevail on their express warranty and implied warranty of fitness-for-a-particular-purpose claims. <u>Zufelt v. Isuzu Motors Am., L.L.C.</u>, 727 F. Supp. 2d at 1124-25. The Court also concludes, however, that the Defendants have not established "with complete certainty upon undisputed evidence," <u>Smoot v. Chi., Rock Island & Pac. R.R. Co.</u>, 378 F.2d at 882, that the Plaintiffs have "no possibility" of a claim against Rinchem Co. for breach of the implied warranty of merchantability, <u>Zufelt v. Isuzu Motors Am., L.L.C.</u>, 727 F. Supp. 2d at 1124-25 (citation omitted). Thus, because the Plaintiffs have stated a "possibly viable" breach-of-warranty claim against Rinchem Co., "remand is required." <u>Montano v. Allstate Indemnity Co.</u>, 211 F.3d 1278, 2000 WL 525592, at *2.

**IT IS ORDERED** that (i) the Plaintiffs' Motion for Remand and Memorandum in Support Thereof, filed March 23, 2016 (Doc. 8), is granted; and (ii) the case is remanded to the First Judicial District Court, County of Santa Fe, State of New Mexico.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

David J. Jaramillo
Jaramillo Law Firm, P.C.
Albuquerque, New Mexico

-- and --

David Bricker
Waters Kraus & Paul
El Segundo, California

-- and --

Maria E. Touchet
Touchet Law Firm, P.C.
Albuquerque, New Mexico

-- and --

Charles Siegel
Waters Kraus & Paul
Dallas, Texas

      *Attorneys for the Plaintiffs*

Daniel L. Ring
Mayer Brown, L.L.P.
Chicago, Illinois

-- and --

William P. Slattery
Dana S. Hardy
Hinkle, Hensley, Shanor & Martin, L.L.P.
Santa Fe, New Mexico

      *Attorneys for Defendants NXP Semiconductors USA, Inc., Philips Electronics North*
        *America Corporation, and Philips Semiconductors, Inc.*

Jeremy K. Harrison
Susan Miller Bisong
Modrall Sperling Roehl Harris & Sisk, P.A.
Albuquerque, New Mexico

      *Attorneys for Defendant Rinchem Company, Inc.*